UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIANE DENMARK,

      Plaintiff

v.

LIBERTY MUTUAL ASSURANCE
COMPANY OF BOSTON, THE GENRAD,
INC. LONG TERM DISABILITY PLAN,
THROUGH TERADYNE, INC., AS
SUCCESSOR FIDUCIARY

      Defendants

Civil Action No. 04-12261-DPW

**EXHIBITS A - F**
**TO**
**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION FOR**
**FOCUSED PRE-TRIAL DISCOVERY RELATING TO**
**THE SCOPE OF THE ADMINISTRATIVE RECORD**

1

EXHIBIT A

 

BRIGHAM AND
WOMEN'S HOSPITAL

HARVARD
MEDICAL SCHOOL

Department of Medicine
Division of Rheumatology/ Immunology/ Allergy
75 Francis Street
Boston, Massachusetts 02115

Peter H. Schur, M.D.
Professor of Medicine

E-mail: phschur@bics.bwh.harvard.edu
Tel: 617 732-5354, Fax: 732-5505

Denmark Diane
17587692

04/12/02

Thomas Goodman, M.D.
Primary Care Specialists
190 Groton Road
Ayer, MA 01432

Dear Dr. Goodman:

Thank you for asking me to see Ms. Denmark in consultation regarding her fibromyalgia. The patient says that she was referred to me to see another rheumatologist regarding disability in respect to her employment at Terradyne. The patient says that she has been working there for decades, and Terradyne's predecessor.

The patient says that she was diagnosed as having fibromyalgia 6 years ago, and in the last year, it has gotten worse to the point that, last October, she could no longer work because she was so tired. Now, she can no longer do housework, cook, needs help shopping, although she is still able to do her laundry. She is just tired all the

Patient: DENMARK,DIANE   MRN: 17587692(BWH)
Author: Peter H. Schur, M.D.                    Page 1 of 4

Status: Imported
Visit Date:04/12/2002

time, has lots of aches and pains all over her body, particularly her neck, upper back, and mid and low back. Also, she is able to fall asleep. She wakes up typically after a few hours, then has a lot of trouble going back to sleep and averages 4-6 hours of sleep at night. She says that her husband snores and that bothers her, and she also says that her husband says that she snores. The patient also has morning stiffness, which lasts all day, which wasn't helped very much by physical therapy. She is able to go on a treadmill just for a few minutes every day.

The patient has also had bouts of chest pain for the last 14 years. She says that she has had a number of stress tests, which she says have been normal, but her Holter monitor, she says, has shown skipped beats. She has been diagnosed as having angina and takes a lot of medications. She describes her angina attacks as a tightness in her precordial area, which sometimes may radiate to the left shoulder, which lasts no more than a few seconds. She also complains of swelling in her neck, by which she means the muscles are hard and tight. Also, complains of swelling in her calf and, on further description, she means they are tight.

She has had no joint swelling, no fevers, no rashes. Eyes are somewhat dry. Jaw sometimes feels like it has dislocated, and she has had chronic sinusitis with repeated infections. No history of thyroid disease, had pneumonia once, bronchitis a few times, and has been told of mitral valve prolapse, but no hypertension. She suffers from gastric reflux and gas, but no other GI problems. A urinary tract infection years ago. Pregnant twice, has a healthy 29 year old daughter and 34 year old son. Her periods stopped a year ago. Before that, they were irregular. She has never been on hormone replacement. She has been told that she has been anemic and actually had some transfusions. She is allergic to sulfonamides. No fractures. Only surgery was for removal of a right ovarian cyst.

FAMILY HISTORY: Mother has hypertension and arthritis. She knows nothing about her father. One sister has MS.

SOCIAL HISTORY: She doesn't smoke, doesn't drink. She was working as a quality control auditor and group leader.

CURRENT MEDICATIONS: Nitroglycerin 0.4 mg for the "angina," Pravachol 20 mg at night for high lipids, Claritin 10 mg a day for postnasal drip, verapamil 80 mg 3 times a day for tachycardia, a diuretic triamterene hydrochlorothiazide 37.5/25 1 per day for this swelling in her neck, hands, and legs, isosorbide 3 times a day, atenolol 25 mg per day, potassium chloride 10 mEq twice per day, Daypro 600 mg twice a day for "inflammation," nortriptyline 25 mg at night, which she has taken for 5 weeks and doesn't think that it has helped much. She was on previous trials of amitriptyline anywhere up to 20 mg at night, which made her groggy, and Flexeril, which, she says, doesn't help. Also, takes Flonase nasal spray periodically and receives vitamin B12 once a month. She was taking Centrum and iron.

PHYSICAL EXAMINATION: She is a well-nourished,

Patient: DENONIX,DIANE    MRN: 17587692(BRB)
Author: Peter H. Schur, M.D.
                                        Page 2 of 4

Status: Imported
Visit Date: 04/12/2002

well-developed white lady. Blood pressure is 130/80, pulse is 100 and regular, and respirations are 18. Skin: No rashes. No nodes in her neck. Mouth and throat clear. Chest: Clear to P&A. No CVA tenderness. Heart: No murmurs. Abdomen: No organ mass or tenderness, enlarged liver or spleen. Extremities: Her muscle tone is very poor throughout. She has about 30 tender points all over, including in her hands, wrists, elbows, around her shoulders, back, and neck, upper back, middle and low back, as well as lower extremity. On the other hand, examination of her fingers, hands, wrists, and elbows shows normal range of motion, no swelling, and no inflammation, but she has decreased abduction in both shoulders, more on the right than on left, and decreased rotation in both shoulders, some decreased rotation in both hips. I cannot not do straight leg raising on either leg because of back discomfort. She is somewhat uncomfortable over both greater trochanters. Knees show no crepitus, no synovial thickening on ankles, and no MTP squeeze tenderness.

The shoulder and pelvic girdle problems plus her history of an elevated sedimentation rate would make one suspect PMR, but I think most of this, in fact, as suggested by others, is classical fibromyalgia. I find a CRP much better for evaluating inflammation than a sedimentation rate, but given her morning stiffness, makes one suspect either PMR or, in fact, RA, and wonder what a rheumatoid factor, CRP, and x-rays of the hands might show.

I am not clear about her cardiac disease. I gather all of her stress tests have been normal, and wonder what her Holter monitor showed and whether it did indeed show runs of tachycard a requiring all the medications that she is taking. Chest pain lasting just a few seconds doesn't sound like angina to me. I bring this up only because she is taking a lot of medications, and I really wonder whether she needs so much. For instance, beta blockers have been associated with fatigue.

The patient clearly has a sleep disorder and, because she snores, one wonders about sleep apnea and would recommend a sleep study.

I certainly endorse the use of tricyclics to try and cut down pain and help her sleep. We find that some patients are resistant to it, but adding Prozac often is synergistic and would help. If that still doesn't help her sleep, I would put her on a sleeping medication like trazodone, so that she isn't so tired and, hopefully, can get some of her stamina back. However, she is severely deconditioned and clearly needs to get some exercise but probably won't until she sleeps.

Therefore, at least for the time being, she is clearly disabled not only from work, but being able to take care of her household. What I have suggested above is some modifications of her regime that hopefully will improve matters, so that she can get her stamina back and be able to go back to work. However, for now, until that is accomplished, which may take months, she is clearly

Patient: HENSRUK,DIANE   MRN: 17587692 (BWH)
Author: Peter H. Schur, M.D.
                                    Page 3 of 4

Status: Imported
Visit Date:04/12/2002

disabled.

Thank you again for asking me to see her. Please let me know if I can be of any further assistance.

Sincerely yours,

PS: Given the fact that she deteriorated with her menopause, one wonders whether hormone replacement might not be of benefit.

Peter Schur, M.D.

eScription document 1-472732 KFFocus

DD: 04/12/02
DT: 04/13/02
DV: 04/12/02

Patient: DEROSSK,DIANE  MRN: 17587692(BWB)
Author: Peter H. Schur, M.D.
                                      Page 4 of 4

Status: Imported
Visit Date:04/12/2002

AR00392

EXHIBIT B

# SOCIAL SECURITY ADMINISTRATION
## Office of Hearings and Appeals

## DECISION

**IN THE CASE OF**

**CLAIM FOR**

Period of Disability and
Disability Insurance Benefits

Diane S. Denmark
(Claimant)

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
(Social Security Number)

(Wage Earner)

## INTRODUCTION

On March 12, 2002, the claimant filed an application for Disability Insurance Benefits. The claim was denied initially and on reconsideration, and a request for hearing was timely filed on January 29, 2003. A hearing was subsequently held on December 9, 2003 in Boston, Massachusetts before Administrative Law Judge Paul S. Carter. Appearing and testifying at the hearing were the following: the claimant and Joseph Goodman, a Vocational Expert. The claimant alleges disability beginning October 2, 2001 due to her impairments. William Troupe, an attorney, represents the claimant in this matter.

The general issue is whether the claimant is entitled to a period of disability and Disability Insurance Benefits under sections 216(i) and 223 of the Social Security Act. The specific issue is whether she is under a disability, which is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for Disability Insurance Benefits, there is an additional issue pertaining to insured status. A review of the claimant's earnings record reveals that she has earned sufficient quarters of coverage to remain insured at least through the date of this decision.

## EVALUATION OF THE EVIDENCE

400000192

The claimant was born on May 28, 1947 and is currently 56 years of age. The claimant has an eighth grade education and has a past relevant work history as a quality control group leader.

AR00293

See Next Page

The claimant appeared and testified that she is 5 feet 1-1/2 inches tall and weighs approximately 163 pounds. The claimant indicated that she has not worked since her alleged onset date of October 2, 2001. The claimant stated that she had to stop working due to the effects of her fibromyalgia. The claimant stated that her fibromyalgia caused her to have severe pain throughout her body and to also suffer from fatigue. The claimant stated that she is treating with Dr Goodman and with Dr. Hack. Regarding her residual functional capacity the claimant indicated that she can only walk for 10 minutes because of severe pain in her back and legs. She stated that she could stand for approximately 30 minutes but would then need to rest with her feet elevated for 10 minutes. She stated that she could only sit for approximately 30 minutes. She stated that she has a limited ability to use her hands to hold objects because her hands become numb.

Also testifying at the hearing in the capacity of a vocational expert was Joseph Goodman. He indicated that claimant's position as a quality control group leader was listed in the Dictionary of Occupational Titles at Section 76.684-022 as being as light exertional level and being semi-skilled.

The medical evidence in this case contains a residual functional capacity evaluation from Dr. Terrence Hack which is dated March 28, 2003. Dr. Hack indicated that the claimant was suffering from fibromyalgia with the symptoms of multiple tender points, chronic fatigue, morning sickness, muscle weakness, irritable bowel syndrome, numbness and tingling, and carpel tunnel syndrome. The doctor noted that the claimant had pain throughout her body. Regarding the claimant's residual functional capacity, the doctor indicated that the claimant could only sit for 20 minutes at a time, stand for 30 minutes at a time, and could walk for 5 minutes at a time. The doctor indicated that the claimant could lift frequently only less than 10 pounds . The doctor concluded that the claimant was incapable of tolerating even low stress because of her pain and fatigue. (Exhibit 10-F).

The claimant has also been treating with Dr. Thomas Goodman who submitted a submitted a report dated February 3, 2003. Dr. Goodman indicated that claimant was suffering from fibromyalgia. He indicated that the claimant was disabled due to her condition and she was taking the medications of Taypro and Elavil. (Exhibit 12F, Page 31).

400000193

Dr. Goodman on March 13, 2003 completed a residual functional capacity questionnaire. He indicated that claimant was suffering from fibromyalgia. He stated that the claimant had the symptoms of multiple tender points, chronic fatigue, morning sickness, muscle weakness, swelling, irritable bowel syndrome, numbness and tingling and carpel tunnel syndrome. The doctor concluded that the claimant had pain throughout her body. The doctor indicated that the claimant, in an eight hour day, could sit for only about 2 hours total and could stand/walk for only 2 hours total. The doctor stated that the claimant could frequently only lift less than ten pounds. The doctor stated that the claimant would be incapable for even low stress jobs because of her pain and physical condition. (Exhibit 11F).

On October 15, 2003, Dr. Goodman stated in a more recent report that he had been caring for the claimant since October 9, 2001 and that she suffers from numerous medical problems including fibromyalgia syndrome, coronary artery disease, atrial fibrillation, B12 deficiency anemia,

gastrial esophageal reflux disease and diabetes mellitus. The doctor indicated that the claimant has the symptoms of chronic fatigue and generalized body pain. The doctor noted that her symptoms were chronic and unremitting. The doctor noted that the claimant described her frequent pain as constant with a deep achiness in her muscles. The doctor stated that her symptoms caused her ability to concentrate to be suboptimal and she was unable to tolerate even low levels of stress. The doctor indicated that he was treating the claimant with a combination of rest, low level exercise, anti inflammatory drugs and pain medications. (Exhibit 12F, Page 1).

The Social Security Regulations provide for a five-step sequential evaluation process for determining disability. (20 CFR §404.1520). At the first step of this process, the Administrative Law Judge must determine whether the claimant has engaged in substantial gainful activity since her alleged onset date. The Administrative Law Judges finds that the claimant has not engaged in a substantial gainful activity since her alleged onset date October 2, 2001.

At the second step of the process, the Administrative Law Judge must determine whether the claimant has a medically determinable impairment or combination of impairments which is "severe". A "severe" impairment is one which significantly limits an individual's physical and mental ability to perform basic work related activities. The Administrative Law Judge finds that the claimant suffers from fibromyalgia. The Administrative Law Judge finds that these impairments have more than a minimal effect upon the claimant's ability to perform basic work related activities and therefore they constitute "impairments". Social Security Ruling 96-3p.

At the third step of the sequential evaluation process, the Administrative Law Judge must determine whether the claimant's severe impairment of fibromyalgia meets the criteria of the section of the Listing of Impairments contained in Appendix 1, Subpart P, Regulation No. 4 or if the claimant's impairments is equivalent in severity to a Listing impairment. The Administrative Law Judge has reviewed all the evidence and concludes that the claimant's severe impairment does not meet or equal the criteria of any of the sections of the Listing of Impairments.

The Administrative Law Judge must then proceed to determine whether the claimant has the residual functional capacity to perform her past relevant work at the fourth step of the sequential evaluation process. If the claimant is no longer capable of performing her past work, the Administrative Law Judge must then determine whether there are other jobs existing in significant numbers in the national economy which the claimant can perform considering her residual functional capacity, age, education, and work experience.

**400000194**

The Administrative Law Judge after reviewing the medical evidence in this case finds that the claimant, due to her severe impairment of fibromyalgia suffers from severe restrictions in a residual functional capacity. The Administrative Law Judge finds that the claimant, due to her fibromyalgia could only lift less than 10 pounds frequently and would be unable to do any prolonged sitting, standing or walking. Furthermore, the Administrative Law Judge finds that the claimant's ability to concentrate and attend to work tasks would be greatly diminished due to her pain and fatigue caused by her fibromyalgia. The Administrative Law Judge finds that these limitations and restrictions have existed since the claimant's alleged onset date of disability of October 2, 2001.

Diane S. Denmark (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)                              Page 4 of 6

The claimant's past relevant work history has been as a quality control group leader, which job a vocational expert has noted to be of a light exertional level. The Administrative Law Judge finds that, due to the claimant's severe pain, limitations and restrictions, she is prevented her from performing her past relevant work.

Once and individual has established that she cannot perform her past relevant work because her impairments, the burden shifts to the Commissioner of the Social Security Administration to demonstrate that there are other jobs existing in the national economy which she can perform consistent with her medically determinable impairments, functional limitations, age, education and work experience.

The Administrative Law Judge finds that the claimant has the residual functional capacity for only less than a full range of sedentary work as of her alleged onset date of disability. This is due to the fact that the claimant's impairment of fibromyalgia causes the claimant to have an inability to do any prolonged sitting, standing or walking and only allow her to lift frequently less than 10 pounds. Due consideration has been given as to whether the claimant can perform her past relevant work and it has been determined that she can no longer perform this work in view of her exertional limitations.

The Administrative Law Judge finds that the claimant's compliance to her treating physicians of her pain, symptoms, and restrictions as well as her testimony at the heating regarding her condition are credible in light of the medical evidence in this case. Social Security Ruling 96-5p, 97-7p.

The Administrative Law Judge has considered the claimant's complaints regarding her symptoms and restrictions cause by her fibromyalgia. The Administrative Law Judge finds the when the claimant's pain and restrictions are viewed in accordance with <u>Avery v. Secretary of Health and Human Services</u> 797 F.2nd 19 that the claimant's condition is of a "disabling" degree.

The Administrative Law Judge concludes that the controlling weight of evidence in this case should be given to the reports of the claimant's treating physicians, Dr. Goodman and Dr. Hack, who are "treating sources" within the meaning of Section 404.1502 of Regulation No. 4, which provide a longitudinal view of the claimant's fibromyalgia condition and its treatment. Since these reports are well supported and not inconsistent with other substantial evidence in this case their opinion is accorded controlling evidentiary weight. Ruling 96-7p.

400000195

The Administrative Law Judge has given consideration to whether or not the claimant has the ability to make and adjustment to other work within the sedentary range provided for by Social Security Ruling 96-9p. Based upon the facts considered above, the Administrative Law Judge concludes that the claimant is found to have a substantial loss of ability necessary to perform a significant number of jobs identified in unskilled sedentary occupational base administratively noticed in Table No. 1 of Appendix 2, Subpart P, Regulations No. 4.

AR00296

See Next Page

Diane S. Denmark (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)                                    Page 5 of 6

The Administrative Law Judge also notes the fact that section 201.00(h) of Appendix 2, Subpart P, Regulations No. 4 directs that for a claimant who cannot even perform sedentary work, a finding of "disabled" would be appropriate.

The Administrative Law Judge notes that state agency physicians who are non-examining physicians are of the opinion that the claimant was "not disabled". However, these state agency physicians have not had the benefit of a face to face meeting with the claimant at the hearing as well as of the latest submitted evidence of the claimant's treating sources. The undersigned Administrative Law Judge has given consideration to the opinion of these state agency experts in evaluating this case. However, the Administrative Law Judge has reached the conclusion that the medical evidence demonstrates that the claimant was "disabled" from performing any gainful activity in the local and national economies. Social Security Ruling 96-6p.

Since the claimant in this case as her alleged onset date October 2, 2001, cannot perform even sedentary work or make an adjustment to other work within a sedentary range, the Administrative Law Judge finds that the claimant was "disabled" as of that date and the claimant's disability continues at least through the date of this decision.

## FINDINGS

After careful consideration of the entire record, the Administrative Law Judge makes the following findings:

1. The claimant meets the nondisability requirements for a period a disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits as of the established onset date.

2. The claimant has not engaged in substantial gainful activity since October 2, 2001.

3. The medical evidence establishes that the claimant has the following "severe" impairment: fibromyalgia.

4. The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

5. The claimant's assertions concerning her ability to work are credible.                **400000196**

6. The claimant retains the residual functional capacity to lift only less than 10 lbs. frequently and cannot do any prolonged sitting, standing or walking.

7. The claimant is unable to perform the requirements of her past relevant work.

8. The claimant's residual functional capacity for the full range of sedentary work is reduced by additional limitations.

9. On October 2, 2001, the claimant was closely approaching advanced age.

Diane S. Denmark (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)                                        Page 6 of 6

10. The claimant has a limited education.

11. The claimant has a semi-skilled work background.

12. Considering the claimant's residual functional capacity, she cannot make an adjustment to
    any work that exists in significant numbers in the national economy; this finding is based
    upon SSR 96-9p with jobs reduced to fewer than a significant number by the claimant's
    condition as well as section 201.00(h) of Appendix No.2.

13. The claimant has been under a disability, as defined in the Social Security Act, since
    October 2, 2001 (20 CFR §404.1520(f)).

## DECISION

It is the decision of the Administrative Law Judge that, based on the application filed on
March 12, 2002, the claimant is entitled to a period of disability commencing October 2, 2001,
and to Disability Insurance Benefits under sections 216(i) and 223, respectively, of the Social
Security Act.

PAUL S. CARTER
U.S. Administrative Law Judge

Date                    JAN 3 1 2004

400000197

AR00298

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

F I L E D
UNITED STATES DISTRICT COURT
DENVER, COLORADO

OCT 2 2 2004

GREGORY C. LANGHAM
CLERK

Civil Action No. 02-RB-41 (BNB)

WILLIAM C. MURRAY,

Plaintiff,

v.

LIBERTY LIFE ASSURANCE OF BOSTON, a Maine corporation, a member of the Liberty Mutual Group,

Defendant.

---

### ORDER

---

This matter is before me on the following motions:

(1)    **Plaintiff's Motion to Compel Discovery and for Determination of the Proper Scope of Discovery in the ERISA -Governed Case** (the "Motion to Compel"), filed September 27, 2004; and

(2)    The **Unopposed Renewed Motion for Extension of Time [etc.]** (the "Scheduling Motion"), filed September 24, 2004.

I held a hearing on the motions today and made rulings on the record, which are incorporated here. In summary and for the reasons stated on the record:

IT IS ORDERED that the Motion to Compel is GRANTED IN PART and DENIED IN PART as follows:

GRANTED with respect to Interrogatory No. 6 to require a response concerning a general description of all claims manuals and training and instructional documents available to the

personnel involved in handling the claim of William Murray from the time he sought disability from any occupation through the date of the denial of his claim;

GRANTED with respect to Production Request No. 3 to require production of the documents identified in the response to Interrogatory No. 6;

GRANTED with respect to Production Request No. 11 to require the production of all documents relating to financial bonuses, incentives, stock options, honors, awards or other compensation tied in any way to the approval or denial of claims;

GRANTED with respect to Production Request No. 12 to require the production of any awards, bonuses, rewards, incentives or remuneration, whether financial or not, awarded to any employee involved in the decision-making process of the claim of William Murray tied in any way to the approval or denial of claims;

GRANTED with respect to Production Request No. 13 to require production of any evaluations or appraisals based in any way on the approval or denial of claims;

GRANTED to allow deposition testimony consistent with the rulings above and to allow inquiry into objective facts concerning the denial process applied in connection with the claim of William Murray; and

DENIED in all other respects.

IT IS FURTHER ORDERED that the defendant shall make supplemental discovery consistent with this order on or before **November 22, 2004.**

IT IS FURTHER ORDERED that the Scheduling Motion is GRANTED. The case schedule is modified to the following extent:

2

**Discovery Cut-Off:**                    **March 4, 2005**
(All discovery must be completed by the discovery cut-off. All
written discovery must be served so that responses are due on or
before the discovery cut-off.)


**Dispositive Motions Deadline:**              **April 4, 2005**

**Final Pretrial Conference:**  A final pretrial conference will be held in this case

on **June 6, 2005**, at **9:00 a.m.**, in Courtroom 401, 4th floor, Alfred A. Arraj United States

Courthouse, 901 19th Street, Denver, Colorado.  A Final Pretrial Order shall be prepared by the

parties and submitted to the court no later than **May 30, 2005**.

DATED October 22, 2004.


BY THE COURT:

_____
United States Magistrate Judge

3

EXHIBIT D

*E W M*

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

THOMAS B. WRIGHT,                    )
                                     )       Civil Action No. 3:04-0327
                Plaintiff,           )       Judge Haynes
                                     )
v.                                   )
                                     )
METROPOLITAN LIFE INSURANCE          )
COMPANY,                             )
                                     )
                Defendant.           )

## MOTION TO BE ALLOWED ADDITIONAL LIMITED DISCOVERY

COMES NOW, Plaintiff Thomas B. Wright, pursuant to Fed. R.Civ. P. 26-36 and

moves this Honorable Court to allow Plaintiff limited discovery in the above-styled and

numbered cause. For the reasons stated in the attached memorandum of law, the Plaintiff

hereby files this motion to be allowed to take additional limited discovery in this ERISA

benefits case.

Attached to this motion and memorandum of law are three interrogatories that the

Plaintiff respectfully requests that the Court order the Defendant to respond to.

*ORDER*

*Based upon Darland v*
*Fortis, 317 F3d 516, 527-28*
*(6th Cir 2003) and Ladd v*
*ITT Corp, 148 F3d 753, 755*
*(7th Cir 1998) and the evidence*
*submitted by the Plaintiff, this*
*motion is GRANTED to allow*
*discovery on the relationship between*
*the Defendant, Elite Physicians and*
*NMR.*  *William J. Haynes USDJ  12-6-04*

Respectfully submitted,

ERIC BUCHANAN & ASSOCIATES, PLLC

BY: _____

Eric L. Buchanan (#018568)
R. Scott Wilson (#019661)
414 McCallie Avenue
Chattanooga  TN  37402
423/634-2506
FAX: 423/634-2505

*Attorneys For Plaintiff*

This document was entered on
the docket in compliance with
Rule 58 and / or Rule 79 (a).

FRCP of 08-6-04 by ____

17

13

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

THOMAS B. WRIGHT,          )
                                )      Civil Action No. 3:04-0327
          Plaintiff,          )      Judge Haynes
                                )
v.                                   )
                                )
METROPOLITAN LIFE INSURANCE    )
COMPANY,                     )
                                )
          Defendant.        )

## DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Metropolitan Life Insurance Company ("MetLife"), through its through its attorneys, Holland & Hart LLP, hereby submits the following Objections, Responses to Plaintiff's First Set of Interrogatories to Defendant, pursuant to the Federal Rules of Civil Procedure.

### PRELIMINARY STATEMENTS AND GENERAL OBJECTIONS

This is an action brought pursuant to the Employee Retirement Income Security Act of 1974 as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Accordingly, the Court's review of this action should be limited to the materials presented to the claims administrator at the time the decision concerning benefits was made. *See Sandoval v. Aetna Life & Cas. Co.*, 967 F.2d 377, 380-81 (10th Cir. 1992); *Woolsey v. Marion Labs., Inc.*, 934 F.2d 1452, 1460 (10th Cir. 1991); *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991); *Perry v. Simplicity Eng'g*, 900 F.2d 963, 967 (6th Cir. 1990); *Guthrie v. Hewlett-Packard Co. Employee Benefits Org.*, 773 F. Supp. 1414 (D. Colo. 1991). Under the ERISA-mandated scope of review, discovery is limited to determining whether the administrative record (*i.e.*, the claim file) is complete, and

any information not in the administrative record is irrelevant. *See, e.g., Macklin v. Retirement Plan for Employees of Kansas Gas & Elec. Co.*, 99 F.3d 1150 (Table), 1996 WL 579940 (10th Cir. 1996); *Caldwell v. Life Ins. Co. of North Am.*, 165 F.R.D. 633, 637 (D. Kan. 1996); *Hemphill v. Unisys Corp.*, 855 F. Supp. 1225, 1239 (D. Utah 1994); *Edens v. Central Benefits Nat'l Life Ins. Co.*, 900 F. Supp. 928, 931 (W.D. Tenn. 1995). Accordingly, MetLife objects to any request for information herein, or any other discovery, which seeks information other than the identification of the administrative record or verification of its completeness. Any other request for information seeks information not relevant to the issues in this case and is not reasonably calculated to lead to the discovery of admissible evidence.

To the extent that any Interrogatory can be interpreted as requiring MetLife to identify documents or information that may be in the possession, custody or control of Plaintiffs or others and have not yet been made available to or are otherwise not in possession of MetLife or are equally accessible to Plaintiffs, MetLife objects thereto.

A partial response by MetLife to any Interrogatory as set forth below is not deemed to be a waiver by MetLife of its objection thereto (if any) or to the right of MetLife to object to additional, supplemental, or further requests for production, or parts thereof.

These responses are to the best of MetLife's present ability and information. MetLife reserves the right to supplement these responses after completion of discovery and further reserves the right to introduce evidence at the time of trial based upon information and/or documents located, developed, or discovered subsequent to the date hereof, which evidence may supplement, amplify, modify or be in conflict with the following answers which are based upon present information only.

**Interrogatory No. 1:**

For all of the physicians who evaluated Plaintiff's claim for benefits, or examined his medical records, or otherwise provided an opinion at the request of MetLife in this case, please state whether said physician was an employee of MetLife, or a related company, or, if the physician was not an employee of MetLife, please state how many records wee reviewed by said physician on behalf of MetLife.

**Response to Interrogatory No.1:**

MetLife objects to this Interrogatory to the extent that it varies from the Interrogatory the Court instructed Plaintiff to submit to MetLife. Specifically, with respect to physicians who evaluated Plaintiff's claim for benefits, but are not employees of MetLife, the Court ordered Plaintiff to submit an Interrogatory inquiring (a) how long such physician has acted as an independent contractor to MetLife, and (b) how many patients MetLife has referred to such physician. Subject to this objection, MetLife responds as follows:

Amy Hopkins, M.D., Board Certified in Internal Medicine and Occupational Medicine, is not an employee of MetLife. Dr. Hopkins is an independent physician consultant retained by MetLife to review Mr. Wright's medical records and provide her opinion regarding Mr. Wright's functional ability. Dr. Hopkins has provided consulting services to MetLife in the form of medical records reviews since September 1999. MetLife is presently reviewing its records to provide a supplemental response regarding the number of files reviewed by Dr. Hopkins on behalf of MetLife.

Michael J. Rosenberg, M.D., Board Certified in Internal Medicine, Cardiology, and Interventional Cardiology, is not an employee of MetLife. Dr. Rosenberg is an independent physician consultant who reviewed Mr. Wright's medical records and provided his opinion

regarding Mr. Wright's functional ability. MetLife retained Elite Physicians, Ltd., a physician referral service, to have a Board Certified cardiologist conduct a medical records review of Mr. Wright's file. Elite Physicians, Ltd. referred Mr. Wright's file to Dr. Rosenberg. MetLife does not maintain records regarding the number of files Dr. Rosenberg may have reviewed for MetLife because the referral was made, and any services paid for, through Elite Physicians, Ltd.

Gary P. Greenhood, M.D., Board Certified in Internal Medicine and Infectious Disease, is not an employee of MetLife. Dr. Greenhood is an independent physician consultant who reviewed Mr. Wright's medical records and provided his opinion regarding Mr. Wright's functional ability. MetLife retained Elite Physicians, Ltd., a physician referral service, to have a physician Board Certified in internal medicine and infectious disease conduct a medical records review of Mr. Wright's file. Elite Physicians, Ltd. referred Mr. Wright's file to Dr. Greenhood. MetLife does not maintain records regarding the number of files Dr. Greenhood may have reviewed for MetLife through Elite Physicians because the referral was made, and any services paid for, through Elite Physicians, Ltd. Dr. Greenhood also has been retained directly by MetLife to provide consulting services to MetLife in the form of medical records reviews with respect to other claimants (although not with respect to Mr. Wright).

Robert G. Slack, M.D., Board Certified in Psychiatry and Neurology, is not an employee of MetLife. Dr. Slack is an independent physician consultant who reviewed Mr. Wright's medical records and provided his opinion regarding Mr. Wright's functional ability and related matters. MetLife retained Elite Physicians, Ltd., a physician referral service, to have a Board Certified psychiatrist conduct a medical records review of Mr. Wright's file. Elite Physicians, Ltd. referred Mr. Wright's file to Dr. Slack. MetLife does not maintain records regarding the

4

number of files Dr. Slack may have reviewed for MetLife because the referral was made, and any services paid for, through Elite Physicians, Ltd.

**Supplemental Response to Interrogatory No. 1:**

MetLife incorporates its objections and responses set forth in its Response to Interrogatory No. 1. MetLife further states that Amy Hopkins, M.D., has reviewed an average of four to five hundred files a year on behalf of MetLife since September 1999.

## OATH

STATE OF NEW YORK

COUNTY OF QUEENS

Personally appeared before me, the undersigned, a Notary Public in and for said state and county, Laura Sullivan, who acknowledged that (s)he is a Business Consultant of Metropolitan Life Insurance Company, and that the answers contained in the foregoing interrogatories are true and correct to the best of her information, knowledge and belief.

Metropolitan Life Insurance Company

By: _____

Sworn to and subscribed before me this
10th day of _September_ 2004.

_____
NOTARY PUBLIC
My Commission Expires:_____

LAWRENCE WOLFF
Notary Public, State of New York
No. 4921522
Qualified in Queens County
My Commission Expires February 01, 2006

5

Respectfully submitted,

Joel T. Galanter
Stokes, Bartholomew, Evans & Petree P.A.
424 Church Street, Suite 2800
Nashville, Tennessee 37219
(615) 259-1450
Attorneys for Defendant
Metropolitan Life Insurance Company

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this ___ th day of September 2004, a copy of the above was sent by U.S. Mail to Eric L. Buchanan at 414 McCallie Avenue, Chattanooga, Tennessee 37402, and by facsimile at 423-634-2505.

Joel Galanter

EXHIBIT E

1

47U8WINC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARK WINKLER,

4                    Plaintiff,

5            v.                              03 Cv. 9656 (SAS)

6   METROPOLITAN LIFE INSURANCE CO.,

7                    Defendant.

8   ------------------------------x

9                                           July 30, 2004
                                            10:25 a.m.
10
    Before:
11
                    HON. SHIRA A. SCHEINDLIN
12
                                            District Judge
13
                         APPEARANCES
14
    SCOTT M. RIEMER
15       Attorney for Plaintiff

16  LESTER SCHWAB KATZ & DWYER
         Attorneys for Defendant
17  BY:  ALLAN M. MARCUS

18

19

20

21

22

23

24

25

47U8WINC

1              (Case called)

2              THE COURT: So you got the last decision.  And you

3      know, therefore, there is going to be a deferential standard of

4      view.

5              Given that, do you want to either try to settle this

6      case or go through with that deferential standard of review?

7              MR. RIEMER: Your Honor, I would definitely entertain

8      settlement talks.  But, also, we haven't -- before we made the

9      motion, we had outstanding discovery issues.

10             THE COURT: Of course, it's affected by the standard

11     of view.

12             MR. RIEMER: I understand that.  I wanted some time to

13     pose new discovery demands and then a time frame for him to

14     reply, and we can probably work out a lot of our differences,

15     but we haven't had discovery yet.

16             THE COURT: All right.  What I am suggesting to you,

17     when you understand the standard of review, it seems to me it's

18     generally on the administrative record.  What more do we need

19     outside the record?

20             MR. RIEMER: It is, your Honor.  You need discovery as

21     to what constitutes the administrative record.

22             THE COURT: Mr. Marcus, why don't you just sort of

23     produce that?

24             MR. MARCUS: It already has been produced, your Honor.

25             MR. RIEMER: Your Honor, MetLife doesn't have carte

47U8WINC

1    blanche to tell us what the administrative record is.

2            THE COURT:  Right.  You have what there is.  What else

3    do you think there is?

4            MR. RIEMER:  They have hired several outside

5    consultants who did medical reviews, and we don't have the

6    files.

7            THE COURT:  Were those reviews considered by the

8    administrators?

9            MR. RIEMER:  Absolutely.

10           THE COURT:  Mr. Marcus, were they?

11           MR. MARCUS:  Yes.

12           THE COURT:  Have you produced those?

13           MR. MARCUS:  Yes, they are part of the administrative

14   record.

15           THE COURT:  Folks, have you discussed this with each

16   other before you're taking my time?

17           MR. RIEMER:  I am not asking for their reports.  I am

18   asking for their files.  They have not produced their files.

19           THE COURT:  I have this funny feeling you have not

20   conversed directly with each other before bringing the dispute

21   to me.  Because every time I turn to Mr. Marcus, he says, but

22   they have that.

23           MR. RIEMER:  We were not ready to --

24           THE COURT:  I am ready.  The case is getting old.

25   It's 03 CIV.

47U8WINC

1      Why don't you go into the jury room and discuss

2  everything while I am doing a criminal arraignment.  Instead of

3  scheduling another conference, another date to discuss your

4  discovery demands, go sit in the jury room, tell him what you

5  want, see what he responds, get all organized, and come back

6  and see me.  We will make progress today, not another day.

7      MR. RIEMER:  I know, your Honor.  The demands that

8  have been filed so far you limited to issues --

9      THE COURT:  I understand.  We were trying to determine

10  the standard of review.  Now we know it's a limited standard of

11  review, namely, just the administrative record.  There is no

12  reason, since you both came down here, go into the jury room,

13  talk this through, tell me if there is a dispute left after you

14  talk.  That way you can also discuss whether you should have

15  settlement talks.

16      Didn't I refer the case to the magistrate judge?

17      MR. MARCUS:  Not yet.

18      THE COURT:  I always do.  I am surprised if I didn't

19  here, but I will do that for you to be seen immediately.  OK?

20      Immediately does not mean today, but the magistrate

21  judge will call you in.

22      MR. MARCUS:  If I may say, your Honor, Mr. Riemer has

23  already posed discovery requests, both documents and

24  interrogatories, and we responded.

25      THE COURT:  He seems to think there is more coming.

47U8WINC

1   He seems to think there is a dispute.  That's why I am

2   suggesting, go into the jury room, talk to each other for 10,

3   15 minutes.  I will be done here, I have one criminal case, and

4   then we will go over it and see what is left and talk about it.

5          In the meantime, I will fill out a referral to the

6   magistrate judge.  When do you think you will be ready to go?

7          MR. RIEMER:  For a settlement conference?

8          THE COURT:  Yes.  Do you want to do it in August?

9          MR. RIEMER:  We were actually talking about our

10  vacation plans.

11         THE COURT:  Do you want to do it in September?

12         MR. MARCUS:  Actually, I am on vacation the first part

13  of September until the 18th.

14         THE COURT:  After September 18.

15         MR. RIEMER:  Right.

16         THE COURT:  Fine.  Why don't you go use our jury room

17  for a few minutes.  Hopefully you will be able to come back

18  with more pointed disputes or differences, and we will proceed

19  from there.  OK?

20         (Recess)

21         THE COURT:  Mr. Riemer, Mr. Marcus, have you had a

22  chance to talk a little bit?

23         MR. RIEMER:  Yes, we have.

24         THE COURT:  Have you done anything at all?

25         MR. RIEMER:  We have a handful of disputes.

47U8WINC

1        THE COURT:  All right.  I think that's better than

2   where we were.

3        MR. RIEMER:  Your Honor, I would request that I be

4   able to make a motion for these disputes because --

5        THE COURT:  No.  Do you think I permit discovery

6   motions?  Why would I do that?  I would be inundated.  People

7   stand up, tell me the story, and I decide.  No motions.  It's

8   not going to happen.  I do not take discovery motions in civil

9   cases.  I would never get any sleep if I allowed people to

10  write discovery motions.

11       MR. RIEMER:  Can we have it referred to the magistrate

12  then?

13       THE COURT:  What's wrong with me?  Tell me the

14  problem.

15       MR. RIEMER:  I want to be able to present to you in a

16  coherent fashion the case law.

17       THE COURT:  Are you saying you're incoherent?

18       MR. RIEMER:  No.  I am saying I am not prepared at

19  this moment to give you case cites.

20       THE COURT:  Tell me what you want.

21       Please, Mr. Riemer.

22       MR. RIEMER:  I will go through what we want.

23       THE COURT:  Thank you.

24       MR. RIEMER:  There were three physicians that reviewed

25  my client's medical records on behalf of MetLife.  They don't

47U8WINC

 1   work for MetLife, but MetLife won't tell me who they work for.

 2   They won't give me their CVs.  They won't tell me how many

 3   times in the past they were hired by MetLife.  They won't give

 4   me the files that these individuals hold, and they won't give

 5   me --

 6           THE COURT:  Relating to your client?

 7           MR. RIEMER:  Right.  And they won't give me the

 8   communications that they have had with these individuals.

 9           I submit that this is very relevant because their

10   determination has to be supported by substantial evidence, and

11   there is nothing in the record now that defines what the

12   qualifications of these doctors are, if any, and whether they

13   have an institutional bias.  I feel that I am entitled for

14   discovery into that.

15           THE COURT:  Your position, Mr. Marcus?

16           MR. MARCUS:  My position is the doctors' reports are

17   already in the record.

18           THE COURT:  Who are they?  They have no employer, is

19   that right?  Are they employed by anybody?

20           MR. MARCUS:  They are not employed by MetLife.

21           THE COURT:  Are they employed by anybody?  Are they

22   independent?

23           MR. MARCUS:  They are independent physicians, as far

24   as I know.

25           THE COURT:  They are in private practice around town,

47U8WINC

1    Dr. So-and-So's office, as far as you know.

2            Would you please check into that and see if they have

3    an employer?  I doubt it, but find out if they have an

4    employer.

5            CV.  Why shouldn't the CV be produced?  It's always

6    nice to know who the doctor is.  I went to this medical school

7    this year.  You should get a CV of each doctor.

8            Those are the two easy ones.

9            He also wants to know how often they are used by

10   MetLife.  Do you know the answer, whether they are routinely

11   consulted, in other words, MetLife has a list of 100 physicians

12   that they send out?

13           MR. MARCUS:  I am not certain.  I believe they have

14   been consulted on other occasions, but I don't know the extent.

15           THE COURT:  Could you look into that, please, and find

16   out if that's all they do?  Is their entire practice a matter

17   of consulting with MetLife, or they just do that on 10 percent

18   of the time or 5 percent of the time?  Do they consult with

19   other insurance companies?  Do they have a full-time practice

20   and do this on the side?  I think that's a fair question.

21           Finally, the last one, what is this thing about

22   MetLife's communications with them?  What does that mean?

23           MR. RIEMER:  I would like to know, there is evidently

24   an individual at MetLife who sends the files out to them and

25   has communications with them about their report.  I would like

47U8WINC

1   to have any records that there are.  I consider that part of

2   the administrative record.

3           THE COURT:  I suspect there is a transmittal letter.

4   Here is the file, review it and let us know.

5           MR. MARCUS:  It's already in the administrative

6   record, your Honor.

7           MR. RIEMER:  That may be.  There may be communications

8   in addition to that saying, Oh, we don't like this report,

9   change this.  They may not have given that to me.  I am

10  entitled to know whether that is there or not.

11          THE COURT:  Mr. Marcus, what I would ask you to do on

12  that, you do not need to turn it over, but you need to put it

13  together.  See if there is any correspondence between MetLife

14  and the consultants, transmittal letters or a smoking gun that

15  he thinks exists.  Find out what there is, put it together, and

16  then hold on to it.  If need be, if there is anything, I could

17  look at it in camera and make decisions.  Or you might report

18  that there is nothing other than the transmittals and you're

19  happy to turn over the transmittals and that's the end of the

20  issue.  But you can't know until you put it together.

21          You need to communicate with your client, whoever it

22  is in your client's office who has contact with the consulting

23  physicians.  I am sure you do this all the time.  All the time

24  they send out the files to a doctor for a report.  It's pretty

25  standard stuff.  Whatever they have, they have.  Tell them to

47U8WINC

1    put it together.  You may be so unconcerned that you say, it's

2    a bunch of transmittal letters, here it is.  Or you may say, we

3    have found things that we don't think he is entitled to, you

4    want to look at it, go ahead and look at it, but we don't think

5    he is entitled to it.  There is no point in ruling in advance

6    when there may be nothing to worry about.

7         MR. MARCUS:  I believe this material is already in the

8    administrative record.

9         THE COURT:  Saying it over again is not helpful.  Go

10   back to the client and just be sure.  Do a number of things.

11   Check whether these people are employed by anyone.  That's

12   number one.  Secondly, get a CV for each doctor.  That's

13   required.  Number three, find out what their practice is.  Is

14   all they do consulting for MetLife or are they in practice and

15   do this a percentage of time?  How long have they been

16   consulting for MetLife?  And then, finally, assure yourself

17   what the paper record of communications is, and we will see

18   what it is.  Maybe it's nothing but transmittals.

19        Now what is it, Mr. Riemer?

20        MR. RIEMER:  Each doctor probably has a file.

21        THE COURT:  On this case?

22        MR. RIEMER:  On this case.  I want a copy of that

23   file.  I think that should be part of the administrative

24   record.

25        THE COURT:  Go ahead.

47U8WINC

1    MR. MARCUS:  I do not think he is entitled to get the

2    file of an outside physician.

3    THE COURT:  I think he is entitled to know what that

4    physician reviewed.  It may be in the report.

5    MR. MARCUS:  It's reflected in the report.

6    THE COURT:  It probably is.  I think you need to

7    double-check that again.  It's easy to find out for yourself

8    whether the doctor has a file on the case.  Take a look at it.

9    It may be nothing other than the material that he cited in the

10   report.  I reviewed the medical records I received.  I reviewed

11   the records from MetLife.

12   We need to make this go smoothly and quickly.  Instead

13   of fighting, do it.  Take a look at it.  See if these doctors

14   have a file that they keep on every case that is referred.

15   MR. MARCUS:  If I could just make one point?  These

16   questions are ultimately directed, I guess, as to whether

17   MetLife had a conflict of interest.  I don't see that exploring

18   the doctors' files is relevant to this.

19   THE COURT:  He thinks it's worse than that.  He thinks

20   if he is persistent enough, he will uncover evidence of real

21   bias.  Maybe somebody at MetLife said, I don't like this first

22   report, fix it and make it different.  That's the kind of

23   smoking gun he is talking about.  I am sure it has happened in

24   the history of the world, by the way.

25   MR. RIEMER:  They are going to say -- one of the

47U8WINC

1    doctor's names is Dr. Greenhood, and I know from other cases, I

2    have seen his name.

3            THE COURT:  You know it's Dr. Greenhood?

4            MR. RIEMER:  Yes.  I know he is around.  If they could

5    say, Well, we have hired Dr. Greenhood a hundred times, or

6    whatever it is, and if they could say, yes, 99 percent of the

7    time he said that the person was not disabled, it would show a

8    bias that this person is not 50/50.  This is somebody who

9    always says --

10           THE COURT:  It may be that the disability claims

11   aren't 50/50.  That's the problem with using statistics and

12   thinking that it is a science.  Let's say out of every 100

13   people he sees, 99 are not disabled.  For all I know, 99 are

14   not disabled.  It doesn't show bias because the figure could be

15   99 out of 100.

16           MR. MARCUS:  You have to look at the quality of the

17   reports that are presented in the administrative file on this

18   case.

19           THE COURT:  What is fair is to know whether their

20   entire workload is doing consults for MetLife.

21           I think you need to realize that it is a deferential

22   standard of review.

23           I have signed a referral today to the magistrate

24   judge.  I have given you most of the discovery you have asked

25   for.

47U8WINC

1          MR. RIEMER:  That was just the first item.  We have a
2  few others.
3          THE COURT:  I thought that was four items.
4          What else do you want, Mr. Riemer?
5          MR. RIEMER:  They have a claims manual that tells
6  their claims reviewers how to handle cases.  I wanted copies of
7  the portion of that manual dealing with claimants that have HIV
8  and depression.
9          THE COURT:  You don't know that already?  You say they
10  have a manual.  You have never seen it?
11          MR. RIEMER:  I have seen it in other cases.  I want it
12  in this case, and I want the sections that deal with these
13  illnesses.
14          THE COURT:  If you have seen it before --
15          MR. RIEMER:  I haven't seen it on these illnesses.
16          THE COURT:  You have seen this manual.  It's been
17  produced to you in other cases.
18          Apparently MetLife doesn't fight that request.  Go
19  find the sections dealing with HIV and depression so he knows
20  the standard applied.
21          MR. MARCUS:  We would like a confidentiality agreement
22  to prevent this from being --
23          THE COURT:  Fine.
24          MR. RIEMER:  I have no problem with that.
25          MR. MARCUS:  We would like the request tailored very

47U8WINC

1    narrowly.

2          THE COURT:  Fair enough.  Write it out.  Tailored

3    narrowly and negotiate a confidentiality agreement.

4          Next, Mr. Riemer.

5          MR. RIEMER:  I know that MetLife has a computer

6    system, and there are various screens on the computer system

7    showing information.  I would like a printout of every screen

8    in the computer system relating to my client so that I could

9    see what is in their system.

10          MR. MARCUS:  As I understand it, what he is referring

11    to is an old computer system.  It may or may not apply to this

12    particular claim.  I can look into that, and if it does, I will

13    supply it.

14          THE COURT:  OK.

15          MR. RIEMER:  There was an old computer system and that

16    was replaced with a newer one and there are still screen

17    prints.

18          MR. MARCUS:  Most likely it's extremely duplicative.

19          THE COURT:  You will look into it?

20          MR. MARCUS:  I will look into it.

21          THE COURT:  All right.

22          MR. RIEMER:  Also, from the claim file, I don't know

23    who made the decision to deny the claim, who at MetLife.

24          THE COURT:  It doesn't say?

25          MR. MARCUS:  The letters are signed.

47U8WINC

1          THE COURT:  The letters are signed.

2          MR. RIEMER:  It doesn't tell me who made the decision.

3          THE COURT:  I don't know what that means.  The letters

4     are signed.

5          MR. RIEMER:  The letter is a letter to my client.

6          THE COURT:  Signed by someone.

7          MR. RIEMER:  It doesn't tell me who made the decision.

8          THE COURT:  The person who signed it was not the

9     decision-maker?

10          MR. RIEMER:  I don't know if they were or not.

11          THE COURT:  Who was the decision-maker on this claim,

12     Mr. Marcus, do you know?

13          Was it a committee?  Who denies claims?  This is

14     pretty standard stuff.  Who denies claims?

15          MR. MARCUS:  There is a claim appeals specialist

16     usually who reviews the claim and makes a decision.

17          THE COURT:  Who was it here, do you know?

18          MR. MARCUS:  It's in the file.  I think the name was

19     Fern Conroy, I believe, if my memory serves me correctly.  She

20     may consult with other people, but I don't see what that

21     matters.

22          THE COURT:  He is entitled to know the decision-maker.

23     If that's the decision-maker, that's the decision-maker.

24          MR. RIEMER:  I would like to take her deposition.

25          MR. MARCUS:  I object, your Honor.  It's not

47U8WINC

1    necessary.  What does he hope to prove?  He has the

2    administrative file.  He has the decision.  He has the basis of

3    the decision.

4         MR. RIEMER:  Let me explain.  The reason why I want

5    her deposition is that this is the person at MetLife who

6    basically made sure that ERISA's requirements were satisfied

7    with regard to my client.  My client has a right for a full and

8    fair review and MetLife has a fiduciary duty to investigate the

9    claim, and I would just like to --

10         THE COURT:  You are not entitled to the

11    decision-maker's deposition.  That's my ruling.  You are

12    entitled to review the administrative record, and I am getting

13    for you much of the detail you have asked for.  But you are not

14    entitled to depose the decision-maker.

15         If you have case law to submit to the contrary, write

16    me a letter, a short letter.  My instinct says no way are you

17    entitled to depose decision-makers on this level of review on

18    an administrative record.  We do it all the time.  I don't

19    allow depositions.

20         MR. RIEMER:  Can you give me a date to do that?

21    Because there is a Second Circuit case that allowed it.

22         THE COURT:  Is it a controlling Second Circuit case or

23    did it say the judge did not abuse her discretion in permitting

24    the deposition?  There is a tremendous difference.  People have

25    an inability to read appellate law.  It is one thing to say

47U8WINC

1    it's not an abuse of discretion to have allowed it.  It is

2    another thing to require it.

3         I have grave doubts that the circuit requires the

4    deposition of a decision-maker in every review of an

5    administrative record.  That some judge didn't just abuse his

6    or her discretion, that's nice.  I am sure I would rule the

7    same way.  I am not allowing the deposition.  If it's that

8    simple, if you know the case, send it in this afternoon.  Here

9    is the citation I mentioned before.

10        MR. RIEMER:  I don't want to misrepresent to you.  It

11   doesn't say that.

12        THE COURT:  Just say, Here is the citation I mentioned

13   in court.

14        MR. RIEMER:  Obviously it's in your discretion.

15        THE COURT:  That's what I thought.  Just send in the

16   citation.  I am happy to read it.

17        MR. RIEMER:  OK.

18        THE COURT:  Anything further?

19        Why don't we start talking about time frame for this

20   and then the briefing of the motion.  If you can't settle this

21   case, then you need to brief the motion, the review, so that

22   you can take your case, if you think you should, to the

23   circuit.  If you think the decision on the level of review is

24   erroneous, you can't get there until you finalize the judgment

25   here.

47U8WINC

 1            MR. RIEMER:  I understand that.

 2            THE COURT:  Let's do it.  Let's say this discovery

 3    that you're seeking might take six weeks or so?

 4            MR. RIEMER:  He has to tell me.

 5            THE COURT:  That's the most.  I know it's summer.

 6    It's hard to get anything done.  I would surely think by

 7    mid-September it's all done.

 8            Assuming it's done, you're the movant on the final

 9    motion.  You want to say that the decision is erroneous and it

10    should be set aside.  So you're the movant.  When do you want

11    to serve your papers, assuming you have all this information by

12    mid-September?

13            MR. RIEMER:  By October 15?  I don't have a calendar.

14            THE COURT:  That's fine.  That's a Friday.

15            How long would you like to respond, Mr. Marcus?

16            MR. MARCUS:  Of course I would like to make a motion.

17            THE COURT:  Cross-motion?

18            MR. MARCUS:  For summary judgment as well.

19            THE COURT:  All right.  You can do it in response.

20    You respond and say, and by the way, we are moving on the same

21    record.

22            MR. MARCUS:  By November 15.

23            THE COURT:  And reply?

24            MR. RIEMER:  If I could have two weeks after that?

25            THE COURT:  Right.  That would take us to November 29,

47U8WINC

1   and then the case will be fully submitted, as far as I am

2   concerned.

3           All right.  You can go ahead and send me that case.  I

4   am happy to look at it.

5           I urge you to try to consider whether this particular

6   case could be settled.

7           OK.  Thank you.

8           (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# LESTER SCHWAB KATZ & DWYER, LLP
## 120 BROADWAY
### NEW YORK, N.Y. 10271-0071

(212) 964-6611
FAX: (212) 267-5916

**ALLAN M. MARCUS**
Writer's Direct Dial: (212) 341-4241
E-Mail: amarcus@lskdnylaw.com

NEW JERSEY OFFICE
24 LACKAWANNA PLAZA
MILLBURN, N.J. 07041
(973) 912-9501

October 26, 2004

**Via Hand Delivery**

Scott M. Riemer, Esq.
60 East 42nd Street, 47th Floor
New York, NY 10165

Re:    **Mark Winkler v. Metropolitan Life Insurance Company**
       **03 CV 9656 (SAS)(AJP)**

Dear Scott:

In accordance with the Court's Order of July 30, 2004, defendant Metropolitan Life Insurance Company ("MetLife") hereby produces the following documents:

1.    MetLife's group policy no. 91630-G. (Exhibit A)

2.    Computer screen prints related to plaintiff's claim. (Exhibit B)

3.    Curriculum vitae for MetLife's independent physician consultants ("IPCs"), Dr. Greenhood, Dr. Kilburn and Dr. Shallcross. (Exhibit C)

4.    Sections of MetLife's claims manual that refer to HIV and depression. (Exhibit D)  Since these are confidential, proprietary materials, I have enclosed a Confidentiality Stipulation and Order for you to execute and return to me.

5.    MetLife's communications with the IPCs relating to plaintiff's claim are found in the claim file already produced to plaintiff.  MetLife has not found any other such communications.

6.    MetLife inquired of the IPCs as to whether they maintained any separate files with respect to plaintiff's claim.  They each responded that they do not maintain any separate files.

In addition, MetLife provides the following information pursuant to the Court's Order:

1.    Affiliations of IPCs:  None of the IPCs are MetLife employees.  As reflected in their CVs, Dr. Greenhood is an urgent care physician affiliated with Kaiser Permanente in Atlanta, Georgia, as well as doing consulting work.  Dr. Kilburn is employed as Medical Director for Prest & Associates in Madison, Wisconsin and

LESTER SCHWAB KATZ & DWYER, LLP

Scott M. Riemer, Esq.
October 26, 2004
Page 2

Atlanta, Georgia, and also does independent consulting work. Dr. Shallcross is in private practice in Atlanta, Georgia, where he is associated with several area hospitals. He also does consulting work for various insurance companies and for the Social Security Administration.

2.  <u>Consulting for MetLife as Percentage of IPC's Workload</u>:  MetLife inquired of the IPCs as to approximately what percentage of their current workload is consulting for MetLife. Their responses were: Dr. Greenhood: 80%; Dr. Kilburn: 33%; Dr. Shallcross: 40%.

3.  <u>Frequency of MetLife's Consultation with IPC's</u>:  MetLife found that it consulted Dr. Greenhood 1,536 times on disability claims in 2003; Dr. Kilburn 414 times on disability claims in 2003; Dr. Shallcross 287 times on disability claims in 2003.

4.  <u>MetLife's Decision-Maker</u>:  The MetLife employees who made the final decision to deny plaintiff's benefit claim were Ferne Conroy and Ann Gunby.

Very truly yours,

ALLAN M. MARCUS
Of Counsel

AMM:dg/645373
Enclosure

EXHIBIT F

## NMR CASE LIST FOUND ON WESTLAW

### Cases Involving Network Medical Review

(1)     *Adamson v. Metropolitan Life Ins. Co.*, 2001 WL 111227 (D.Md. 2001)

(2)     *Aloisi v. Lockheed Martin, Inc.*, 321 F.3d 551 (6th Cir. 2003)

(3)     *Austin v. Continental Cas. Co.*, 216 F.Sup2d 550 (W.D.N.C. 2002)

(4)     *Baker v. Abo*, 2003 WL 21639151 (D.Minn. 2003)

(5)     *Bishop v. Metropolitan Life Ins. Co.*, 2003 WL 21659439 (6th Cir. 2003)

(6)     *Bismark-Thurbush v. Metropolitan Life/Disability Ins. Co.*, 2004 WL 1093611 (N.D.Ill. 2004)

(7)     *Bolan v. Barnhart*, 212 F.Supp.2s 1248 (D.Kan. 2002)

(8)     *Brooks v. North American Philips Corp.*, 142 F.Supp.2d 407 (W.D.N.Y. 2001)

(9)     *Caraveo v. U.S. E.E.O.C.*, 2004 WL 608590 (2nd Cir. 2004)

(10)    *Chandler v. Raytheon Employees Disability Trust*, 53 F.Supp.2d 84 (D.Mass. 1999)

(11)    *Coday v. Metropolitan Life Ins. Co.*, 193 F.Supp.2d 1332 (D.Kan. 2002)

(12)    *Coffman v. Metropolitan Life Ins. Co.*, 218 F. Supp.2d 715 (S.D.W.Va. 2002)

(13)    *Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793 (8th Cir. 2002)

(14)    *Cook v. New York Times Co., Long-Term Disability Plan*, 2004 WL 203111 (S.D.N.Y. 2004)

(15)    *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516 (6th Cir. 2003)

(16)    *Dew v. Metropolitan Life Ins. Co.*, 69 F.Supp.2d 898 (S.D.Tex. 1999)

(17)    *De Dios Cortse v. MetLife, Inc.*, 122 F.Supp.2d 121 (D.Puerto Rico 2000)

(18)    *Downey v. Aetna Life Ins. Co./U.S. Healthcare*, 2003 WL 21135710 (D.Mass. 2003)

(19)    *Dreiman v. PSI Energy, Inc.*, 2002 WL 31427445 (S.D.Ind. 2002)

(20)   *Dubuc v. Whitney Nat. Bank Plan*, 199 WL 4919 (E.D.La. 1999)

(21)   *Durr v. Metropolitan Life Ins. Co.*, 15 F.Supp.2d 205 (D.Conn. 1998)

(22)   *Dusablon v. Raytheon Corp.*, 1997 WL 683846 (D.Mass. 1997)

(23)   *Dwyer v. Metroplitan Life Ins. Co.*, 2001 WL 94749 (4th Cir. 2001)

(24)   *Eriksen v. Metropolitan Life Ins. Co.*, 39 F.Supp.3d 864 (E.D.Mich. 1999)

(25)   *Etkin v. Merk & Co., Inc.*, 2001 WL 1346368 (E.D. Pa. 2001)

(26)   *Hagberg v. Liberty Life Assur. Co. of Boston*, 321 F.Supp.2d (N.D. Fla. 2004)

(27)   *Hill v. Metropolitan Life Ins. Co.*, 218 F.Supp.2d 128 (D. Puerto Rico 2002)

(28)   *In re Campbell*, 116 F.Supp.2d 937 (M.D.Tenn. 2000)

(29)   *Irvin v. Metropolitan Life Ins. Co.*, 1998 WL 401690 (E.D.Pa. 1998)

(30)   *Ladd v. ITT Corp.*, 148 F.3d 753 (7th Cir. 1998)

(31)   *Leahy v. Raytheon Co.*, 315 F.3d 11 (1sr Cir. 2002)

(32)   *Mormile v. Metropolitan Life Ins. Co.*, 91 F.Supp.2d 492 (D.Conn. 2001)

(33)   *Mueller v. CAN Group Life Assurance Co.*, 2004 WL 1161173 (N.D.Cal. 2004)

(34)   *Nichols v. Verizon Communications, Inc.*, 2003 WL 22384772 (3rd Cir. 2003)

(35)   *Payton v. C.I.R.*, 2001 WL 1922058 (U.S. Tax Ct. 2001)

(36)   *Piscottano v. Metropolitan Life Ins. Co.*, 118 F.Supp.2d 200 (D.Conn. 2000)

(37)   *Pollini v. Raytheon Disability Employee Trust*, 54 F.Supp.2d 54 (D.Mass. 1999)

(38)   *Pratlutsky v. Metropolitan Life Ins. Co.*, 316 F.Supp.2d 840 (D.Minn. 2004)

(39)   *Rendulic v. Kaiser Aluminum & Chemical Corp.*, 166 F.Supp.2d 326 (W.D.Pa. 2001)

(40)   *Scardo v. Metropolitan Life Ins. Co.*, 2000 WL 33281679 (W.D. Va. 2000)

(41)   *Sheehan v. Metropolitan Life Ins. Co.*, 2003 WL 22290230 (S.D.N.Y. 2003)

(42)   *Smith v. Continental Cas. Co.*, 276 F.Supp.2d 447 (D.Md. 2003)

(43)    *Stvartak v. Eastman Kodak Co.*, 945 F.Supp. 1532 (M.D.Fla. 1996)

(44)    *Sullivan v. Raytheon Co.*, 262 F.3d 41 (1st Cir. 2001)

(45)    *Tholke v. Unisys Corp.*, 2003 WL 21203349 (S.D.N.Y. 2003)

(46)    *Tremain v. Bell Indus. Inc.*, 196 F.3d 970 (9th Cir. 1999)

(47)    *Vartanian v. Metropolitan Life Ins. Co.*, 2002 WL 484852 (N.D.Ill. 2002)

(48)    *Vaugh v. Metropolitan Life Ins. Co.*, 87 F.Supp.2d 421 (E.D.Pa. 2000)

(49)    *Voight v. Metropolitan Life Ins. Co.*, 28 F.Supp.2d 569 (C.D.Cal. 1998)

(50)    *Welch v. CoreStates Financial Corp.*, 1999 WL 387276 (E.D.Pa. 1999)

(51)    *Willis v. ITT Educational Services, Inc.*, 254 F.Supp.2d 926 (S.D.Ohio 2003)
L:\Denm001\NMR.Caselist1.wpd