UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANE DENMARK,<br><br>    Plaintiff<br><br>v.<br><br>LIBERTY MUTUAL ASSURANCE COMPANY OF BOSTON, THE GENRAD, INC. LONG TERM DISABILITY PLAN, THROUGH TERADYNE, INC., AS SUCCESSOR FIDUCIARY<br><br>    Defendants | Civil Action No. 04-12261-DPW |

**MEMORANDUM OF PLAINTIFF IN SUPPORT OF
MOTION THAT THE DENIAL OF BENEFITS CLAIM
BY LIBERTY MUTUAL ASSURANCE COMPANY OF BOSTON
IS SUBJECT TO THE *"DE NOVO"* STANDARD OF REVIEW**

The plaintiff, Diane Denmark ("Denmark"), submits this memorandum, in accordance with the Scheduling Order of this Court dated December 9, 2004, in support of her motion to establish the standard of review before this Court as *de novo*. This Court is urged to review Liberty Mutual Assurance Company of Boston's ("Liberty") denial of Denmark's long-term disability benefits ("LTD benefits") under this standard, rather than the *arbitrary and capricious* standard sometimes granted to insurers under ERISA.

INTRODUCTION

A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan ," in which case an abuse of discretion standard is applied. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L.Ed.2d 80, 109 S. Ct. 948 (1989). The First Circuit has "steadfastly applied *Firestone* to mandate de novo review of benefits determinations unless 'a benefits plan ... clearly grant[s] discretionary authority to the administrator,' " Terry v. Bayer Corp., 145 F.3d 28, 37 (1st Cir.1998) (quoting Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 583 (1st Cir.1993). If plan administrators are granted such authority, an "arbitrary and capricious" standard of review will apply. *See* Recupero v. New England Tel. & Tel. Co., 118 F.3d 820, 827 (1st Cir.1997). *See*, Dana M. Muir, *Fiduciary Status as an Employer's Shield: The Perversity of ERISA Fiduciary Law*, 2 U. Pa. J. Lab. & Emp. L. 391 (2000).

As the party advocating a deferential standard of review, or interchangeably referred to as an "arbitrary and capricious" standard of review, Liberty bears the burden of demonstrating that its adverse disability determination is entitled to such deference. Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 251-52 (2d Cir.1999). "Despite the holding of *Firestone Tire,* plan sponsors have been unaccountably loath to amend their plans to make the delegation of discretionary authority unambiguously explicit. The result is a plenitude of litigation contesting the standard of review to be applied in individual cases, with claimants advancing inventive, if at times impervious, arguments for applying the more friendly *de novo* standard." Giannone v. MetLife, 311 F.Supp.2d

168, 174 (D. Mass. 2004)[1].

In this instance, discretionary review authority has not been granted to the plan Administrator, Genrad, Inc. Therefore, a delegation of that authority could not have been granted to Liberty.

## I. LIBERTY CANNOT GRANT DISCRETIONARY AUTHORITY TO ITSELF.

### A. Liberty Has Failed To Produce the Plan Instrument.

The governing document under which Liberty will contend that it is entitled to deferential review is nothing more than an insurance policy identified as *Group Disability Income Policy*. Liberty is sure to point to language in the *Group Disability Income Policy*, and to argue that it must be afforded the status of an ERISA Administrator that has been granted discretionary authority to make benefit decisions:

> Liberty shall have the sole authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding. [AR 146[2]].

---

[1]The nonprofit Families USA advocates expansion of the NAIC's Model to Prohibit Discretionary Clauses to disability insurance contracts.... "The discretionary clauses create an uneven playing field for consumers who want to file legal challenges against an insurer's decision, according to Sonya Schwartz, an attorney and health policy analyst for Families USA. These clauses give legal deference to the insurer's decision unless the claimant can prove that the insurer's decision was unreasonable or irrational (the "arbitrary and capricious" standard), which is a "very difficult standard to meet," Ms. Schwartz noted. Claimants are much less successful in cases where the arbitrary and capricious standard was applied (only 28% were successful) than they were in cases involving "de novo" review (68% were successful). According to Ms. Schwartz, "Prohibiting discretionary clauses in disability insurance contracts insures that courts will apply the same standard of review as they do in other contract cases so that consumers will get a fair, impartial review of their claim."
http://www.benico.com/News/News%20Updates/6-21-04.htm

[2]AR refers to a two binder set of documents that Liberty's counsel filed with this Court on January 20, 2005. For convenience of the Court, duplicates of the pages referred to have been

The language above seems to comply with that set forth in Brigham v. Sun Life, 317 F.3d. 72, 81 (1st Cir. 2003) (Referencing Chief Judge Posner's "proposed model 'safe harbor' language for inclusion in ERISA plans that could leave no doubt about the administrator's discretion: 'Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them.' "). Herzberger v. Standard Ins. Co.,205 F.3d 327, 331 (7th Cir.2000). There is a significant contrast between the safe harbor language in Herzberger, and the language quoted from the Liberty insurance policy. The Herzberger language runs to the Plan Administrator and not the insurer. This difference was addressed in Wallace v. Reliance Standard, 318 F.3d 723 (7th Cir. 2003).

The Seventh Circuit stated that an insurance policy is not an ERISA plan instrument. Wallace v. Reliance Standard, 318 F.3d 723, 724 (7th Cir. 2003). *("Pegram* concluded that a contract of insurance sold *to* a plan is not itself "the plan," so that the HMO implementing its contract is not a fiduciary. Just so, one would suppose, with a disability-insurance carrier.") In reaching this conclusion, the Seventh Circuit stated:

> Asked at oral argument what provision of ERISA turns an insurer into a fiduciary, Wallace relied entirely on 29 U.S.C. § 1104. This section, however, specifies the duties of fiduciaries; it does not tell us who *is* a fiduciary. The "who" of the matter depends on 29 U.S.C. § 1002(21)(A), which as the Court remarked in *Pegram* tells us that managers, administrators, and financial advisers of pension and welfare plans are fiduciaries. Id. at 724.

The determination by the Seventh Circuit is directly on point. Liberty has produced an insurance policy, *Group Disability Income Policy* , and not a Plan instrument. Without the

---

attached herewith as EXHIBIT A.

existence of a plan instrument, discretionary authority cannot be conferred on the plan Administrator or anyone else.  Thus, Liberty's self purported delegation of discretionary authority fails to follow the explicit requirements of ERISA By default, the decision of Liberty to deny benefits must be reviewed *de novo*.  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115, 103 L.Ed.2d 80, 109 S. Ct. 948 (1989)

**B. <u>No Grant of Discretionary Authority Was Delegated to Liberty</u>.**

Here, the Plan Sponsor is the Plan Administrator, Genrad, Inc.  Genrad, Inc., is identified on the first page of the *Group Disability Income Policy* as the Sponsor. That insurance policy does not specify who is the Plan Administrator [3] . Therefore, by default under 29 U.S.C. §1002(16), the Plan Sponsor, Genrad, Inc., is vested with the duties of the Plan Administrator.  [AR 114]. Without an appropriately adopted governing plan document, the plan Administrator, Genrad, Inc., could not delegate discretionary decision making authority to another party.  In addition, Liberty could not grant discretionary authority to itself.

Discretionary decision making authority does not arise as a matter of right. It must be properly set forth in an ERISA plan instrument, in order for a Plan Administrator to exercise it. A Plan Administrator may delegate that authority if it follows the procedure set forth in the plan instrument, and ERISA.  This is explicitly set forth at  29 U.S.C. § 1105( c), and has been carefully

---

[3] 29 U.S.C. 1102 (16)(A) **The term ``administrator'' means--**
 (i) the person specifically so designated by the terms of the instrument under which the plan is operated;
 **(ii) if an administrator is not so designated, the plan sponsor**; or
(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.
   (B) The term ``plan sponsor'' means (i) the employer in the case of an employee benefit plan established or maintained by a single employer,

followed in the First Circuit for more than a decade. Rodriguez-Abreu v. Chase Manhattan Bank, 986 F.2d 580, 584 (1st Cir. 1993).

Under *Firestone,* a Plan Administrator, may gain discretionary authority under the terms of a written instrument. If the instrument fails to contain such language, the review must be *de novo*. Liberty cannot grant discretionary authority to itself.

Here, neither Genrad, Inc., or Liberty can point to a plan instrument under which discretionary authority was granted to the Administrator, Genrad, Inc., and under which the Administrator, Genrad, Inc., delegated its discretionary authority by the terms of a written instrument to Liberty. 29 U.S.C. section 1105 ( c). The only document that is contained in the record filed with the Court on January 20, 2005, is the *Group Disability Income Policy* which is an insurance policy identifying Genrad, Inc., as the Sponsor. By default to the statute, the Plan Administrator is the same as the Plan Sponsor, namely Genrad, Inc. 29 U.S.C. 1102 (16)(A).

Defendants individually, or collectively, may attempt to argue that there was a proper delegation by Genrad, Inc., to Liberty. This argument, however, is not supported by the record before this Court. 29 U.S.C. section 1105 (c) allows for delegation of a fiduciary's discretion, but any such delegation must conform with the requirements of the law. The First Circuit is particularly strict in this regard. Specifically, section 1105 (c) entitled "Allocation of fiduciary responsibility; designated persons to carry out fiduciary responsibilities," states:

> (1) The instrument under which a plan is maintained may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, **and** (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan. (Emphasis added.)

This statute is conjunctive and has been interpreted to allow a "named fiduciary" to delegate

its fiduciary responsibilities under ERISA to a third party, however it may do so only if: (1) The written plan instrument expressly allows for the delegation, including explanation of the specific procedures that must be complied with in completing the delegation; and (2) there is an express delegation between the delegator and delgatee. Rodriguez-Abreu at 584 (1st Cir. 1993). "To be an effective delegation of discretionary authority so that the deferential standard of review will apply, therefore, the fiduciary must properly designate a delegate for the fiduciary's discretionary authority." Rodriguez-Abreu at 584. (District court properly employed *de novo* standard of review, rather than more deferential arbitrary and capricious standard, in action to recover benefits after participant's ERISA claim was denied by plan administrator; although plan administration booklet granted plan fiduciaries discretionary authority, it did not include express procedures for delegating that authority to plan administrator, and administrator did not claim to be acting as delegate of fiduciaries. *Accord*, Guarino v. MetLife, 915 F.Supp. 435, 443 (D. Mass. 1995) ("The First Circuit has interpreted the *Firestone* rule "to mean that a benefits plan must *clearly grant* discretionary authority to the administrator before decisions will be accorded the deferential, arbitrary and capricious, standard of review." Rodriguez-Abreu, 986 F.2d at 583 (1st Cir.1993) (emphasis added) (holding de novo standard of review appropriate where delegated discretionary authority was unclear).

  The United States District Court for the District of Maine addressed an almost identical scenario involving Liberty Mutual Life Insurance Company and its subsidiary Liberty Life Assurance Company in connection with a long term disability benefits action in Davidson v. Liberty Life, 998 F.Supp.2d 1, 9 (D. Me. 1998). There, the Court held that the benefits review had to be *de novo*, because the defendant insurers had not complied with Rodriguez-Abreu v. Chase Manhattan

Bank, 986 F.2d 580, 584 (1ˢᵗ Cir. 1993).

The Court held that Liberty Life Assurance Company failed to demonstrate that the Plan Administrator, Liberty Mutual Insurance Company, had properly delegated discretionary authority from Liberty Mutual Insurance Company to Liberty Life Assurance Company. "Because the Court cannot assume that the LTD plan permitted delegation of the duties of the plan administrator in satisfaction of 29 U.S.C. § 1105( c), the Court will apply the *de novo* standard of review to the out-of-court decisions made by Liberty Life," Davidson v. Liberty Life, 998 F.Supp.2d 1, 9 (D. Me. 1998)

Liberty Life unsuccessfully argued that because, its parent, Liberty Mutual Insurance Company, the employer, had been granted discretionary authority to make benefits decision, by implication, or otherwise, that authority had been delegated to Liberty Life Assurance Company. The Court soundly rejected that argument, since neither defendant produced any evidence that the delegation had been assigned in accordance with 29 U.S.C. section 1105 ( c). The Court reviewed the benefit decision *de novo*.

There is no evidence before this Court showing that Genrad, Inc., had been granted discretionary authority. In addition, there is no evidence that Genrad, Inc., further delegated discretionary authority to Liberty.  Liberty cannot grant discretionary authority to itself. As such, the review must be *de novo*.

## II. TO THE EXTENT THAT LIBERTY HAS BEEN GRANTED DISCRETIONARY AUTHORITY TO MAKE BENEFIT DECISIONS, LIBERTY SHOULD BE STRIPPED OF SUCH AUTHORITY FOR ITS SELF DEALING.

When a plan administrator labors under a conflict of interest, such as when an insurer serves as plan fiduciary and pays claims out of its own assets, the Court may review the decision of the administrator under a higher standard of review. *See, e.g.,* Doe v. Travelers Ins. Co., 167 F.3d 53, 57 (1st Cir.1999). In this Circuit, it has been sometimes described as review with "more bite." Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir.1998). Unfortunately, the First Circuit has not provided guidance as to what the heightened review standard should entail.

In the Eleventh Circuit, for example, it is assumed that an insurer operates under a conflict of interest, and as such, the Court must review a benefits denial (this assumes that the Plan instrument properly confers discretion on the insurer) under a heightened arbitrary and capricious standard. Levinson v. Reliance Standard Life Ins., 245 F.23d 1321, 1326 (11th Cir. 2001) (When ERISA plan administrator profits from denial of benefits, a conflict of interest exists, and heightened arbitrary and capricious standard applies). Then, the first decision that the Court must make is whether the insurer's decision to terminate or deny benefits is just "wrong." HCA Health Serv. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 992 (11th Cir.2001). If the Court concludes that the decision was not "wrong," that ends the inquiry. If the Court concludes otherwise, the insurer may only prevail if its decision was reasonable, and then the Court must decide that the decision was not tainted by self interest. Id. at 994. If both requirements are not met, then judgment should be rendered for the claimant.

In the Third Circuit, the District Courts engage in a "sliding scale" review when reviewing

an insurer's or other conflicted party's decision. Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (3rd Cir. 2000). The Eighth Circuit follows a somewhat similar approach. Woo v. Deluxe Corp., 144 F.3d 1157, 1161-62 (8th Cir.1998). The Tenth Circuit uses a standard similar too. Fought v. Unum Life Ins. Co. Of America, 379 F.3d 997 (10th Cir 2004).

The Ninth Circuit has held that the abuse of discretion standard of review may be "heightened" if a plan administrator has a conflict of interest. Atwood v. Newmont Gold Co., 45 F.3d 1317, 1322 (9th Cir.1995). An apparent conflict of interest exists where the defendant is both the insurer and the administrator of the insurance policy. See Bendixen v. Standard Ins. Co., 185 F.3d 939, 943 (9th Cir.1999). However, "the presence of a conflict does not automatically remove the deference ordinarily accord[ed] to ERISA administrators who are authorized by the plan to interpret a plan's provisions. Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc., 125 F.3d 794, 797 (9th Cir.1997).

There are a number of factors that a Court will look to in determining whether the insured's conflicted interest materially affected the claims decision process. Atwood v. Newmont Gold Co., 45 F.3d 1317, 1323 (9th Cir.1995). Those include: (1) the plan administrator provides inconsistent reasons for its denial, See Lang, 125 F.3d at 799 (first contending that plaintiff did not have fibromyalgia and then contending that plaintiff would have to show that fibromyalgia was physical illness and not mental illness); (2) the plan administrator relies on an improper disability definition in denying the claim for benefits. (Tremain v. Bell Industries, Inc., 196 F.3d 970, 977 (9th Cir.1999)); (3) the plan administrator determines a material fact for which there is no supporting evidence, Id.; (4) the plan administrator fails to follow plan procedures. See Friedrich v. Intel Corp., 181 F.3d 1105, 1110 (9th Cir.1999); (5) the plan administrator fails to provide requested

information, *See,* Cherene v. First American Financial Corp. Long-Term Disability Plan, 303 F.Supp.2d 1030, 1037 (N.D.Cal.2004); (6) the plan administrator fails to provide a full and fair review of the claim and its denial, *See* Friedrich, 181 F.3d at 1110; (7) Taken as a whole, the record suggests that the administrator acted as an adversary determined to deny the Plaintiff's claim for benefits. *See Id.*

In the present matter, Liberty engaged in a whole host of conduct, that demonstrates that it acted as an adversary, rather than a fair adjudicator of a claim for benefits. Since it acted as a conflicted claims evaluator, it should not be accorded the deference granted to a true fiduciary.

**A. Liberty Provided Inconsistent Reasons for Denying Denmark's Claim.**

Liberty first contended that Denmark's fibromyalgia[4] was not disabling. Then, after an examination by an Independent Medical Examiner, who determined that Denmark was suffering from fibromyalgia and was completely disabled, Liberty changed its position and contended that she

---

[4]Fibromyalgia syndrome is a disease that can potentially be totally disabling, despite the fact that there are no laboratory tests to establish the diagnosis and its symptoms are entirely subjective. Hawkins v. First Union Corporation Long Term Disability Plan, 326 F.3d 914, 916 (7th Cir. 2003). There Chief Judge Posner stated, in part:
> As we explained in *Sachet v. Cater,* 78 F.3d 305, 306-7 (7th Cir. 1996) (citations omitted), fibromyalgia, also known as fibrositis [is] a common but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principle symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates it and all other diseases of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch...There is no serious doubt that Sachet is afflicted with the disease but it is difficult to determine the severity of her condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not and the question is whether Sachet is one of the minority. *Id.*

might not even be afflicted by fibromyalgia.

On December 26, 2001, based on a paper review by Dr. Clay Miller, a physical medicine and rehabilitation doctor concluded, "there are no documented objective physical exam findings that supports a decrease or significant change in patient's physical condition." [AR 474]. On August 20, 2002, Liberty denied Denmark's claim for LTD benefits. This was after Denmark had been examined, on April 12, 2002, by Dr. Peter Schur, M.D., a rheumatologist, a Professor of Medicine at Harvard Medical School, and an Independent Medical Examiner, who found her disabled [AR 389-392, 405]. In its August 20, 2002 letter, Liberty referred to the opinion of Dr. Schur, M.D., and tacitly acknowledged that Denmark had been paid Short Term disability benefits from October 2, 2001 to April 2, 2002. Liberty also stated that its Nurse Case Manager, had concluded that Denmark was not disabled, despite the opinion of Dr. Schur, M.D. [AR 406]. After a further internal appeal, on December 10, 2002 Liberty then contended that Dr. Schur, M.D.'s opinion was not an Independent Medical Exam, but a "second opinion." [AR 345]. Liberty also stated that it's file reviewer, Dr. Bomalski, M.D., opined that "physical examination and testing do not support the diagnosis of Ms. Denmark's treating physicians, at least within the records provided." [AR 347].

This either means that Liberty did not provide a full set of records, or that Dr. Bomalski, M.D., did not believe that Denmark was suffering from fibromyalgia, a disease that her primary medical doctor, Thomas Goodman, M.D., had diagnosed in 1996 and had been confirmed by the IME doctor, Peter Schur, M.D, and accepted by Liberty. [AR 353-357]. These shifting reasons for denying benefits were indicative of unfair claims practices.

**B. Liberty Relied On An Opinion Of The Wrong Type Of Medical Specialist.**

Initially, instead of having Denmark, examined by a rheumatologist, it relied on the a file review opinion of Dr. Clay Miller, a physical medicine and rehabilitation doctor who claimed, "there are no documented objective physical exam findings that supports a decrease or significant change in patient's physical condition." [AR 474]. This was wrong, and indicative of a conscious effort to deny benefits. Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996)("Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist.") Monroe v. Pacific Telesis Group Comprehensive Disability Benefits Plan, 971 F. Supp. 1310, 1315 (C.D. Cal. 1997) (To assess a disability claim based on fibromyalgia, a benefit plan should rely on reports from *specialists* in the field of *rheumatology*, not other fields); Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118 (9th Cir. 1998) (administrator abused its discretion when it referred the claim file to an in-house physician who rejected the conclusion of the claimant's doctors without offering contradictory evidence. The court found arbitrary and capricious the fact that the *insurer's doctor not a specialist in relevant field*; the insurer did not confer with the treating physician(s); the insurer did not examine the plaintiff, and held that the treating physician's opinions must stand where there is no independent examination conducted by the insurer.) Although Liberty later relied on Dr. Bomalski, M.D., a rheumatologist, his opinion was of less value, because it appears that Liberty did not even provide to him a complete set of medical records. "physical examination and testing do not support the diagnosis of Ms. Denmark's treating physicians, *at least within the records provided*." [AR 347].

Finally, Liberty wholesale rejected the finding of disability of the United States Social Security Administration ("SSA"), that determined Denmark became disabled on October 2, 2001.

[AR 102, 293-298]. That determination included an examination by a psychologist who found Denmark to be credible. Liberty just ignored the SSA finding rather than engaging in deliberative reasoning why the Social Security Administration finding of disability was incorrect, or inaccurate, when applying the same facts to the Liberty insurance policy and its definition of disability. Gannon v. MetLife, 360 F.3d 211 215,(1st Cir. 2004) (Concluding that SSA denial of SSDI benefits was relevant in supporting MetLife's denial of benefits under an ERISA plan).  Because the First Circuit believes that a denial of SSDI benefits can support a denial of benefits under ERISA, the granting of SSDI benefits should  be carefully considered too.

### C. Liberty Pretended It Did Not Participate In the Short Term Disability Analysis.

On October 25, 2001, Liberty wrote to Denmark and advised her that it was conducting a claims investigation. [AR 558] In part, Liberty advised Denmark, "your cooperation in providing the requested information is essential to our claims investigation." [AR 558]. After Short Term Disability benefits were paid, Liberty said that it did not take part in the decision, and it was solely, the employer, Genrad, Inc.,  who decided to pay benefits. [AR 406]. Liberty then rejected Dr. Schur, M.D.'s opinion relying on its own employee nurse, something that Courts have rejected as unreasonable. This is in itself has been found to be indicative of an abuse of discretion. Billings v. Continental Casualty 2003 WL 145420 (N.D.Ill.) (CNA did not consult with or obtain any other physician's opinion or seek an independent medical examination of Billings. Indeed, CNA never utilized a doctor at any level of the claims process, even to review the medical evidence submitted by four of Billings' treating physicians).

**D. Liberty Added A Requirement Of Objective Evidence Not Contained In The Policy.**

It is black letter law that a reviewing insurance company cannot add the requirement of "objective medical evidence" to a Plan that does not expressly contain that language. Cook v. Liberty Life Assurance Co. Of Boston, 320 F.3d 11, (1st Cir. 2003). That is exactly what Liberty did, although it couched its language in Dr. Miller's opinion where he stated "there are no documented objective physical exam findings... [AR 474]. Here, as a ground to deny benefits, it told Denmark that she had failed to provide objective evidence of her disability.

**E. Liberty Failed To Follow The Department Of Labor Claims Regulations and ERISA.**

When an insurer denies a claim for benefits, ERISA requires the claimant be informed of the specific reasons for the denial and the insurer must afford the claimant opportunity for "full and fair review." 29 U.S.C. § 1133. The corresponding Department of Labor regulations require that this notice of denial include: (1) the specific reasons for the denial; (2) reference to the pertinent plan provisions on which the denial is based; (3) a description of additional information necessary to perfect the claim; and (4) the steps to be taken if the beneficiary wishes to submit his or her claim for review. § 2560.503(f) (1977). *See, e.g.*, Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir. 1997).

The Department of Labor regulations, as revised in January 2002, also require that where a plan utilizes a specific internal rule, the plan must inform a claimant that the protocol was relied on and furnish it upon request. § 2560.503(g)(1)(v) (2001). This includes information "relied upon in making the determination, or ... submitted to the plan, considered by the plan, or generated in the course of making the benefit determination." 65 Fed. Reg. at 70,252.

Accordingly, subsection (b)(5) provides that procedures must include such safeguards "to verify that benefit claims determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." 65 Fed. Reg. 70,246, 70,251 (2000). Further, subparagraph (m)(8) provides that a claimant who is denied benefits is entitled to information generated in the course of "verifying that, in making the particular determination, the plan complied with its own ... safeguards that ensure and verify appropriately consistent decision making in accordance with the plan's terms." 65 Fed. Reg. at 70,252.

The Department of Labor intended for insurers or plan administrators to safeguard consistency in making claims determinations, particularly in regard to the use of protocols and guidelines. The former regulations required that claimants be afforded access to "pertinent documents" following a claim denial. 29 C.F.R. § 2560.503-1(g)(1)(ii) (1977). Recognizing the confusion over the meaning of the term "pertinent," the Department of Labor altered the regulations to provide that claimants must be afforded access to "relevant" documents. Subsection (m)(8) provides that a document, record, or other information is relevant to a claimant's claim if the document "constitutes a statement of policy or guidance ... concerning the denied treatment option or benefit ... without regard to whether such advice or statement was relied upon in making the benefit determination." 29 C.F.R. § 2560.503(m)(8) (2001). The Department of Labor therefore explicitly revised the 1977 regulations to make available relevant documents to claimants.

Here, Liberty failed to produce all documents requested by Denmark. In May 2004, Denmark wrote to Liberty and requested that Liberty "produce all pertinent documents under 29 CFR 2560.503-1(g)." [AR 321]. It chose not to. For example, Liberty failed to provide a surveillance tape in response to production of all relevant documents prior to commencement of litigation. Liberty

only produced a copy of the surveillance tape, in mid - January 2005. It appears that when Liberty submitted a two volume set of documents which it contended comprised the administrative record for review, it did not even provide the surveillance tape to this Court. In its cover letter dated January 20, 2005, Liberty's counsel stated, "In addition, the record also includes a surveillance tape....That Tape is available for the Court's review if it would like a copy." [EXHIBIT A]. Liberty did not produced its claim guidelines. The discovery of such documents are subject to a discovery motion pending before this Court.

### F. Liberty Did Not Properly Analyze the IME Physician Opinion Or That Of The Treating Doctor.

In Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), the Supreme Court precluded District Courts from giving conclusive impact to the "treating physician rule." At its essence, Nord directs that not a single source of evidence in an ERISA case should absolutely be afforded more weight than another, unless the Department of Labor has articulated otherwise. The Supreme Court issued, however, a cautionary warning to lower courts not to over-read its decision stating, "Plan administrators, of course, may not arbitrarily refuse to credit a claimant's evidence, including the opinions of a treating physician." Id. at 834.

Liberty's decision to rely upon the opinions of paper reviewers, over examining physicians, is suspect. Here, Liberty "cherry picked" the entire medical record. An insurer violates ERISA when the record of the internal process shows that the reviews conducted by the insurer's physicians entail a selective parsing of the records in an attempt to justify a denial of benefits. *See* Conrad v. Reliance Standard Life Ins. Co., 292 F.Supp.2d 233, 237-238 (D.Mass. 2003) ("While it was reasonable for Reliance to rely on a medical examiner's review of Conrad's records, the reports Dr.

Hauptman generated betray a palpable bias in favor of rejecting the claim."). This is what Liberty's paper reviewers did. Liberty's hired doctors appear to have selectively reviewed medical records, and did not explain with facts why the opinion of Denmark's treating doctor and that of the IME was wrong.

## CONCLUSION

For the foregoing reasons, this Court is urged to find that the decision of Liberty is subject to the *de novo* standard of review before this Court.

Date:   February 4, 2005

**DIANE DENMARK**
By Her Attorneys,
*/s/ Jonathan M. Feigenbaum*

_____
Jonathan M. Feigenbaum, Esq.
B.B.O. N#546686
Philips & Angley
One Bowdoin Square
Boston, MA 02114
Tel. No. : (617) 367-8787

L:\Denm001\memo.standarreview.wpd