UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIANE DENMARK,

       Plaintiff

v.

LIBERTY MUTUAL ASSURANCE
COMPANY OF BOSTON, THE GENRAD,
INC. LONG TERM DISABILITY PLAN,
THROUGH TERADYNE, INC., AS
SUCCESSOR FIDUCIARY

       Defendants

Civil Action No. 04-12261-DPW

**PLAINTIFF'S
MOTION TO ESTABLISH DENIAL OF BENEFITS CLAIM
BY LIBERTY MUTUAL ASSURANCE COMPANY OF BOSTON
IS SUBJECT TO THE "DE NOVO" STANDARD OF REVIEW**

**EXHIBIT A**

L:\Denm001\motion.standard.review.exhibitA.wpd



Representing Management Exclusively in Workplace Law and Related Litigation

| | |
|---|---|
| **Jackson Lewis LLP** | ATLANTA, GA / LOS ANGELES, CA / SACRAMENTO, CA |
| **75 Park Plaza** | BOSTON, MA / MIAMI, FL / SAN FRANCISCO, CA |
| **Boston, Massachusetts 02116** | CHICAGO, IL / MINNEAPOLIS, MN / SEATTLE, WA |
| **Tel 617 367-0025** | DALLAS, TX / MORRISTOWN, NJ / STAMFORD, CT |
| **Fax 617 367-2155** | GREENVILLE, SC / NEW YORK, NY / WASHINGTON, DC REGION |
| **www.jacksonlewis.com** | HARTFORD, CT / ORLANDO, FL / WHITE PLAINS, NY |
| | LONG ISLAND, NY / PITTSBURGH, PA |

January 20, 2005

**VIA HAND DELIVERY**

Clerk of Court
United States District Court
District of Massachusetts
United States Courthouse
1 Courthouse Way, Room 2300
Boston, MA 02210

                  Re:    Denmark v. Liberty Life Assurance
                            Civil Action No.: 04-12261

Dear Sir/Madam:

Enclosed for filing and docketing in the above matter, please find the Administrative Record of Diane Denmark Submitted by Defendant for Judicial Review. Please note that Plaintiff's social security number and date of birth have been redacted from these documents in accordance with Local Rule 5.3.

This record was previously produced to Plaintiff's counsel. In addition, the record also includes a surveillance tape that is being preserved at Defendant's counsel's office during the pendency of this action and is being made available to Plaintiff. That tape is available for the Court's review if it would like a copy.

In acknowledgement of this letter and its enclosure, please date stamp the copy of this letter and return it to the awaiting messenger.



Thank you for your attention to this matter.

Very truly yours,

JACKSON LEWIS LLP

Richard W. Paterniti

RWP/ks
Enclosure
cc:    Jonathan M. Feigenbaum
        Andrew C. Pickett


**Liberty Mutual**®

June 3, 2004

Diane Denmark
36 Nashua Street
Ayer, MA  01432

Liberty Life Assurance Company
of Boston

2510 West Dunlap
Suite 300
P. O. Box 37500
Phoenix, AZ 85069
Telephone 602-861-0856
1-800-320-7585
Fax 1-800-3207583

RE:    Long Term Disability Benefits
       Policyholder:  Genrad Inc.
       Claim # 735355

Dear Ms. Denmark:

This letter responds to your correspondence that we received on May 24, 2004.  Your
letter indicates that you were awarded Social Security Disability (a copy of the award was
attached) and wished to obtain a copy of your claim file.  Enclosed is a copy of your
claim file, policy, and claim notes.

Although you were awarded Social Security Disability benefits, this decision by the
Social Security Administration does not affect our prior denial determination.  As
indicated the appeal letter, dated December 10, 2002, it is stated "determinations made by
Liberty Life Assurance Company of Boston are based on the provisions outlined in the
Genrad Inc.'s policy.  These provisions are not contingent on decisions made by the
Social Security Administration nor the Workers' Compensation Carrier."

Our position, as explained in our December 10, 2002 letter (enclosed) remains
unchanged.  You were afforded an opportunity to submit a timely written request for
review and to submit additional medical findings to support your claim.  Our office
communicated all claim determinations to you.  Therefore, it is our position that you were
afforded a full and fair opportunity to appeal the denial of your claim in a timely manner.
As documented in our denial letters, our assessment of the claim and our determination to
not pay disability benefits were supported by the claim facts and the terms of the policy
and are not contingent on your recent award for Social Security Disability.

Liberty Life has reviewed the prior appeal and has rendered our final determination on
this claim.  Liberty Life's final determination was rendered on December 10, 2002,
therefore no additional information will be considered your administrative record remains
closed with no further review conducted by Liberty Life Assurance Company of Boston.

AR00102

400000001

Member of Liberty Mutual Group

Sincerely,

*[signature: M. Scott]*

Michelle Scott, DCP, HIA
Appeal Review Consultant
Home Office Examining
1-800-320-7585 ext. 291

Encl:  Denial letter dated 12/10/02
       Claim file/system notes
       Genrad Inc.'s Policy

400000002

# GROUP DISABILITY INCOME POLICY

Sponsor:        GenRad, Inc.

Policy Number:  GF3-810-254021-01

Effective Date:  August 1, 2001

Governing Jurisdiction is Massachusetts and subject to the laws of that State.

Premiums are due and payable monthly on the first day of each month.

Policy Anniversaries shall occur each August 1st beginning in 2002.

Liberty Life Assurance Company of Boston (hereinafter referred to as Liberty) agrees to pay the benefits provided by this policy in accordance with its provisions. This policy provides Long Term Disability coverage.

PLEASE READ THIS POLICY CAREFULLY FOR FULL DETAILS.

This policy is a legal contract and is issued in consideration of the Application of the Sponsor, a copy of which is attached, and of the payment of premiums by the Sponsor.

For purposes of this policy, the Sponsor acts on its own behalf or as the Covered Person's agent. Under no circumstances will the Sponsor be deemed the agent of Liberty.

This policy is delivered in and governed by the laws of the governing jurisdiction and to the extent applicable by The Employee Retirement Income Security Act of 1974 (ERISA) and any subsequent amendments.

The following pages including any amendments, riders or endorsements are a part of this policy.

Signed at Liberty's Home Office, 175 Berkeley Street, Boston, Massachusetts, 02117.

NON-PARTICIPATING

Form ADOP

AR00114                    400000013

)                              )

## SECTION 7 - GENERAL PROVISIONS
### (Continued)

Furnishing of Information - Access to Records

1.  The Sponsor will furnish at regular intervals to Liberty:

    a.  information relative to Employees:

        i.    who qualify to become insured;
        ii.   whose amounts of insurance change; and/or
        iii.  whose insurance terminates.

    b.  any other information about this policy that may be reasonably required.

    The Sponsor's records which, in the opinion of Liberty, have a bearing on the insurance will be opened for inspection at any reasonable time.

2.  Clerical error or omission will not:

    a.  deprive an Employee of insurance;
    b.  affect an Employee's Amount of Insurance; or
    c.  effect or continue an Employee's insurance which otherwise would not be in force.

Interpretation of the Policy

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

Incontestability

The validity of this policy shall not be contested, except for non-payment of premiums, after it has been in force for two years from the date of issue. The validity of this policy shall not be contested on the basis of a statement made relating to insurability by any person covered under this policy after such insurance has been in force for two years during such person's lifetime, and shall not be contested unless the statement is contained in a written instrument signed by the person making such statement.

Legal Proceedings

A claimant or the claimant's authorized representative cannot start any legal action:

1.  until 60 days after Proof of claim has been given; or

2.  more than three years after the time Proof of claim is required.

400000045

## SOCIAL SECURITY ADMINISTRATION
### Office of Hearings and Appeals

## DECISION

| IN THE CASE OF | CLAIM FOR |
|---|---|
| | Period of Disability and |
| Diane S. Denmark | Disability Insurance Benefits |
| (Claimant) | |

| (Wage Earner) | (Social Security Number) |
|---|---|

## INTRODUCTION

On March 12, 2002, the claimant filed an application for Disability Insurance Benefits. The claim was denied initially and on reconsideration, and a request for hearing was timely filed on January 29, 2003. A hearing was subsequently held on December 9, 2003 in Boston, Massachusetts before Administrative Law Judge Paul S. Carter. Appearing and testifying at the hearing were the following: the claimant and Joseph Goodman, a Vocational Expert. The claimant alleges disability beginning October 2, 2001 due to her impairments. WilliamTroupe, an attorney, represents the claimant in this matter.

The general issue is whether the claimant is entitled to a period of disability and Disability Insurance Benefits under sections 216(i) and 223 of the Social Security Act. The specific issue is whether she is under a disability, which is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for Disability Insurance Benefits, there is an additional issue pertaining to insured status. A review of the claimant's earnings record reveals that she has earned sufficient quarters of coverage to remain insured at least through the date of this decision.

## EVALUATION OF THE EVIDENCE

400000192

The claimant was born on ████ ██████ and is currently 56 years of age. The claimant has an eighth grade education and has a past relevant work history as a quality control group leader.

AR00293

See Next Page

Diane S. Denmark (⬛⬛⬛⬛⬛⬛⬛                                        Page 2 of 6

The claimant appeared and testified that she is 5 feet 1-1/2 inches tall and weighs approximately 163 pounds. The claimant indicated that she has not worked since her alleged onset date of October 2, 2001. The claimant stated that she had to stop working due to the effects of her fibromyalgia. The claimant stated that her fibromyalgia caused her to have severe pain throughout her body and to also suffer from fatigue. The claimant stated that she is treating with Dr Goodman and with Dr. Hack. Regarding her residual functional capacity the claimant indicated that she can only walk for 10 minutes because of severe pain in her back and legs. .She stated that she could stand for approximately 30 minutes but would then need to rest with her feet elevated for 10 minutes. She stated that she could only sit for approximately 30 minutes. She stated that she has a limited ability to use her hands to hold objects because her hands become numb.

Also testifying at the hearing in the capacity of a vocational expert was Joseph Goodman. He indicated that claimant's position as a quality control group leader was listed in the Dictionary of Occupational Titles at Section 76.684-022 as being as light exertional level and being semi-skilled.

The medical evidence in this case contains a residual functional capacity evaluation from Dr. Terrence Hack which is dated March 28, 2003. Dr. Hack indicated that the claimant was suffering from fibromyalgia with the symptoms of multiple tender points, chronic fatigue, morning sickness, muscle weakness, irritable bowel syndrome, numbness and tingling, and carpel tunnel syndrome. The doctor noted that the claimant had pain throughout her body. Regarding the claimant's residual functional capacity, the doctor indicated that the claimant could only sit for 20 minutes at a time, stand for 30 minutes at a time, and could walk for 5 minutes at a time. The doctor indicated that the claimant could lift frequently only less than 10 pounds . The doctor concluded that the claimant was incapable of tolerating even low stress because of her pain and fatigue. (Exhibit 10-F).

The claimant has also been treating with Dr. Thomas Goodman who submitted a submitted a report dated February 3, 2003. Dr. Goodman indicated that claimant was suffering from fibromyalgia. He indicated that the claimant was disabled due to her condition and she was taking the medications of Taypro and Elavil. (Exhibit 12F, Page 31).

400000193

Dr. Goodman on March 13, 2003 completed a residual functional capacity questionnaire. He indicated that claimant was suffering from fibromyalgia. He stated that the claimant had the symptoms of multiple tender points, chronic fatigue, morning sickness, muscle weakness, swelling, irritable bowel syndrome, numbness and tingling and carpel tunnel syndrome. The doctor concluded that the claimant had pain throughout her body. The doctor indicated that the claimant, in an eight hour day, could sit for only about 2 hours total and could stand/walk for only 2 hours total. The doctor stated that the claimant could frequently only lift less than ten pounds. The doctor stated that the claimant would be incapable for even low stress jobs because of her pain and physical condition.   (Exhibit 11F).

On October 15, 2003, Dr. Goodman stated in a more recent report that he had been caring for the claimant since October 9, 2001 and that she suffers from numerous medical problems including fibromyalgia syndrome, coronary artery disease, atrial fibrillation, B12 deficiency anemia,

Diane S. Denmark ( ████████ )                                    Page 3 of 6

gastrial esophageal reflux disease and diabetes mellitus. The doctor indicated that the claimant has the symptoms of chronic fatigue and generalized body pain. The doctor noted that her symptoms were chronic and unremitting. The doctor noted that the claimant described her frequent pain as constant with a deep achiness in her muscles. The doctor stated that her symptoms caused her ability to concentrate to be suboptimal and she was unable to tolerate even low levels of stress. The doctor indicated that he was treating the claimant with a combination of rest, low level exercise, anti inflammatory drugs and pain medications. (Exhibit 12F, Page 1).

The Social Security Regulations provide for a five-step sequential evaluation process for determining disability. (20 CFR §404.1520). At the first step of this process, the Administrative Law Judge must determine whether the claimant has engaged in substantial gainful activity since her alleged onset date. The Administrative Law Judges finds that the claimant has not engaged in a substantial gainful activity since her alleged onset date October 2, 2001.

At the second step of the process, the Administrative Law Judge must determine whether the claimant has a medically determinable impairment or combination of impairments which is "severe". A "severe" impairment is one which significantly limits an individual's physical and mental ability to perform basic work related activities. The Administrative Law Judge finds that the claimant suffers from fibromyalgia. The Administrative Law Judge finds that these impairments have more than a minimal effect upon the claimant's ability to perform basic work related activities and therefore they constitute "impairments". Social Security Ruling 96-3p.

At the third step of the sequential evaluation process, the Administrative Law Judge must determine whether the claimant's severe impairment of fibromyalgia meets the criteria of the section of the Listing of Impairments contained in Appendix 1, Subpart P, Regulation No. 4 or if the claimant's impairments is equivalent in severity to a Listing impairment. The Administrative Law Judge has reviewed all the evidence and concludes that the claimant's severe impairment does not meet or equal the criteria of any of the sections of the Listing of Impairments.

The Administrative Law Judge must then proceed to determine whether the claimant has the residual functional capacity to perform her past relevant work at the fourth step of the sequential evaluation process. If the claimant is no longer capable of performing her past work, the Administrative Law Judge must then determine whether there are other jobs existing in significant numbers in the national economy which the claimant can perform considering her residual functional capacity, age, education, and work experience.

400000194

The Administrative Law Judge after reviewing the medical evidence in this case finds that the claimant, due to her severe impairment of fibromyalgia suffers from severe restrictions in a residual functional capacity. The Administrative Law Judge finds that the claimant, due to her fibromyalgia could only lift less than 10 pounds frequently and would be unable to do any prolonged sitting, standing or walking. Furthermore, the Administrative Law Judge finds that the claimant's ability to concentrate and attend to work tasks would be greatly diminished due to her pain and fatigue caused by her fibromyalgia. The Administrative Law Judge finds that these limitations and restrictions have existed since the claimant's alleged onset date of disability of October 2, 2001.

AR00295

See Next Page

Diane S. Denmark (███████████)                                    Page 4 of 6

The claimant's past relevant work history has been as a quality control group leader, which job a vocational expert has noted to be of a light exertional level. The Administrative Law Judge finds that, due to the claimant's severe pain, limitations and restrictions, she is prevented her from performing her past relevant work.

Once and individual has established that she cannot perform her past relevant work because her impairments, the burden shifts to the Commissioner of the Social Security Administration to demonstrate that there are other jobs existing in the national economy which she can perform consistent with her medically determinable impairments, functional limitations, age, education and work experience.

The Administrative Law Judge finds that the claimant has the residual functional capacity for only less than a full range of sedentary work as of her alleged onset date of disability. This is due to the fact that the claimant's impairment of fibromyalgia causes the claimant to have an inability to do any prolonged sitting, standing or walking and only allow her to lift frequently less than 10 pounds. Due consideration has been given as to whether the claimant can perform her past relevant work and it has been determined that she can no longer perform this work in view of her exertional limitations.

The Administrative Law Judge finds that the claimant's compliance to her treating physicians of her pain, symptoms, and restrictions as well as her testimony at the heating regarding her condition are credible in light of the medical evidence in this case. Social Security Ruling 96-5p, 97-7p.

The Administrative Law Judge has considered the claimant's complaints regarding her symptoms and restrictions cause by her fibromyalgia. The Administrative Law Judge finds the when the claimant's pain and restrictions are viewed in accordance with <u>Avery v. Secretary of Health and Human Services</u> 797 F.2nd 19 that the claimant's condition is of a "disabling" degree.

The Administrative Law Judge concludes that the controlling weight of evidence in this case should be given to the reports of the claimant's treating physicians, Dr. Goodman and Dr. Hack, who are "treating sources" within the meaning of Section 404.1502 of Regulation No. 4, which provide a longitudinal view of the claimant's fibromyalgia condition and its treatment. Since these reports are well supported and not inconsistent with other substantial evidence in this case their opinion is accorded controlling evidentiary weight. Ruling 96-7p.

400000195

The Administrative Law Judge has given consideration to whether or not the claimant has the ability to make and adjustment to other work within the sedentary range provided for by Social Security Ruling 96-9p. Based upon the facts considered above, the Administrative Law Judge concludes that the claimant is found to have a substantial loss of ability necessary to perform a significant number of jobs identified in unskilled sedentary occupational base administratively noticed in Table No. 1 of Appendix 2, Subpart P, Regulations No. 4.

AR00296

Diane S. Denmark (█████████)                                    Page 5 of 6

The Administrative Law Judge also notes the fact that section 201.00(h) of Appendix 2, Subpart P, Regulations No. 4 directs that for a claimant who cannot even perform sedentary work, a finding of "disabled" would be appropriate.

The Administrative Law Judge notes that state agency physicians who are non-examining physicians are of the opinion that the claimant was "not disabled". However, these state agency physicians have not had the benefit of a face to face meeting with the claimant at the hearing as well as of the latest submitted evidence of the claimant's treating sources. The undersigned Administrative Law Judge has given consideration to the opinion of these state agency experts in evaluating this case. However, the Administrative Law Judge has reached the conclusion that the medical evidence demonstrates that the claimant was "disabled" from performing any gainful activity in the local and national economies. Social Security Ruling 96-6p.

Since the claimant in this case as her alleged onset date October 2, 2001, cannot perform even sedentary work or make an adjustment to other work within a sedentary range, the Administrative Law Judge finds that the claimant was "disabled" as of that date and the claimant's disability continues at least through the date of this decision.

## FINDINGS

After careful consideration of the entire record, the Administrative Law Judge makes the following findings:

1.  The claimant meets the nondisability requirements for a period a disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits as of the established onset date.

2.  The claimant has not engaged in substantial gainful activity since October 2, 2001.

3.  The medical evidence establishes that the claimant has the following "severe" impairment: fibromyalgia.

4.  The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

5.  The claimant's assertions concerning her ability to work are credible.              **400000196**

6.  The claimant retains the residual functional capacity to lift only less than 10 lbs. frequently and cannot do any prolonged sitting, standing or walking.

7.  The claimant is unable to perform the requirements of her past relevant work.

8.  The claimant's residual functional capacity for the full range of sedentary work is reduced by additional limitations.

9.  On October 2, 2001, the claimant was closely approaching advanced age.

AR00297

Diane S. Denmark (                    Page 6 of 6

10. The claimant has a limited education.

11. The claimant has a semi-skilled work background.

12. Considering the claimant's residual functional capacity, she cannot make an adjustment to any work that exists in significant numbers in the national economy; this finding is based upon SSR 96-9p with jobs reduced to fewer than a significant number by the claimant's condition as well as section 201.00(h) of Appendix No.2.

13. The claimant has been under a disability, as defined in the Social Security Act, since October 2, 2001 (20 CFR §404.1520(f)).

## DECISION

It is the decision of the Administrative Law Judge that, based on the application filed on March 12, 2002, the claimant is entitled to a period of disability commencing October 2, 2001, and to Disability Insurance Benefits under sections 216(i) and 223, respectively, of the Social Security Act.


PAUL S. CARTER
U.S. Administrative Law Judge

Date                    JAN 3 1 2004


400000197

AR00298

RECEIVED

MAY 2 4 2004

Liberty Life Phoenix AZ

5-14-04

Dear Michelle Scott of Liberty Ins.
I am writing in regards to
my long term Disability Claim
My name is Diane Denmark
Claimant # 735355. I was
denied Benefits on December 10
2002 16 months ago I would
like to request under 29 USC &
1132(c) to obtain copies of
the summary plan discription
and the plan documents and
policy of insurance for long
Term Disability plan under
which benefits were denied.
Also, please provide all
documents, including but not
limited to pertinent documents
which the claims administrator
considered or relied upon when
it decided to deny my
benefits, both initially and
after further review. 29 CFR &
2560.503-1(g) in reference to
the letter I received December
10 2002 Liberty stated I
may request to receive free
of charge, copies of all documents
relevant to my claim. Also
I would like to know time frame

to bring civil action under
section 502(a) of Erisa if it
has expired. This is why I
am requesting a copy of Liberty's
Insurance Policy. Recently I
was awarded my social security
benefits by Administative Law
Judge Paul S. Carter. Enclosed
is a copy of that decision.
   Sincerly
            Diane Denmark
            36 Nashua St.
            Ayer Mass 01432

AR00322


Liberty
Mutual

Liberty Life Assurance Company
of Boston

2510 West Dunlap
Suite 300
P.O. Box 37500
Phoenix, AZ 85069
Telephone (602) 861-0856
1-800-320-7585
Fax 1-800-320-7583

December 10, 2002

G. Gregory Howard, Esq.
Attorney At Law
45 Merrimack Street, Ste. 323
Lowell, Massachusetts 01852

Re:    Long Term Disability Benefits
       Policyholder: Genrad Inc.
       Claimant: Diane Denmark
       Claim #: 735355

Dear Attorney Howard:

We have completed our review of your request for reconsideration of Ms. Diane
Denmark's Long Term Disability claim and are unable to alter our original determination
to deny benefits.

As stated in our August 20, 2002 letter, in order to be eligible for Long Term Disability
Benefits, Ms. Denmark must meet the following definition of disability:

"Disability" or "Disabled" means:

1.    For persons other than pilots, co-pilots, and crewmembers of an aircraft:

      i.    if the Covered Person is eligible for the 24 Month Own Occupation benefit, "Disability" or
            "Disabled" means that during the Elimination Period and the next 24 months of Disability the
            Covered Person, as a result of Injury or Sickness, is unable to perform the Material and
            Substantial Duties of his Own Occupation; and

      ii.   thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material
            and Substantial Duties of Any Occupation.

            The Elimination Period is 180 days, based on October 3, 2001, the date of disability, the
            elimination Period is satisfied April 1, 2002. To be eligible for benefits, Ms. Denmark is
            required to be disabled from her last day of work and through the elimination period.

Ms. Denmark's Long Term Disability benefits were denied, as the medical evidence and
vocational information in her file did not establish that she satisfied part (i) of the
definition of disability quoted above. The basis for denial was outlined in our letter of
August 20, 2002 (copy enclosed). At that time, you were given the opportunity to
provide additional medical documentation, which would support continued disability.
We specifically outlined in our letter to you, dated October 14, 2002, what was necessary
to be forwarded to assist with our review. To date, the only non-duplicative information

AR00344

Diane Denmark
2

received was a Psychiatric Examination, by Dr. Milton Taylor, received October 25, 2002. No other *new* information was forwarded from her attending physicians as requested.

Therefore, our appeal review was been conducted based on medical and vocational evidence available on file, including the Psychiatric Examination you provided.

# Pertinent Medical, Vocational and Non-Medical Information in the file:

- A Peer Review was performed by Dr. Miller, a Physical Medicine and Rehabilitation physician on December 5, 2001. He reviewed the medical records that were from April 1996 through October 2001 from various treating physicians that Ms. Denmark saw at Primary Care Specialists, Inc. Dr. Miller, stated that Ms. Denmark has had problems with chronic pain, which was diagnosis in 1996 as Fibromyalgia, based on the medical records he reviewed. The claimant was noted to receive medical treatment on and off over the years until a rheumatology consult was done in October of 2001. The evaluation documented a normal neurological and musculoskeletal physical exam. The rheumatology exam was positive only for the 18 fibromyalgia trigger points. There were no documented changes in the physical finding of the exam that supported a decrease or significant change in the claimant's condition. In fact the claimant had a normal cardiac exercise test November 9, 2001, as well. . Dr. Miller concluded that the medical records did not substantiate that the patient's condition had changed significantly as of October 3, 2001, to warrant a cessation from work.

- A physician from Primary Care Specialist (signature of doctor illegible) sends a letter dated January 14, 2002, indicating lack of agreement with Dr. Miller 's report, indicating the diagnosis of Fibromyalgia lacks objective findings and the Ms. Denmark describes extreme pain, fatigue and sleep disorder.

- Dr. Peter Schur, performed a second opinion rheumatology consultation on Ms. Denmark on April 12, 2002. Her attending physician, Dr. Goodman, referred her for a second opinion to Dr. Schur. Ms. Denmark, indicates having the condition for 6 years and it worsen by October of 2001, in which she was no longer able to work due to fatigue. She indicates no longer able to do housework, cook, needed help shopping, although able to still do laundry. Main complaints were tiredness, aches and pains all over her body. Sleeps only 4-5 hours of sleep with self reported morning stiffness. Physical exam indicates muscle tone is poor throughout and she has 30 tender points all over. On the other hand, the examination of her fingers, hands, wrists, and elbows shows normal range of motion, no swelling and no inflammation. She has decreased abduction in both shoulders, more on the right than on left and decreased rotation in both shoulders, some decreased rotation in both hips. Can't do straight leg raising because of back discomfort and somewhat uncomfortable over both greater trochanters. The shoulder and pelvic girdle problems plus her history of elevated sedimentation

Diane Denmark
3

rate would make one suspect PMR, but he thought most of this, in fact, as suggested by others, is classical fibromyalgia. He found that CRP much better for evaluating inflammation than a sedimentation rate, but given her morning stiffness, makes on suspect either PMR or, in fact RA and wonder what a rheumatoid factor, CRP and x-rays of the hands might show. He was unsure about her cardiac disease. He gathered all of her stress tests, which were normal and wonder what her holter monitor showed and whether it did indeed show tachycardia requiring all of the medications that she is taking. Chest pain lasting just a few seconds doesn't sound like angina. He brings this up only because she is taking a lot of medications and really wonder whether she needs so much. For instance, beta blockers have been associated with fatigue. Dr. Shur, concluded that she was not able to work due to her symptoms.

- Psychiatric consultative examination report from psychologist, Dr. Taylor dated, July 24, 2002. This examination was arranged by the Massachusetts Rehabilitation Commission Disability Determination Services. Ms. Denmark was seen for a psychodiagnositic interview and arrived at the appointment driven there on her own. Her complaints were a lack of concentration and that she had Fibromyalgia. There was a request for a full mental status examination, diagnostic impression and assessment of substance abuse and statement regarding functional capacity. There was also a request to note her ability to concentrate during the session. Dr. Taylor had a copy of Dr. Schur's report and Ms. Denmark indicated that she continued with the same complaints as noted in this report including fatigue, problems sleeping, aches/pains all over and inability to do much without assistance other than being able to do laundry by herself. After the examination, Dr. Taylor states Ms. Denmark presents as mildly depressed and the mental status examination was essentially unremarkable. He notes that it is likely that Ms. Denmark may have some difficulty with concentration when she becomes overly fatigued. She was noted to be cognitively capable of performing full range of ADL's; however, she reports physical restrictions. The primary diagnostic impressions are adjustment disorder with depressed mood, as well as, a diagnosis of sleep disturbance. He finds that her depression, in and of itself, does not prevent her from gainful work.

- Activity Check performed in October of 2002, in which Ms. Denmark was observed demonstrating the ability to walk with a normal gait with no pain behaviors noted while she drove around from 10:00 am -1:10 pm running errands, which included going to the bank, going to the grocery store: pushing a cart and shopping through the isles, moving fluidly while bending and lifting a case of soda and a gallon of milk with no difficulties. She loaded her grocery bags into her car and went to the cleaners to drop off her clothing. Later she were seen going into a drug store and after exiting the store, she returned home and brought her groceries bags into her home. No restrictions and limitation were noted throughout these observations.

Diane Denmark
4

- Peer Review performed December 4, 2002, by Dr. Bomalaski, Board Certified
  Internal Medicine, Rheumatology. Dr. Bomalaski reviewed all of the medical
  records and reports that were available in Ms. Denmark's claim file. He
  concludes that the physical examination and testing do not support the diagnosis
  of Ms. Denmark's treating physicians, at least within the records provided. There
  is no documentation of laboratory testing ruling out coexisting causes of myalgia
  such as hypothyroidism or disorders of calcium metabolism. She did have an
  elevated sedimentation rate in the past and further testing related to that is not
  available nor is a rheumatoid factor, as suggested by Dr. Schur. Ms. Denmark has
  areas of discomfort on examination, but objective findings such as abnormal lab
  tests are not provided in the medical records for review. The clinical medical
  evidence does not clearly support severe impairment because as noted the
  diagnosis of fibromyalgia remains in question not only by this reviewer but also
  by Dr. Schur, the consultant rheumatologist. Limitations of ability to function are
  difficult to assess related to Ms. Denmark's impairment, although related
  surveillance photos do show that she is able to go shopping, use grocery cart and
  is able to lift with one hand a gallon of water and put groceries in her car. Dr.
  Bomalaski concludes that Ms. Denmark would be capable of full time sedentary
  work. He notes the following restrictions: Occasional sitting, standing, walking,
  pushing, pulling grasping and occasional repetitive motions with the upper
  extremities and lifting up to 20 lbs. She could perform bending, kneeling,
  squatting and climbing on a seldom basis.

The results of the Rheumatology Peer Review performed based on Ms. Denmark's
medical records, we were able to utilize Ms. Denmark's functional capacity in
comparison to her occupational duties as a Manufacturing Group Leader. A Vocational
Consultant conducted a Labor Market Survey to determine the physical requirements of a
group leader. The results of the Labor Market Survey defined the physical demands as
sedentary to light with occasionally lifting up to 20 lbs. The duties require primarily
sitting with occasional standing, walking and bending with the opportunity to change
positions. Most employers noted occasional to frequent use of the hands.

Given that the medical evidence lacks support of a severity of impairment that would
preclude Ms. Denmark from performing her own occupational job duties as customarily
performed, it is determined that she does not meet the above definition of disability as
defined in part (i). Therefore no benefits are payable.

This claim determination reflects an evaluation of the claim facts and applicable policy
provisions. Please note that decisions rendered by the Social Security Administration or
Workers' Compensation are not determinative of entitlement to benefits under the terms
and conditions of the Genrad Inc.'s Group Disability Income Policy.

Under the Employee Retirement Income Security Act (ERISA) Appeal guidelines, Ms.
Denmark was entitled to appeal the determination made by Liberty Life Assurance
Company of Boston (Liberty), and to submit any additional information wished to be

Diane Denmark
5

considered as part of the appeal. Liberty has conducted a full and fair review of Ms. Denmark's appeal and accompanying materials, and have determined that the denial of benefits will be maintained.

At this time, Ms. Denmark's administrative right of review has been exhausted and no further review will be conducted by Liberty. Ms. Denmark may request to receive, free of charge, copies of all documents relevant to her claim. Ms. Denmark has the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Sincerely,

Michelle Scott, DCP, HIA
Appeal Review Consultant
1-800-320-7585 Ext. 291
Fax# 1-800-320-7583


cc:    Diane Denmark

 

BRIGHAM AND
WOMEN'S HOSPITAL

HARVARD MEDICAL SCHOOL

Department of Medicine
Division of Rheumatology/ Immunology/ Allergy
75 Francis Street
Boston, Massachusetts 02115

Peter H. Schur, M.D.
Professor of Medicine

E-mail: phschur@bics.bwh.harvard.edu
Tel: 617 732-5356, Fax: 732-5505

Denmark Diane
17587692

04/12/02

Thomas Goodman, M.D.
Primary Care Specialists
190 Groton Road
Ayer, MA 01432

Dear Dr. Goodman:

Thank you for asking me to see Ms. Denmark in consultation
regarding her fibromyalgia. The patient says that she was
referred to me to see another rheumatologist regarding
disability in respect to her employment at Terradyne. The
patient says that she has been working there for decades,
and Terradyne's predecessor.

The patient says that she was diagnosed as having
fibromyalgia 6 years ago, and in the last year, it has
gotten worse to the point that, last October, she could no
longer work because she was so tired. Now, she can no
longer do housework, cook, needs help shopping, although she
is still able to do her laundry. She is just tired all the

Patient: DENMARK,DIANE   MRN: 17587692 (BWH)
Author: Peter H. Schur, M.D.

Page 1 of 4

Status: Imported
Visit Date:04/12/2002

AR00389

time, has lots of aches and pains all over her body, particularly her neck, upper back, and mid and low back. Also, she is able to fall asleep. She wakes up typically after a few hours, then has a lot of trouble going back to sleep and averages 4-6 hours of sleep at night. She says that her husband snores and that bothers her, and she also says that her husband says that she snores. She says she also has morning stiffness, which lasts all day, which wasn't helped very much by physical therapy. She is able to go on a treadmill just for a few minutes every day.

The patient has also had bouts of chest pain for the last 14 years. She says that she has had a number of stress tests, which she says have been normal, but her Holter monitor, she says, has shown skipped beats. She has been diagnosed as having angina and takes a lot of medications. She describes her anginal attacks as a tightness in her precordial area, which sometimes may radiate to the left shoulder, which lasts no more than a few seconds. She also complains of swelling in her neck, by which she means the muscles are hard and tight. Also, complains of swelling in her calf and, on further description, she means they are tight.

She has had no joint swelling, no fevers, no rashes. Eyes are somewhat dry. Jaw sometimes feels like it has dislocated, and she has had chronic sinusitis with repeated infections. No history of thyroid disease, had pneumonia once, bronchitis a few times, and has been told of mitral valve prolapse, but no hypertension. She suffers from gastric reflux and gas, but no other GI problems. A urinary tract infection years ago. Pregnant twice, has a healthy 29 year old daughter and 34 year old son. Her periods stopped a year ago. Before that, they were irregular. She has never been on hormone replacement. She has been told that she has been anemic and actually had some transfusions. She is allergic to sulfonamides. No fractures. Only surgery was for removal of a right ovarian cyst.

FAMILY HISTORY: Mother has hypertension and arthritis. She knows nothing about her father. One sister has MS.

SOCIAL HISTORY: She doesn't smoke, doesn't drink. She was working as a quality control auditor and group leader.

CURRENT MEDICATIONS: Nitroglycerin 0.4 mg for the "angina," Pravachol 20 mg at night for high lipids, Claritin 10 mg a day for postnasal drip, verapamil 80 mg 3 times a day for tachycardia, a diuretic triamterene hydrochlorothiazide 37.5/25 1 per day for this swelling in her neck, hands, and legs, isosorbide 3 times a day, atenolol 25 mg per day, potassium chloride 10 mEq twice per day, Daypro 600 mg twice a day for "inflammation," nortriptyline 25 mg at night, which she has taken for 5 weeks and doesn't think that it has helped much. She was on previous trials of amitriptyline anywhere up to 20 mg at night, which made her groggy, and Flexeril, which, she says, doesn't help. Also, takes Flonase nasal spray periodically and receives vitamin B12 once a month. She was taking Centrum and iron.

PHYSICAL EXAMINATION: She is a well-nourished,

Patient: DENSMER,DIANE   MRN: 17587692 (BHH)
Author: Peter H. Schur, M.D.

Page 2 of 4

Status: Imported
Visit Date:04/12/2002

AR00390

well-developed white lady. Blood pressure is 130/80, pulse
is 100 and regular, and respirations are 18. Skin: No
rashes. No nodes in her neck. Mouth and throat clear.
Chest: Clear to P&A. No CVA tenderness. Heart: No
murmurs. Abdomen: No organ mass or tenderness, enlarged
liver or spleen. Extremities: Her muscle tone is very poor
throughout. She has about 30 tender points all over,
including in her hands, wrists, elbows, around her
shoulders, back, and neck, upper back, middle and low back,
as well as lower extremity. On the other hand, examination
of her fingers, hands, wrists, and elbows shows normal range
of motion, no swelling, and no inflammation, but she has
decreased abduction in both shoulders, more on the right
than on left, and decreased rotation in both shoulders, some
decreased rotation in both hips. I cannot not do straight
leg raising on either leg because of back discomfort. She
is somewhat uncomfortable over both greater trochanters.
Knees show no crepitus, no synovial thickening on ankles,
and no MTP squeeze tenderness.

The shoulder and pelvic girdle problems plus her history of
an elevated sedimentation rate would make one suspect PMR,
but I think most of this, in fact, as suggested by others, is
classical fibromyalgia. I find a CRP much better for
evaluating inflammation than a sedimentation rate, but given
her morning stiffness, makes one suspect either PMR or, in
fact, RA, and wonder what a rheumatoid factor, CRP, and
x-rays of the hands might show.

I am not clear about her cardiac disease. I gather all of
her stress tests have been normal, and wonder what her
Holter monitor showed and whether it did indeed show runs of
tachycardia requiring all the medications that she is
taking. Chest pain lasting just a few seconds doesn't sound
like angina to me. I bring this up only because she is
taking a lot of medications, and I really wonder whether she
needs so much. For instance, beta blockers have been
associated with fatigue.

The patient clearly has a sleep disorder and, because she
snores, one wonders about sleep apnea and would recommend a
sleep study.

I certainly endorse the use of tricyclics to try and cut
down pain and help her sleep. We find that some patients
are resistant to it, but adding Prozac often is synergistic
and would help. If that still doesn't help her sleep, I
would put her on a sleeping medication like trazodone, so
that she isn't so tired and, hopefully, can get some of her
stamina back. However, she is severely deconditioned and
clearly needs to get some exercise but probably won't until
she sleeps.

Therefore, at least for the time being, she is clearly
disabled not only from work, but being able to take care of
her household. What I have suggested above is some
modifications of her regime that hopefully will improve
matters, so that she can get her stamina back and be able to
go back to work. However, for now, until that is
accomplished, which may take months, she is clearly

Patient: HENSRUK, DIANE    MRN: 17587692 (BWH)
Author: Peter H. Schur, M.D.

Page 3 of 4

Status: Imported
Visit Date: 04/12/2002

AR00391

disabled.

Thank you again for asking me to see her. Please let me
know if I can be of any further assistance.

Sincerely yours,

PS: Given the fact that she deteriorated with her
menopause, one wonders whether hormone replacement might not
be of benefit.

Peter Schur, M.D.

eScription document 1-472732 KFFocus

DD: 04/12/02
DT: 04/13/02
DV: 04/12/02

AR00392

 **Liberty Mutual.**

Liberty Life Assurance of Boston
Disability Claims
P.O. Box 5031
Wallingford, CT 06492-7531
Phone No.: 888-440-6118
Fax No.: 203-294-4298

December 26, 2001

Diane Denmark
36 Nashua St
Ayer, MA 01432-0000

RE:   Short Term Disability Benefits
      Genrad Inc.
      Claim Number: 991112

Dear Ms. Denmark:

We are writing in regard to your claim for disability benefits. We have completed a thorough review of
your eligibility for disability benefits, and have determined that benefits are not payable. Genrad Inc.'s
Short Term Disability Benefits plan requires that to receive benefits you must meet the following
definition of disability:

*"Disability" or "Disabled" means you are unable to perform all of the material and substantial duties of your occupation
on an Active Employment basis because of an Injury or Sickness.*

In order to evaluate whether or not you met the above definition of disability, we requested medical
information from your physician(s), and then compared your restrictions and limitations to the
requirements of your job with your current employer.

You submitted a claim for fibromyalgia, and the medical documentation from Dr. Malanoski shows
the October 4, 2001 physical examination noted general point muscle tenderness, no nodes, lungs clear
and heart sounds normal. Review of office notes submitted from 1996 to present clearly document
that you have been able to function without restrictions and that physical therapy has relieved your
symptoms in the past.

We also requested information from Dr. Goodman – the office visit note of October 8, 2001. The
neurological and musculoskelatal physical examinations were normal. The rheumatological
examination outlined 18 positive tender points. Dr. Goodman indicates present symptoms are
exacerbated by menopausal symptoms and that you are able to engage in regular exercise. Medications
and physical therapy were prescribed.

The results of the November 9, 2001 cardiac exercise test received from your cardiologist, Dr. Hack,
are normal.

Review of your claim, including the evaluations by all three of your providers, was completed by an
independent physician, Dr. Clay Miller, Physical Medicine and Rehabilitation. Dr. Miller determined
"there are no documented objective physical exam findings that support a decrease or significant
change in this patient's physical condition." Therefore, restrictions and limitations cannot be defined.

Diane Denmark
December 26, 2001
Page 2 of 2

Your job as a Group Leader - Manufacturing Inspection requires that you oversee inspection of
components, modules and finished systems, monitoring job performance, and ensuring efficient work
flow. Based on the medical information in relation to your job requirements, there are no restrictions
or limitations that preclude you from performing the duties of your job at Genrad Inc. Therefore, you
do not meet your plan's definition of disability, and we must deny your claim for benefits.

This claim determination reflects an evaluation of the claim facts and plan provisions. We reserve the
right to make a determination on any additional information that may be submitted.

Under the Employee Retirement Income Security Act of 1974 (ERISA), you may request a review of
this denial by writing to the Liberty Life Assurance Company of Boston representative signing this
letter. The written request for review must be sent within 60 days of the receipt of this letter and state
the reasons why you feel your claim should not have been denied. In your request for review, include
documentation such as testing results or consultations which you feel will support your claim. You
may request to review pertinent claim file documents upon which the denial of benefits was based. If
Liberty Life does not receive your written request for review within 60 days of your receipt of this
notice, our claim decision will be final, your file will remain closed, and no further review of your claim
will be conducted. Under normal circumstances, you will be notified of the final decision within 60
days of the date that your request is received. If there are special circumstances requiring delay, you
will be notified of the final decision no later than 120 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any Genrad Inc. rights and defenses under the
above captioned plan, and all of these rights and defenses are reserved to the Company, whether or not
they are specifically mentioned herein.

If you have any questions about this determination please call me.

Sincerely,

*Mary Ellen Smith*

Mary Ellen Smith
Disability Case Manager
Phone: (888) 440-6118 ext. 358
Fax: (203) 294-4298

AR00475



**Liberty Life Assurance Company of Boston**

August 20, 2002

P.O. Box 5031
Wallingford, CT  06492-7531
(888) 440-6118 Toll Free
(203) 294-4298 Fax

C. Gregory Howard
Attorney At Law
45 Merrimack St.
Suite 323
Lowell, MA  01852

RE:    Long Term Disability Benefits
       Diane Denmark
       Claim #: 735355

Dear Mr. Howard,

We have completed a thorough review of Diane Denmark's claim for long term disability benefits. The Teradyne, Inc. long term disability policy requires that to receive disability benefits the Covered Person must meet the definition of disability and satisfy an Elimination Period as follows:

*"Disability" or "Disabled" means:*

*If the Covered Person is eligible for the 24 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*

*Thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*

*"Elimination Period" means a period of consecutive days of disability or partial disability for which no benefit is payable. The elimination period is shown in the Schedule of Benefits and begins on the first day of disability.*

*If the Covered Person returns to work for any 30 or fewer days during the Elimination Period and cannot continue, Liberty will count only those days the Covered Person is Disabled or Partially Disabled to satisfy the Elimination Period.*

AR00404

Ms. Denmark submitted a claim for Fibromyalgia with a date of disability of October 3, 2001. A review of Dr. Gregory Malanoski's medical records from 1996 to the present indicated that she had been able to function without restrictions, and that physical therapy relieved her symptoms.

Dr. Thomas Goodman's office note of October 8, 2001 indicated that Ms. Denmark's neurological and musculoskeletal examinations were normal. The examination outlined 18 positive tender points, noting that her present symptoms were exacerbated by menopausal symptoms, and that she was able to engage in regular exercise. Dr. Goodman prescribed medications and physical therapy. Ms. Denmark was previously able to attend physical therapy sessions without an interruption of her occupational functioning.

On November 9, 2001, Ms. Denmark was seen by a cardiologist, Dr. Terrence Hack. The information submitted by Dr. Hack confirms that there are no serious cardiac arrhythmias and her stress test was normal.

A peer review was conducted by Dr. Clay Miller. Dr. Miller's conclusion was as follows, "The documentation provided does not indicate a significant change in the patient's condition about the time of disability 10/3/2001 because there are no objective physical functional deficits documented and patient had a normal cardiac exercise test 11/9/2001."

On December 26, 2001, a letter was sent to Ms. Denmark advising her that her claim for benefits had been denied. On January 17, 2002, subsequent to Ms. Denmark's appeal of her denial, a letter was sent to your office advising that the appeal documentation had been forwarded to Ms. Denmark's employer, with the explanation that Liberty Life Assurance Company of Boston provides claims management to GenRad, Inc. on an administrative services only basis, not to include appeal reviews.

We were notified on May 7, 2002, that Teradyne, Inc. had made a decision to have Ms. Denmark undergo an Independent Medical Examination. Included was a copy of the examination, and a request to revisit our decision. At that point, Teradyne, Inc. was advised that due to a prior agreement with the company, this decision was to be made by the employer. Liberty then received correspondence dated June 21, 2002 from Elaine Wallace, at Teradyne, Inc. which indicated that "Teradyne has made the decision to pay Diane Denmark (Claim No 991112) her Short Term Disability pay through 4/3/2002 based on her Independent Medical Exam. Per her attorney she is now filing additional information for Long Term Disability...".

AR00405

Based solely on the decision by Teradyne, Inc., Ms. Denmark's Short Term Disability claim was paid through April 2, 2002.

The Independent Medical Examination by Dr. Peter Shur was reviewed by a Nurse Case Manager. Our assessment of the new information provided by Dr. Shur does not find any information to alter our previous findings that there was no significant change in Ms. Denmark's condition on October 3, 2001 which would preclude her from performing the Material and Substantial duties of her occupation.

Ms. Denmark has not met the definition of disability and therefore did not satisfy a 180 day Elimination Period. Consequently, we are unable to provide benefits to her and must deny her claim for Long Term Disability Benefits.

This claim determination reflects an evaluation of the claim facts and policy provisions. We reserve the right to make a determination on any additional information that may be submitted.

Under the Employee Retirement Income Security Act of 1974 (ERISA), you may request a review of this denial by writing to:

> Liberty Life Assurance Company of Boston
> Attn: Elizabeth Kiernan
> PO Box 5031
> Wallingford, CT 06492

The written request for review must be sent within 180 days of your receipt of this letter and state the reasons why you feel your claim should not have been denied. If Liberty does not receive your written request for review within 180 days of your receipt of this notice, our claim decision will be final, and no further review of your claim will be conducted. In your request for review, include documentation such as office or chart notes, hospital records, or test results which you feel will support your claim. You may request to receive, free of charge, copies of all documents relevant to your claim.

Under normal circumstances, you will be notified of the final decision within 45 days of the date that your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision within 90 days after your request for review is received. Additional time for final decision may exceed 90 days to the extent that the timeframe is tolled while Liberty is awaiting receipt of requested documentation needed to fully evaluate your claim. You have the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

If you have any questions about this determination write us at the address listed above.

Sincerely,


Elizabeth Kiernan
Senior Disability Case Manager
1-888-440-6118 Ext. 283
fax (203) 294-4298

cc: Diane Denmark

AR00407

## APPEAL RECOMMENDATION

To:  Claim File

Office#: 163    Manager:  Kristianne Corporan    Case Mgr:  Elizabeth Kiernan

From:  Appeal Review Consultant, Michelle Scott    Date:  12/05/2002

Claimant Name:  Diane Denmark    Claim #:  735355

Policyholder/Self-Insured Plan holder:    Genrad Inc.

Additional reviews performed by Appeal Review unit:

[ ] IME    [X] Peer Review    [ ] MDS Referral    [ ] Medical Director
[X] VCM    [ ] None    [ ] Other _____

Recommendation (Check One)

[ ] Reversal    [ ] Returned for Add'l Inv estigation    [X] Uphold *

*Upheld denials/terminations will remain in Appeal Review unit for 2 months

File Analysis:

⬤yrs old female Group Leader (Manufacturing Inspection) with job duties detailed as lifting up to 25 lbs, bending, squatting and body movement involved in inspecting external and internal components of various products. DX: Fibromyalgia  DOD: 10/3/01 Own Occ LTD eff. 4/1/02. No LTD Bnfts Paid.

MDS review in 11/01 (as clmt applied for STD bnfts) indicated clmt diagnosed with Fibro for 5 years and there were noted episodes of flare ups throughout this time, however, there was limited evidence to support a need to cease working and she was able in fact to work at her own occupation for long hours. There was no indication of what changed in her condition to warrant r/l's noted by her PCP, Dr. Malanowski . Complaints noted were general myalgias, headaches, general point muscle tenderness. Other diagnoses noted: Pernicious Anemia (requires B 12 injections), multiple episodes for Sinusitis, Diverticulitis with Gastrointesinal bleeding in 3/01, Iron Deficiency Anemia caused by Uterine bleeding caused by HRT. The anemia was of such severity she had to have blood transfusion in 5/00.   MDS found that clmt was under appropriate care and tx and has responded to PT in the past for her symptoms.

Rheumatologist, DR. Goodman's, m edical records indicated seen initially 10/01 and had hx of present illness c/o increased fatigue, exhaustion, myalgia, insomnia x 1-2 yrs, dx with fibro 6 yrs ago and pt in the past has helped esp.

with neck and shoulders. Physical exam was negative except for 18/18 trigger points. Clmt noted to have hx for cardiac afibillation and wasn't a g ood candidate for elavil. Clmt to continue Daypro, added flexeril. In subsequent visit clmt complained of heart palpitations and had holter monitor as she was being seen by cardiologist. Clmt noted to have hot flashes, night sweats and poor sleep and Dr. Goodman felt that she had Fibro complicated by menopause.

Cardiologist, Dr. Hack's, m edical records obtained and reviewed.  Holter monitor dated 11/15/01 indicated normal sinus rhythm/sinus tachycardia with atrial premature contractions---no supraventricular tachycardia or ventricular tachycardia. Stress test performed 11/9/01 concludes that clmt achieved 78% of target heart rate there was no chest pain, or st segment changes on EKG with exercise. Clmt did experience mild SOB but maintained oxygen saturation of 98%. Impression was normal exercise test, limited by symptoms.
Echocardiogram 11/9/01 indicated normal left ventricle function, mitral valve prolapse and trace mitral regurgitation. MDS found that the ''ho lter monitor does not demonstrate serious cardiac arrhythmias, as sinus tachycardia & atrial premature contractions can occur w/normal functioning. holter does not demonstrate atrial fibrillation as stated in rheumatologist's note as being a contraindication to placing on elavil. exercise stress test does not show evidence of cardiac ischemia to warrant r/l's. The fact that clmnt experienced fatigue & shortness of breath during exercise may reflect general deconditioning. echocardiogram did confirm mitral valve prolapse, but per previously reviewed medical records, this is not a new finding. this condition usually requires prophylactic antibiotics during invasive procedures or dental work to prevent the development of infection of the heart valves. It would not support the need for r/l's' '.

After this review MDS determined that Peer Review should be performed. MDS review ''rev iewed the peer review report completed by Dr Clay Miller, PM&R, dated 12/5/01. Dr indicates review of the medical information does not provide objective findings that would indicate a significant change in clmt's condition on or about DOD. Tx to date has been appropriate but multidisciplinary chronic pain management w/ behavioral interventions recommended.  He notes there are no objective physical functional deficits documented and clmt had a normal cardiac exercise test on 11/9/01. The review finds clmt has had problems w/ chronic pain dx as fibromyalgia 4/96 and received medical tx and reported varying symptoms on and off through the years . Due to increased c/o fatigue, clmt underwent rheumatology eval 10/8/01 which documented a normal neurological and musculoskeletal physical exam ; rheumatology exam + for 18-fibromyalgia tender points. Medications and physical therapy which were prescribed were appropriate for the given diagnosis but recommendation for multidisciplinary chronic pain mgt program

w/ behavioral intervention would be medically appropriate due to continued pain syndrome. Based on the peer review findings, no objective change in clmt`s status as of DOD defined and therefore no r/l defined.' '

Recommendations was made to deny claim which the ER supported. However, on appeal which the ER handled, clmt attend an IME 4/12/02 with Dr. Peter Schur who the treating Rheumatologist, Dr. Goodman, referred clmt to for a second opinion. MDS review ''Dr. Schur rev iew history of present illness, with diagnosis of fibromyalgia made 6 years ago, with being unable to work since October because she was so tired & has aches & pains in her neck, upper, mid & low back, & has disturbed sleep. Clmnt also reports morning stiffness, lasting all day, & not relieved with pt. Clmnt reports to dr. Schur chest pain x 14 years, with normal stress tests, but has been diagnosed w/angina & is on a lot of medication. Other medical problems reported by clmnt include calf swelling/tightness, chronic sinusitis w/repeated infections, bronchitis, mitral valve prolapse, gerd, gas, anemia. Medications as of 4/02 included: nitroglycerin, pravachol, claritin, verapamil, triamterine/hctz, isosorbide, atenolol, kcl, daypro 600 mg bid, nortriptyline 25 mg @ hs [x 5 weeks], flonase nasal spray, vitamin b-12 q month, centrum vitamin & iron. Previous trials of amitriptyline [elavil] caused drowsiness & flexeril, which did not help. Abnormalities noted on Physical exam: poor muscle tone throughout, 30 tender points all over, decreased abduction in both shoulders r > l, decreased rotation in both shoulders, & some decreased rotation in both hips. Slr unable to be tested due to reports of back discomfort; uncomfortable over both greater trochanters [hips]. Dr. Schur was suspicious of pmr [polymyalgia rheumatica] or ra [rheumatoid arthritis], but concurred that most likely sxs were due to classical fibromyalgia, although he did suggest additional lab & x-rays. Dr. Schur felt that her cardiac disease was unclear, & questioned if all the cardiac medications are necessary, as beta blockers [atenolol] have been associated with fatigue. He recommended a sleep study to evaluate her sleep disorder & r/o sleep apnea because clmnt snores. Dr. Schur endorsed the use of tricyclics to decrease pain & improve sleep, & suggesting adding prozac for synergy, or trazadone for sleep so she can rest & regain stamina. He notes that clmnt is severely deconditioned & needs to get some exercise. He opined that clmnt is disabled for the time being, but with the above suggestions & modifications of her regime, she may regain her stamina & rtw. He estimated that this will take months, & also suggests that hormone replacement therapy may be of benefit since she deteriorated with menopause. There are no other medical reports in file, & clmnt states that dr. Goodman has assumed her care as Dr. Malanoski has left the practice. Review of occ. Description identifies occ. As light with frequent reaching, handling, fingering, talking, hearing, near acuity, & occasional depth perception, accommodation & color vision. There is no indication of constant standing requirement either in job or occ. description.

The ER elected to approve STD benefits on the basis of the IME and clmt's Atty requested LTD bnfts which we denied 8/02 as the medical evidence did not support that the clmt meet the elimination period and is disabled according to the LTD definition of disability. No additional medical was forwarded for the LTD review other than Dr. Goodman's pro gress report in 12/01.

### Additional Information forwarded for Appeal

No new medical records were forwarded for review. Atty indicates that all medical opinions including the ER's expert clearly supports clmt inability to work.

Plan: Advise Atty that medical records from Cardiologist, PCP, and Rheumatologist (as well as any other treating providers) for period of 12/01 needs to be forwarded for this review. Also will have activity check performed as clmt indicates severe limitations in performing ADL's o n the Activities Questionnaire she completed in July. Will prefer for Rheumatologist Peer Review. Also have LMS performed to get actual physical job requirements for own occ.

LMS performed 11/18/02 indicates clmt's o wn occupation as a Group Leader could be classified as sedentary to light. 7 employers contacted and ER reported that job duties primarily involved sitting with occasional standing walking and bending. One ER noted that the opportunity to change positions was available and most ER reported occasional to frequent use of the hands with occasional lifting up to 20 lbs.

Received Peer review by Dr. Bomalaski, Board Certified Internal Medicine and Rheumatology, dated 12/4/02 concludes that the clinical medical evidence does not clearly support severe impairment because as noted the dx of fibro remains in question not only by this reviewer but by the IME done by Dr. Schur, the consultant rheumatologist who examined the clmt at the request of her treating rheumatologist. He finds that based on the job description provided the clmt would be capable of full time work in a primarily sedentary position within the limitations noted on the Functional Capacities form. He thinks lab studies should be performed to rule out other diagnoses as suggested by Dr. Schur and other treatment and muscle relaxant other than flexeril should be considered. Treating her underlying depression could also improve her overall general discomfort. FYI Dr Bomalaski did review the activity check and photographs taken during a active day for the clmt which he states supported sedentary capacity. Functional Capacity form notes <u>occasionally</u>: sitting, standing, walking, bending, repetitive motions of wrist elbow shoulder and ankle and

lifting up to 20 lbs. All of these duties are an occasional basis which supports her ability to do her own occupation as outlined in the LMS and her own job description which just isn't as detailed co ncerning all the physical requirements but notes occasional lifting up to 25 lbs.

Recommendations:

As clinical evidence reviewed by the Peer Review DR does not support severity of a condition that would prevent performing her own occupation as identified as sedentary to light with the ability to change position and occasional lifting up to 20 lbs (max). Most of the ER had positions that fit perfectly within the r/l's as noted by the peer review. Therefore, recommend to uphold denial and no bnfts are found to be payable.

Response:

 **Liberty Mutual.**

Liberty Life Assurance of Boston
Disability Claims
P.O. Box 5031
Wallingford, CT 06492-7531
Phone No.: 888-440-6118
Fax No.: 203-294-4298

October 25, 2001

Diane Denmark
36 Nashua St
Ayer, MA 01432-0000

cc
Genrad Inc.
Attn: Beth Gorelick
7 Technology Park Drive
Westford, MA 01886-0033

RE: Short Term Disability Benefits
GENRAD INC.
Claim Number: 991112

Dear Ms. Denmark:

We are in need of your assistance in obtaining information necessary to process your request for disability benefits. GENRAD INC.'s Short Term Disability Benefits plan requires that you provide proof of disability in order to receive benefits. This proof must be provided within a reasonable timeframe of your absence from work.

We have tried contacting your treating physician on October 18, 2001 to support your claim for disability benefits. As of the date of this letter, I have not received the requested information. I have enclosed a copy of the Restrictions Form and the Attending Physician's Statement that is to be signed by you and given to your physician. Please provide the signed copy of this form to your physician for completion and have faxed back to our office. Liberty's fax number is (888)443-6123. Please contact your treating physician today to complete and return the medical forms to our office.

Your cooperation in providing the requested information is essential to our claims investigation. We ask that you provide us with this information no later than November 9, 2001 as required under the terms of your contract. If there are any other attending physicians or specialists that we are not aware of, please have them forward all of your medical records pertinent to this period of disability within the timeframe stated above. In the absence of this information we will make a claims determination based on the information in our file.

If approved for payment, your claim will be routinely reviewed to ensure you continue to qualify for benefits. Ongoing proof may be necessary to substantiate continued disability and therefore requests may be made for additional information to your employer or physician.

AR00558

Diane Denmark
October 25, 2001
Page 2 of 2

If you have any questions about your application for benefits please call me.

Sincerely,


Crystal Shepard
Insurance Assistant
(888) 440-6118 ext. 368
Fax: (203) 294-4298

Helping People Live Safer, More Secure Lives.

AR00559