UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANE DENMARK,<br><br>    Plaintiff<br><br>v.<br><br>LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, THE GENRAD, INC. LONG TERM DISABILITY PLAN, THROUGH TERADYNE, INC., AS SUCCESSOR FIDUCIARY<br><br>    Defendants | Civil Action No. 04-12261-DPW |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Liberty Life Assurance Company of Boston ("Liberty Life") and The Genrad Inc. Long Term Disability Plan, through Teradyne, Inc., as Successor Fiduciary ("The Plan"),[1] submit this memorandum of law in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56. Because there are no material facts in dispute and because the decision to deny Plaintiff's application for long-term disability benefits was reasonable, Defendants are entitled to judgment as a matter of law on Plaintiff's claims.[2] Further, Liberty Life is entitled to summary judgment on Plaintiff's contract claim based on preemption grounds. This memorandum, Defendants' Statement of Undisputed Material Facts, and the Declaration of Paula McGee are submitted in support of Defendants' motion.

---

[1] The Plan was named as a party in this action, but no specific allegations have been raised against it. Because the Plan is fully insured through a policy of insurance under which Liberty Life pays long-term disability benefits, any award of benefits in this case will be paid by Liberty Life under the policy of insurance. For the purpose of this motion for summary judgment, the Plan joins Liberty Life in the arguments presented herein.

[2] Plaintiff originally brought a claim under Sections 1132(a)(1)(B), (a)(2), and (a)(3) of the Employee Income Retirement Security Act ("ERISA"), and a breach of contract claim. On May 26, 2005, counsel for Plaintiff advised Defendants' counsel that Plaintiff does not intend to pursue her claims under Sections 1132(a)(2) and 1132(a)(3) of ERISA and will withdraw such claims. As a result, those claims should be dismissed.

## **SUMMARY OF ARGUMENT**

Plaintiff was a Group Leader in Manufacturing at Genrad, Inc.[3] In this action, she is seeking long-term disability benefits, which were previously denied by Liberty Life, the claims administrator under the policy of insurance that provides disability benefits under Genrad's group disability insurance plan. Plaintiff claims that she is entitled to such benefits because she is totally disabled from her job due to her alleged fibromyalgia.

Plaintiff's claim for long-term disability benefits was reasonably and properly denied by Liberty Life after it conducted three full reviews of her claims for disability benefits and determined that Plaintiff was not "disabled," as defined under the policy. Specifically, Liberty Life conducted a review of Plaintiff's claim for short-term disability benefits, which was also based upon Plaintiff's alleged disability due to fibromyalgia. Liberty Life's review of Plaintiff's claim for short-term disability benefits included a medical review by a nurse in Liberty Life's Managed Disability Services ("MDS") department and a medical review by an independent physician specializing in Physical Medicine and Rehabilitation. Based upon these reviews and the claims file, Liberty Life reasonably concluded that Plaintiff was not disabled from her own occupation.

Plaintiff subsequently applied for long-term disability benefits, and Liberty Life conducted two reviews of this claim. The initial review of Plaintiff's claim for long-term disability benefits included a review of Plaintiff's medical records by a nurse in Liberty Life's MDS department. After Plaintiff's claim for long-term disability benefits was denied, Liberty Life conducted a subsequent review of Plaintiff's claim when Plaintiff appealed the decision. The subsequent review included an additional review of the claims file by a physician specializing in Rheumatology, as well as a vocational report and a surveillance of Plaintiff's

---

[3] Genrad, Inc. was later acquired by Teradyne, Inc.

activities. The medical professionals who reviewed Plaintiff's claim for long-term disability benefits concluded that Plaintiff's condition did not prevent her from performing the activities of a Group Leader – Manufacturing.

Based on Plaintiff's medical records, the opinions of a reviewing nurse and the independent physicians, and based on the entire claims file, Liberty Life concluded that Plaintiff was not disabled under the policy. In light of its extensive review process and the records in the claims file, Liberty Life's decision was reasonable. As a result, summary judgment in favor of Defendants is appropriate as a matter of law, because Liberty Life's decision to deny Plaintiff's appeal for long-term disability benefits was not "arbitrary and capricious" and therefore should be upheld under the Employee Retirement Income Security Act of 1974 ("ERISA").

## SUMMARY OF PRIOR PROCEEDINGS

Plaintiff filed her Complaint on September 15, 2004 asserting claims under Section 502(a) of ERISA for wrongful denial of long-term disability benefits. (Complaint, ¶¶ 21-27) Plaintiff also asserted a breach of contract claim against Liberty Life. (Complaint, ¶¶ 28-30). Defendants filed their respective Answers to Plaintiff's Complaint on November 19, 2004, in which they denied Plaintiff's allegations. The Court approved the Parties' Joint Statement Pursuant to Local Rule 16.1(D), which included a Proposed Pre-Trial Schedule and Discovery Plan. (See Joint Statement Pursuant to Local Rule 16.1(D)).

Based on the pre-trial schedule, Plaintiff filed a motion for discovery on January 20, 2005. Defendants opposed this motion. On February 4, 2005, Defendants moved for application of an "arbitrary and capricious" standard of review, and Plaintiff moved for application of a "*de novo*" standard of review. On April 4, 2005, at a hearing on the pending motions, the Court granted Plaintiff's motion for discovery and denied the parties' motions regarding the standard of review to be applied in this case, stating that the parties should include arguments relating to this

issue in their motions for summary judgment.[4] As a result, Defendants now move for summary judgment in this matter based on the administrative record.

## ARGUMENT

### I. The Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Fed. R. Civ. P. 56 advisory committee's note), rev'd and remanded on other grounds, 976 F.2d 77 (1st Cir. 1992); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Thus, summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The standard for summary judgment is different in denial of benefits cases under ERISA than in other civil cases. The First Circuit has explained the standard in these cases as follows: "In an ERISA benefit denial case, trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Company, 315 F.3d 11, 17-18 (1st Cir. 2002).

Applying this standard in the instant case, Plaintiff's ERISA claims fail as a matter of law, for the reasons set forth below.

---

[4] Although the Court declined to rule on the standard of review at the April 4, 2005 hearing, the Court also indicated that it would likely apply the "arbitrary and capricious" standard of review in this matter:
> "I suspect that I will go off on an arbitrary and capricious standard. I suspect that I won't be using a de novo standard. . . . I would say it's a 95 chance that this is going to be an arbitrary and capricious review."

Transcript from April 4, 2005 Hearing, pp. 3, 13. (Attached as Exhibit A.)

4

**II.    Defendants Are Entitled to Summary Judgment Because Liberty Life's Decision to Deny Plaintiff's Appeal of the Denial of Her Claim for Long-Term Disability Benefits Was Not "Arbitrary and Capricious"**

Summary judgment should be granted in favor of Defendants, because Liberty Life's determination of Plaintiff's claim for long-term disability benefits was not "arbitrary and capricious." The information available to Liberty Life at the time it considered Plaintiff's claim demonstrates that its decision with respect to Plaintiff's claim was reasonable.

**A.    Liberty Life's Determination of Plaintiff's Eligibility for Benefits Should Be Reviewed Under An Arbitrary and Capricious Standard**

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the United States Supreme Court held that "[c]onsistent with established principles of trust law, we hold that a denial of benefits under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan." Firestone, 489 U.S. at 115. The law in the First Circuit is clear: "[w]here a benefits plan grants discretionary authority to the plan administrator, [the First Circuit Court of Appeals] review[s] this administrator's decisions to determine whether they are arbitrary and capricious." Sullivan v. Raytheon Co., 262 F.3d 41, 50 (1st Cir. 2001), cert. denied, 534 U.S. 1118 (2002) (citing Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 418 (1st Cir. 2000) and Terry v. Bayer Corp., 145 F.3d 28, 40 (1st Cir. 1998)). In this case, such discretionary language is present. The Plan expressly states, at Section 7:

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

(See AR 00035). Such language provides a clear grant of discretionary authority to Liberty Life by allocating to it the right to make factual findings, to determine eligibility for benefits, and/or to interpret the terms of the Plan. See Terry, 145 F.3d at 37 (holding that Plan in that case properly granted discretionary authority to Plan Administrator, because it allocated to the Company the right to find necessary facts, determine eligibility for benefits, and interpret the terms of the Plan).

The arbitrary and capricious standard requires this Court to determine only whether an administrator's decision is plausible in light of the record as a whole, or, put another way, whether the decision is within the administrator's authority, reasoned and supported by substantial evidence on the record, that is, evidence reasonably sufficient to support a conclusion.[5] See Sullivan, 262 F.3d at 50; Pari-Fasano, 230 F.3d at 419. "Moreover, the existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary." Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001). Under this standard, "'a court is not to substitute its judgment for that of the [decision-maker].'" Terry, 145 F.3d at 40. The deciding administrator's decision will be upheld if it is reasonable. See id. Because this standard emphasizes reasonableness, the standard recognizes "that in order to find that an insurer had abused its discretion under the contract, [a court] would have to conclude that the insurer's eligibility determination was unreasonable in light of the information available to it." Pari-Fasano, 230 F.2d at 419.

---

[5] Under First Circuit law, even if Liberty Life or any claims fiduciary pays the disability benefits from its own assets, the decision by Liberty Life or any claims fiduciary is still reviewed for reasonableness under the arbitrary and capricious standard. See Pari-Fasano v. ITT Hartford Life & Accid. Ins. Co., 230 F.3d 415, 418-419 (1st Cir. 2000); Doe v. Travelers Ins. Co., 167 F.3d 53, 57 (1st Cir. 1999).

6

**B.  Liberty Life's Decision to Deny Plaintiff's Claim for Long-Term Disability Benefits Was Not "Arbitrary and Capricious"**

The Administrative Record in this case contains ample support for the decision to deny Plaintiff's claim for long-term disability benefits. The extensive medical evidence collected as part of Liberty Life's review of Plaintiff's claim, as well as her related claim for short-term disability benefits, not only reasonably supported a determination that Plaintiff was not entitled to benefits, but compelled such a determination. Plaintiff simply did not meet the definition for "disability" or "disabled" contained in the policy.[6]

As discussed in detail below, Plaintiff's medical condition was reviewed on several occasions, two of which included independent reviews by physicians, which were requested and received by Liberty Life. Liberty Life also received and reviewed reports by a nurse in the MDS department, an occupational analysis of Plaintiff's position, a labor market survey and vocational review, and surveillance of Plaintiff's activities. Throughout that time, Plaintiff, through her attorney, provided supplemental medical records/reports to Liberty Life, which she sought to have considered by Liberty Life. All of these records and reviews were considered as part of Liberty Life's final decision.

As a result of the substantial time and resources expended on the review of Plaintiff's claims for benefits, Liberty Life was able reasonably to determine whether Plaintiff was

---

[6] Section 2 of the Policy defines "Disability" or "Disabled" as follows:

1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:

   i. if the Covered Person is eligible for the 24 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

   ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation. (See Dec. of McGee, ¶ 5; AR 00006).

disabled. Based upon this review, Liberty Life denied Plaintiff's claim for long-term disability benefits, as it found that Plaintiff did not meet the policy's definition of "disabled." In light of the medical evidence presented to Liberty Life, this decision was imminently reasonable.

1. **The Review by Liberty Life of Plaintiff's Claim for Short-Term Disability Benefits**

Several months prior to reviewing Plaintiff's claim for long-term disability benefits based on her alleged disability due to fibromyalgia, Liberty Life received and reviewed Plaintiff's claim for short-term disability benefits. This claim was submitted in October 2001, and was also based upon Plaintiff's alleged fibromyalgia. (AR 00558). After a thorough review of Plaintiff's medical records, a job description of her position as Group Leader - Manufacturing, a review by an independent physician, and a review by a nurse in the MDS Department, Liberty Life determined that the record did not support a finding of disability and, thus, Plaintiff did not meet the requirements under the short-term disability policy for benefits.[7] (AR 00474-475).

The job description for Plaintiff's position as Group Leader – Manufacturing indicated that Plaintiff was responsible for overseeing the inspection of products to ensure that the products met certain specifications and quality standards. (AR 00501). Plaintiff was also responsible for making routine work assignments, monitoring job performance, and ensuring efficient work flow. (Id.) The physical demands of the position were minimal. (Id.) In fact, the position required only bending, squatting and body movement associated with inspecting external and internal components of products, utilizing material handling equipment, and occasional lifting of items up to 25 pounds in weight. (Id.)

---

[7] The short-term disability policy defines "disability" or "disabled" as being unable to perform all of the material and substantial duties of [plaintiff's] occupation on an Active Employment basis because of an Injury or Sickness. (AR 00474).

8

At the request of a Liberty Life Disability Case Manager, Nurse Debra Kaye, a nurse in Liberty Life's MDS Department[8], reviewed Plaintiff's claims file in November 2001. (See AR 00055-65). Based on her review of the office notes of Plaintiff's treating physician, Dr. Gregory Malanoski, Nurse Kaye noted that Plaintiff had a five-year history of fibromyalgia dating back to 1996 with episodes of flare ups in her condition and that she responded to physical therapy during past occurrences. (AR 00065). Nurse Kaye also noted that throughout the five-year period, "there is no evidence that [Plaintiff] needed to cease occupational functioning [and,] in fact, was able to function in an occupational setting full time, working long hours," and that Dr. Malanoski's office notes did not indicate what had changed in Plaintiff's condition to warrant the restrictions and limitations of remaining out of work, which he recommended in 2001. (Id.).

Nurse Kaye also reviewed the office notes of Dr. Thomas Goodman, a Rheumatologist who worked in the same office as Dr. Malanoski, and who had examined Plaintiff on or about October 9, 2001. (AR 00062-64). Based on Dr. Goodman's notes, Nurse Kaye noted that although Dr. Goodman confirmed Dr. Malanoski's diagnosis of fibromyalgia, he stated that Plaintiff was able to exercise on a regular basis and that her condition was complicated by menopause symptoms. (AR 00062). She noted that Plaintiff had other diagnoses, including "GERD (gastroesophageal reflux disease), pernicious [and] iron deficiency anemia, mitral valve prolapse, palpitations, diverticulitis, recurrent sinus [and] upper respiratory infections, [history of] uterine bleeding." (AR 00063). Nurse Kaye also noted that Plaintiff wore a holter monitor for her cardiac symptoms and had a history of arrhythmias and mitral valve prolapse and that it was unclear if these conditions "may be a contributing factor to her current condition." (AR 00060). Moreover, Nurse Kaye opined that the limitation of remaining out of work was not

---

[8] The MDS Department is a department comprised principally of health care professionals such as nurses, and is available as a resource at Liberty Life for obtaining and evaluating information about medical issues involved in administering claims.

9

supported by the medical information in the file. (Id.) Based upon her review of the office notes, Nurse Kaye recommended that Liberty Life obtain an independent medical review of Plaintiff's file to define Plaintiff's condition and her restrictions and limitations. (AR 00061).

As a result, Liberty Life obtained a peer review of Plaintiff's medical records from Dr. Clay Miller, an independent physician specializing in Physical Medicine and Rehabilitation, on or about December 5, 2001. (AR 00482-83). In his report, Dr. Miller stated that Plaintiff had been having problems with chronic pain diagnosed as fibromyalgia beginning in medical records dated April 1996, and that she had received medical treatment off and on over the years. (AR 000483). Dr. Miller noted that Plaintiff had a rheumatology consult in October 2001 and that the consult showed normal neurological and musculoskeletal physical exams. (Id.). In addition, Dr. Miller pointed out that Plaintiff had a normal cardiac exercise test in November 2001. (Id.). Based upon his review of the file, Dr. Miller concluded that there were no documented "physical exam findings that support a decrease or significant change in [Plaintiff's] physical condition." (Id.). Significantly, Dr. Miller concluded that "the medical records do not substantiate that [Plaintiff's] condition significantly changed about the time of disability 10/03/2001" and that there were no "physical functional deficits documented" in the records. (AR 000482-483).

Based upon Dr. Miller's review and the records in the administrative file, Liberty Life, in a letter dated December 26, 2001, denied Plaintiff's application for short-term disability benefits. (AR 00474-475). In this letter, Liberty Life explained that Plaintiff did not meet the definition of "disabled," noting that a review of her medical records revealed that she was diagnosed with fibromyalgia in 1996 and, evidently, had been able to function without restrictions from 1996 to 2001. (AR 000474). Liberty Life also noted that the medical records from Plaintiff's treating physician indicated that Plaintiff was able to engage in regular exercise and that a recent cardiac

exercise test and recent neurological and musculoskeletal physical examinations were normal. (Id.). Liberty Life explained the conclusions of Dr. Miller, determined that there were no restrictions or limitations that precluded Plaintiff from performing the duties of her position, and therefore denied her claim for short-term disability benefits. (Id.). Liberty Life also provided Plaintiff with the necessary information to appeal this decision. (AR 00475).

In January 2002, Plaintiff, through her attorney at the time, appealed the decision to deny her application for short-term disability benefits. (AR 00470). Along with the appeal letter, Plaintiff's counsel enclosed a recent report from Dr. Goodman. (AR 00471). Because Liberty Life provided claims management advice to Genrad on an administrative services basis only, the appeal was referred to Genrad, which was responsible for reviewing and making determinations on all appeals of its employees' short-term disability benefits claims. (AR 00461).

Subsequently, Genrad conducted a review of Plaintiff's appeal of the denial of her claim for short-term disability benefits. In doing so, Genrad reviewed a report provided by Dr. Peter Schur, a Rheumatologist at Brigham and Women's Hospital, who examined Plaintiff in or about April 2002, after her treating physician, Dr. Goodman, referred her to Dr. Schur. (AR 00457). In his report, Dr. Schur concluded that "at least for the time being, [Plaintiff] is clearly disabled not only from work, but being able to take care of her household." (AR 00459) In his April 12, 2002 report, which was based on his examination of Plaintiff -- and not a review of her medical records -- Dr. Schur noted that Plaintiff's shoulder and pelvic girdle problems, as well as her history of an elevated sedimentation rate, would make one suspect PMR [polymyalgia rheumatica] or RA [rheumatoid arthritis], "but I think most of this, in fact, as suggested by others, is classical fibromyalgia." (Id.) Dr. Schur also stated that he "wonders what a rheumatoid factor, CRP, and x-rays of the hands might show" and made suggestions regarding Plaintiff's

11

regime to try and improve her condition. (Id.) He also questioned Plaintiff's treatment of her cardiac condition and noted that he "wonder[ed] whether she need[ed] so much" medication and that "beta blockers have been associated with fatigue." (Id.) Dr. Schur concluded "[t]herefore, at least for the time being, [Plaintiff] is clearly disabled not only from work, but from being able to take care of her household." (Id.) Based on Dr. Schur's report, in June 2002, Genrad opted to pay short-term disability benefits to Plaintiff through April 3, 2002. (AR 00443).

### 2. The Initial Review by Liberty Life of Plaintiff's Claim for Long-Term Disability Benefits

In or about June 2002, Plaintiff applied for long-term disability benefits based upon her alleged disability due to fibromyalgia. (AR 00446-53). As part of its initial review, Liberty Life requested and received an occupational analysis and another review by Nurse Kaye.

Nurse Kaye was asked by Liberty Life to review Plaintiff's file, including Dr. Schur's report, and was asked to determine if the restrictions/limitations supported a finding of disability. After reviewing the file, Nurse Kaye concluded that the new medical information in Dr. Schur's report did not alter Liberty Life's previous findings that a significant change in Plaintiff's condition was not noted as of the date of the alleged disability. (AR 00046). Nurse Kaye also noted that the occupational and job descriptions did not indicate that constant standing was required for Plaintiff's position. (Id.) In regard to Dr. Schur's report, Nurse Kaye opined:

> Since an IME [independent medical exam] provides an examination on a specific date in time, its scope is limited in that inferences to the status of conditions 6 months previous cannot be accurately assessed. [Plaintiff] is noted to be severely deconditioned as of 4/02, most likely as a result of interrupted functional activities, [and] this could certainly have affected Dr. Schur's assessment. His conclusion that [Plaintiff] is on excessive cardiac medications, with unclear indications, may be an additional contributing factor to the [Plaintiff's] reports of fatigue.

(Id.) Nurse Kaye also noted that there is not a standard duration for fibromyalgia and that Plaintiff "may be self-limiting her work or social activities, with no objective medical basis to

support [restrictions/limitations] from 10/3/01-4/12/02." (Id.). Finally, Nurse Kaye suggested that Liberty Life consider "non-medical intervention to determine if [Plaintiff's] daily activities are consistent with the low level of functioning that she has reported. [Plaintiff's] physicians' assertion that claimant is unable to stand for long duration at work is not supported by the physical job demands of her job." (Id.).

Based on this review, Liberty Life informed Plaintiff's counsel in August 2002 that it had completed its review of Plaintiff's claim for long-term disability benefits and concluded that such benefits were not payable. (AR 00404-07). Liberty Life explained the review history of Plaintiff's claim for short-term disability benefits and that Dr. Schur's report was reviewed by Liberty Life's nurse case manager. (Id.). Liberty Life concluded that the information provided by Dr. Schur did not alter Liberty Life's previous findings -- based upon the entirety of the medical records in the claims file -- that there was no significant change in Plaintiff's condition on October 3, 2001 which would preclude her from performing the duties of her occupation. (Id.). As a result, Liberty Life determined that Plaintiff did not meet the definition of "disabled" for long-term disability benefits. (Id.).

3. **Plaintiff's Appeal of Liberty Life's Denial of Her Claim for Long-Term Disability Benefits**

Plaintiff appealed Liberty Life's decision regarding her claim for long-term disability benefits in September 2002. (AR 00399). As part of its review of Plaintiff's appeal, Liberty Life referred Plaintiff's file for an occupational review and labor market survey to determine the actual physical requirements of Plaintiff's occupation. Liberty Life also sought surveillance of Plaintiff to determine her level of activity, and requested another review of Plaintiff's file by an independent physician.

13

First, Liberty Life sought an occupational review and labor market survey from an independent vocational consultant to determine the veracity of Plaintiff's claim that her position as Group Leader – Manufacturing required extensive walking, standing, and bending. In MPO Consulting's vocational report, the vocational consultant concluded that the physical demands for Plaintiff's position in the national economy "would be considered sedentary to light work with occasional standing, walking and bending. The opportunity to intermittently change positions from sitting to standing and walking is typically provided during the course of the workday." (AR 00376) This report revealed that Plaintiff's claims regarding the physical demands of her position and Dr. Goodman's claim that Plaintiff's position required "her to be on her feet all day" were exaggerated and inconsistent with the vocational report. (AR 00471)

In addition, as part of its review, Liberty Life requested that an independent investigator conduct surveillance of Plaintiff to determine whether her reported physical limitations were consistent with her actual level of activity. Miles Investigations, Inc. conducted a surveillance of Plaintiff on four dates in late October 2002 and early November 2002. (AR 00366-372). During the surveillance, Plaintiff was observed running errands up to three hours at a time and driving her car up to 20 minutes at a time. (AR00371-372). She was observed "walking and moving in a fluid non-obstructed manner, bending and lifting items such as a case of soda and a gallon of milk without difficulties." (AR 00371). She was also observed walking in a normal fashion, as well as transferring grocery bags from a shopping cart into her car and then carrying grocery bags from her car to her house. (AR 00369, 00371). No restrictions or limitations were noted throughout the observations. (AR 00366-372). The surveillance contradicts Plaintiff's claims in her Activities Questionnaire, in which Plaintiff claimed that her daughter and husband shop for groceries and carry groceries into the house, as well as Plaintiff's claim that she is able

to drive a car for only five minutes at a time and able to walk for only 10 to 15 minutes at a time. (AR 00410-23).

During the appeal process, Liberty Life requested that Plaintiff provide additional medical records from December 2001 through the present from her treating physicians. (AR 00396). In response, Plaintiff's counsel submitted only one report, a report from Dr. Milton Taylor, dated October 25, 2002, of his psychiatric examination of Plaintiff.[9] (AR 00383-87).

After receiving Plaintiff's updated medical records, Liberty Life referred Plaintiff's medical records to Network Medical Review for an independent medical review. Dr. John Bomalaski, a board certified rheumatologist, reviewed Plaintiff's file and prepared a report on or about December 4, 2002. (AR 00331-35). In his report, Dr. Bomalaski concluded that the physical examination and testing contained in Plaintiff's claims file did not support the diagnosis of fibromyalgia. (Id.). Dr. Bomalaski opined that the only current signs of fibromyalgia contained in Plaintiff's medical records were Plaintiff's "areas of subjective discomfort on examination." (AR 00333). Dr. Bomalaski noted that there was a lack of abnormal laboratory tests contained in Plaintiff's medical records. (AR 00332). Further, Dr. Bomalaski noted that the surveillance photos revealed that Plaintiff is able to "go shopping, use[] a grocery cart and is able to lift with one hand a gallon of water from a grocery cart and put that into her car." (Id.).

With regard to Dr. Schur's report, Dr. Bomalaski indicated that Dr. Schur appeared to doubt whether Plaintiff suffered from fibromyalgia. (Id.). Dr. Bomalaski pointed out that Dr. Schur noted concerns that Plaintiff's shoulder and pelvic girdle problems and her history of elevated sedimentation rate would cause one to suspect polymyalgia rheumatica and raised the possibility that Plaintiff suffered from rheumatoid arthritis. (Id.). Dr. Bomalaski also noted the

---

[9] Dr. Taylor concluded that Plaintiff's psychiatric condition did not prevent her from working as a Group Leader – Manufacturing at Genrad. (AR 00387).

15

medical records did not contain any "documentation of laboratory testing ruling out coexisting causes of myalgia such as hypothyroidism or disorders of calcium metabolism." (Id.). Dr. Bomalaski further noted that Plaintiff had an elevated sedimentation rate in the past and opined that "further testing related to that is not available nor is a rheumatoid factor, as suggested by Dr. Schur." (Id.). In responding to Liberty Life's specific questions, Dr. Bomalaski concluded as follows:

> The clinical medical evidence does not clearly support severe impairment because as noted the diagnosis of fibromyalgia remains in question not only by this reviewer but also by Dr. Schur, the consulting rheumatologist who had examined [Plaintiff] at the request of her treating rheumatologist, Dr. Goodman. . . . [Plaintiff's] condition does not prevent a return to full time work. . . . [B]ased on the available medical information, from a rheumatology perspective, [Plaintiff] is capable of working full time in a primarily sedentary position." (AR 00333).

Based on Dr. Bomalaski's review, as well as the vocational review, a labor market survey, surveillance, and the entire claims file, Liberty Life reasonably concluded that it was unable to alter its original determination to deny long-term disability benefits. (AR 00344-48). In a letter to Plaintiff, Liberty Life summarized the key documents in the claims file, and concluded that Plaintiff's claims file lacked support of a severity of impairment that would preclude her from performing the job duties of her own occupation as customarily performed. (Id.). Accordingly, Liberty Life determined that Plaintiff did not meet the definition of disabled under the policy and upheld its decision to deny Plaintiff's claim for long-term disability benefits. (Id.).

   4.   **Liberty Life's Decision Was Reasonable and Not "Arbitrary and Capricious"**

The claims history detailed above undeniably demonstrates that Liberty Life's decision was reasonable and amply supported by the records and reports contained in the claims file. The claims file contains several reports which reveal that Plaintiff simply did not meet the definition

16

of disabled or disability. Further, the claims file establishes the thorough review process in which Liberty Life engaged when evaluating Plaintiff's claim. Indeed, Liberty Life sought reviews by two independent physicians, reviews by a nurse in its MDS department, a vocational report, a labor market survey, and surveillance of Plaintiff's activities. All of this evidence supported the decision to deny Plaintiff's claim for long-term disability benefits. Liberty Life's determination is supported by ample evidence in the record and was based upon that evidence. See Brigham v. Sun Life of Canada, 183 F.Supp.2d 427, 437 (D.Mass. 2002), aff'd, 317 F.3d 72 (1st Cir. 2003) (finding that the existence of contrary medical assessments by plaintiff's treating physicians does not change the analysis under the arbitrary and capricious standard); Chandler v. Raytheon Employees Disability Trust, 53 F.Supp.2d 84, 91 (D.Mass. 1999), aff'd, 229 F.3d 1133 (2000) (same). Plaintiff cannot show that Liberty Life's determination was not reasonable or plausible based upon the extensive review process in which Liberty Life engaged. Accordingly, Plaintiff cannot show that Liberty Life's decision was "arbitrary and capricious."

Further, all reports as to Plaintiff's position as Group Leader – Manufacturing – including the job description and the vocational report – indicate that the position requires only light physical activity. Dr. Bomalaski also noted that even Dr. Schur appeared to question whether Plaintiff suffered from fibromyalgia or from a different medical condition, such as polymyalgia, rheumatica or rheumatoid arthritis, due to Plaintiff's shoulder and pelvic girdle problems and her history of elevated sedimentation rate. Moreover, Dr. Bomalaski opined that further testing related to Plaintiff's elevated sedimentation rate was not present in the file nor is "a rheumatoid factor, as suggested by Dr. Schur." Significantly, Dr. Bomalaski concluded that the clinical medical evidence in the file did not clearly support severe impairment and that Plaintiff is capable of working full time in a primarily sedentary position.

Finally, the fact that there are conflicting opinions in Plaintiff's claims file does nothing more than raise the potential presence of conflicting evidence, which the First Circuit has explained is not, in and of itself, enough to make the administrator's decision unreasonable and therefore arbitrary. See Leahy, 315 F.3d at 19; Vlass, 244 F.3d at 30. Moreover, the opinions of Drs. Malanoski and Goodman do not require special deference by Liberty Life. See Black & Decker Disability Plan v. Nord, 123 S.Ct. 1965, 1966 (2003) ("ERISA does not require plan administrators to accord special deference to the opinions of treating physicians."). Further, the fact that conflicting evidence exists in Plaintiff's claims file supports the Court's use of the deferential standard of review under ERISA. Under this standard, "the court is to not substitute its judgment for that of the [decisionmaker]." Terry, 145 F.3d at 40. In situations where conflicting medical records could lead to conflicting decisions as to whether a plaintiff is disabled, a court should defer to the decisionmaker as long as the record contains evidence reasonably sufficient to support the decisionmaker's decision. See Pari-Fasano, 230 F.3d at 419. Here, the record undeniably contains evidence that was sufficient to support Liberty Life's decision to uphold its denial of Plaintiff's claim for long-term disability benefits. Accordingly, the Court should grant summary judgment for Defendants on Plaintiff's ERISA claims.

### III.   Plaintiff's State Law Contract Claim Is Preempted By ERISA

Liberty Life is entitled to summary judgment on Plaintiff's breach of contract claim on preemption grounds. ERISA contains a broad preemption provision, which is uniformly recognized as "the most sweeping federal preemption statute ever enacted by Congress." Sejman v. Warner-Lambert Co., 845 F.2d 66, 68 (4th Cir. 1988). The preemption provision states that ERISA shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." § 514(a) of ERISA, 29 U.S.C. §1144(a). State law is defined in the statute as including "all laws, decisions, rules, regulations, or other State action having the effect

18

of law, of any State." § 514(c)(1) of ERISA, 29 U.S.C. §1144(c)(1). Accordingly, if Plaintiff's state law contract claim "relate[s] to" any employee benefit plan, her claim is preempted.

The phrase "relate to" was interpreted by the Supreme Court and "given its broadest common-sense meaning such that a state law 'relates to' a benefit plan . . . 'if it has a connection with or reference to such a plan.'" Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739 (1985) overruled in part on other grounds, Ky. Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329 (2003). The Supreme Court further emphasized that the preemption clause was not limited to "state laws specifically designed to affect employee benefits plans." Shaw v. Delta Air Lines, 463 U.S. 85, 97 (1983). "[C]ommon law causes of action . . . based on alleged improper processing of a claim for benefits . . . undoubtedly meet the criteria for preemption under §514(a)." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47 (1987). Whether the "connection with" or "reference to" is direct or indirect, the state law will be preempted. See Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 525 (1981).

The First Circuit has consistently affirmed dismissals on ERISA preemption grounds of state law claims similar to that brought by Plaintiff. See e.g., Danca v. Emerson Hosp., 9 F.Supp.2d 27 (D. Mass. 1998), aff'd, 185 F.3d 1 (1st Cir. 1999) (affirming dismissal of state law tort claims preempted by ERISA). The First Circuit has specifically affirmed dismissal of contract claims on the basis of ERISA preemption. See Hampers v. W.R. Grace & Co., 202 F.3d 44, 51-53 (1st Cir. 2000) (affirming dismissal of state law contract claims as preempted by ERISA); Carol v. Reed Rolled Thread Die Co., 49 F.3d 790, 795 (1st Cir. 1995) (upholding dismissal of state law claim for breach of contract as preempted by ERISA); Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1082, cert. denied, 498 U.S. 1013 (1st Cir. 1990) (affirming dismissal of state law breach of contract claim as preempted by ERISA).

Based on the broad interpretation given the phrase "relate to" by the Supreme Court, Plaintiff's contract claim in this action undeniably "relate[s] to" an employee benefits plan governed by ERISA, because it is based upon Liberty Life's denial of her claim for long-term disability benefits. Accordingly, Plaintiff's contract claim relates to an employee benefits plan and is preempted.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant summary judgment in their favor on Plaintiff's Complaint.

Respectfully submitted,

LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, THE GENRAD, INC. LONG TERM DISABILITY PLAN, THROUGH TERADYNE, INC., AS SUCCESSOR FIDUCIARY

By their attorneys,

/s/Richard W. Paterniti
Andrew C. Pickett, BBO# 549872
Richard W. Paterniti, BBO #645170
JACKSON LEWIS LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

May 31, 2005