UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANE DENMARK,<br><br>    Plaintiff<br><br>v.<br><br>LIBERTY LIFE ASSURANCE COMPANY OF BOSTON, THE GENRAD, INC. LONG TERM DISABILITY PLAN, THROUGH TERADYNE, INC., AS SUCCESSOR FIDUCIARY<br><br>    Defendants | Civil Action No. 04-12261-DPW |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendants, Liberty Life Assurance Company of Boston ("Liberty Life") and The Genrad Inc. Long Term Disability Plan, through Teradyne, Inc., as Successor Fiduciary ("The Plan"), submit this Statement of Undisputed Material Facts In Support of Their Motion for Summary Judgment. Defendants hereby state that the following are undisputed material facts taken from the pleadings of record, the Declaration of Paula McGee, and the administrative record concerning Plaintiff Diane Denmark's claim for disability benefits.[1]

---

[1] The complete administrative record and policy for Diane Denmark were produced to Plaintiff on December 14, 2004 and were filed with the Court on January 20, 2005. The documents contained in the Administrative Record are labeled "AR____." For the Court's convenience, Defendants are not filing these documents again with the Declaration of Paula McGee.

## The Benefits Plan and Long-Term Disability Insurance Policy

1.  At all times pertinent to her claims in this lawsuit, Plaintiff was employed by Genrad, Inc.[2] ("Genrad") as a Group Leader in Manufacturing. (AR 00567).

2.  As part of her employment with Genrad, Plaintiff was offered coverage under a group disability insurance plan. (See Dec. of McGee, ¶ 5; AR 00001-40). This plan is an ERISA welfare employee benefit plan. (Id. See also Complaint at ¶ 7). Under the plan, Plaintiff was provided with disability benefits through a policy of insurance -- policy no. GF3-810-254021-01 ("the Policy"). (See Dec. of McGee, ¶ 5; AR 00001-40). Liberty Life is the insurer for long-term disability benefits under the Policy. (See Dec. of McGee, ¶ 5; AR 00001).

3.  Section 7 ("General Provisions") of the Policy states: "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (See Dec. of McGee, ¶ 5; AR 00035).

4.  Section 2 of the Policy defines "Disability" or "Disabled" as follows:

    1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:

        i.  if the Covered Person is eligible for the 24 Month Own Occupation benefit, "**Disability**" or "**Disabled**" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

        ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation. (See Dec. of McGee, ¶ 5; AR 00006).

5.  Section 2 of the Policy also defines "Own Occupation" as follows:

---

[2] Genrad, Inc. was later acquired by Teradyne, Inc.

> **"Own Occupation"** means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy. (AR 00008).

### Plaintiff's Claim for Short-Term Disability Benefits

6.  In or about October 2001, Plaintiff applied for short-term disability benefits under Genrad Inc.'s Short Term Disability Benefits plan. (AR 00558). Under this plan, Liberty Life served as the disability claims administrator. (AR 00466). As such, Liberty Life provided claims management advice to Genrad on an administrative services only basis. (AR 00461). Liberty Life, therefore, provided the initial review of short-term disability claims and Genrad performed appeal reviews. (AR 00461).

7.  At or around the time that Plaintiff applied for short-term disability benefits, her employer completed the "Employer's Statement." In this document, Genrad noted that Plaintiff's last day worked was October 2, 2001. (AR 00567).

8.  By letter dated October 25, 2001, Liberty Life requested that Plaintiff ask her treating physician to complete a Restrictions Form and Attending Physician's Statement relating to Plaintiff's condition. (AR 00558).

9.  Liberty Life received an Attending Physician's Statement and other forms, which had been completed by Plaintiff's treating physician, Dr. Gregory Malanoski, a physician specializing in internal medicine, on or about November 7, 2001. (AR 00552, 00555-57). Dr. Malanoski identified Plaintiff's diagnosis as fibromyalgia, which had been initially diagnosed in 1996. (AR 00557). Dr. Malanoski also indicated that Plaintiff's treatment plan was a "rheumatology consult and physical therapy." (AR 00556). On the accompanying "Restrictions

Form," Dr. Malanoski noted that Plaintiff's restrictions and limitations had not been determined. (AR 00555).

10. As part of its review of Plaintiff's claim, Liberty Life requested and received a job description of Plaintiff's position, Group Leader – Manufacturing Inspection, from Genrad. (AR 00500). The job description indicated that Plaintiff was responsible for overseeing the inspection of products to ensure that the products met certain specifications and quality standards. (AR 00501). Plaintiff was also responsible for making routine work assignments, monitoring job performance, and ensuring efficient work flow. (Id.). As for physical requirements of the position, the job description indicated that the position required only bending, squatting and body movement associated with inspecting external and internal components of products, utilizing material handling equipment, and occasional lifting of items up to 25 pounds in weight. (Id.).

11. At the request of a Liberty Life Disability Case Manager, Nurse Debra Kaye, a nurse in Liberty Life's Managed Disability Services ("MDS") Department, reviewed Plaintiff's claims file on several occasions in November 2001. (See AR 00055-65). On or about November 14, 2001, based on her review of Dr. Malanoski's office notes regarding Plaintiff, Nurse Kaye noted that Plaintiff had a five-year history of fibromyalgia with episodes of flare ups in her condition. (AR 00065). According to Nurse Kaye, Dr. Malanoski's notes indicated that Plaintiff responded to physical therapy during past occurrences. (Id.). She also noted that throughout the five-year period, "there is no evidence that [Plaintiff] needed to cease occupational functioning [and,] in fact, was able to function in an occupational setting full time, working long hours." (Id.). Nurse Kaye noted that Dr. Malanoski's office notes did not indicate what had changed in Plaintiff's condition to warrant the restrictions and limitations of remaining out of work he recommended. (Id.).

12. Nurse Kaye also reviewed the office notes of Dr. Goodman, a Rheumatologist who worked in the same office as Dr. Malanoski and who had examined Plaintiff on or about October 9, 2001. (AR 00062-64). Based on Dr. Goodman's notes, Nurse Kaye noted that although Dr. Goodman confirmed Dr. Malanoski's diagnosis of fibromyalgia, he stated that Plaintiff was able to exercise on a regular basis and that her condition was complicated by menopause symptoms. (AR 00062). She noted that Plaintiff had other diagnoses, including "GERD (gastroesophageal reflux disease), pernicious [and] iron deficiency anemia, mitral valve prolapse, palpitations, diverticulitis, recurrent sinus [and] upper respiratory infections, [history of] uterine bleeding." (AR 00063). Nurse Kaye also noted that Plaintiff wore a holter monitor for her cardiac symptoms and had a history of arrhythmias and mitral valve prolapse and that it was unclear if these conditions "may be a contributing factor to her current condition." (AR 00060). Moreover, Nurse Kaye wrote that that the limitation of remaining out of work was not supported by the medical information in the file and that:

> [The primary care physician] diagnosed fibromyalgia in 1996, and throughout this time, including flares, [her doctor] has documented that [Plaintiff] was able to work full time, including long hours [without] any interruption in functional activities. There is no indication that there has been a change in condition to support [restrictions/limitations] for avoidance of work. [Plaintiff] was able to attend physical therapy previously without an interruption in her occupation functioning. (AR 00063).

13. Based upon her review of the office notes, Nurse Kaye recommended that Liberty Life obtain an independent medical review of Plaintiff's file to define Plaintiff's condition and her restrictions and limitations. (AR 00061).

14. After receiving medical records from Dr. Malanoski, Dr. Goodman, and Dr. Terrence Hack, a cardiologist/internist, Liberty Life requested an independent medical review of Plaintiff's claims file based upon Nurse Kaye's recommendation. (AR 00058). Dr. Clay Miller,

an independent physician specializing in Physical Medicine and Rehabilitation, reviewed the medical records and Plaintiff's file and issued a report on or about December 5, 2001. (AR 00482-83). In his report, Dr. Miller stated that Plaintiff has been having problems with chronic pain diagnosed as fibromyalgia beginning in medical records dated April 1996 and has received medical treatment off and on over the years. (AR 00483). Dr. Miller also noted that Plaintiff had a rheumatology consult in October 2001 and that the consult showed normal neurological and musculoskeletal physical exams. (Id.). In addition, Dr. Miller pointed out that Plaintiff had a normal cardiac exercise test in November 2001. (Id.). Further, Dr. Miller indicated that Plaintiff's rheumatology exam was "positive only for the 18-fibromyalgia tender points." (Id.). Based upon his review of the file, Dr. Miller noted that there were no documented "physical exam findings that support a decrease or significant change in [Plaintiff's] physical condition." (Id.). Significantly, Dr. Miller concluded that "the medical records do not substantiate that [Plaintiff's] condition significantly changed about the time of disability 10/03/2001" and that there were no "physical functional deficits documented." (AR 00482-83).

15. As a result of Dr. Miller's assessment, Liberty Life sent a letter to Plaintiff dated December 26, 2001, which explained that Liberty Life had determined that benefits were not payable for Plaintiff's claim for short-term disability benefits. (AR 00474). Specifically, Liberty Life notified Plaintiff that, based on her medical records from Drs. Malanoski, Goodman, and Hack and based on the review by Dr. Miller, an independent physician, Liberty Life concluded that the medical records did not support a finding of disability. (Id.). Liberty Life also pointed out that review of the office notes submitted from 1996 to the present "clearly document that you have been able to function without restrictions and that physical therapy has relieved your symptoms in the past." (Id.). Liberty Life also noted that the medical records from Plaintiff's

treating physician indicated that Plaintiff was able to engage in regular exercise and that a recent cardiac exercise test and recent neurological and musculoskeletal physical examinations were normal. (Id.). Liberty Life provided Plaintiff with the necessary information to appeal the decision. (AR 00475). Finally, Liberty Life explained that "based on the medical information in relation to [Plaintiff's] job requirements, there are no restrictions or limitations that preclude [her] from performing the duties of [her] job at Genrad Inc." (Id.).

16.     By letter dated January 3, 2002, Plaintiff's previous counsel sent a letter to Liberty Life advising that Plaintiff requested a review of Liberty Life's denial of her short-term disability benefits claim. (AR 00470). Along with that letter, Plaintiff's counsel enclosed a report from Plaintiff's treating physician, Dr. Goodman, which Plaintiff had not previously provided to Liberty Life. (AR 00471). In the report, which is dated December 11, 2001, Dr. Goodman stated that Plaintiff's symptoms of fatigue, exhaustion, myalgia, and insomnia had worsened recently. He also stated that Plaintiff is "unable to perform her usual work as a quality control group leader. This work requires her to be on her feet all day." (Id.). In this note, Dr. Goodman also listed the various medications that were prescribed to Plaintiff to treat her condition, including Daypro and Elavil. (Id.).

17.     By letter dated January 9, 2002, Liberty Life notified Plaintiff's counsel that it received the letter requesting a review of its decision to deny Plaintiff's claim for short-term disability benefits. (AR 00468). In the letter, Liberty Life also stated that it was in the process of reviewing the information submitted with Plaintiff's appeal letter. (AR 00468).

18.     Liberty Life then sent letters to Drs. Goodman and Malanoski asking them to review Dr. Miller's report and to provide comments regarding the report. (AR 00466-67). Dr. Malanoski responded to Liberty Life's letter on or about January 14, 2002, stating that he

"strongly disagree[s]" with the peer review decision not to provide disability benefits. (AR 00463). Dr. Malanoski indicated in his letter that Dr. Goodman "agrees with [Plaintiff's] degree of disability." (Id.).

19.     By letter dated January 17, 2002, Liberty Life notified Plaintiff's counsel that it had forwarded Plaintiff's claims file and appeal documents to Genrad for its review because Liberty Life did not perform appeal reviews for Genrad. (AR 00461). In the letter, Liberty Life explained that it provides claims management advice on short-term disability benefits claims to Genrad on an administrative services only basis. (Id.).

20.     Genrad reviewed Plaintiff's appeal of Liberty Life's decision as to her claim for short-term disability benefits. In doing so, Genrad reviewed a report provided by Dr. Peter Schur, a Rheumatologist at Brigham and Women's Hospital, who examined Plaintiff in or about April 2002, after her treating physician, Dr. Goodman, referred her to Dr. Schur. (AR 00457). In his report, which was based on his examination of Plaintiff and not a review of her medical records and which was dated April 12, 2002, Dr. Schur noted that Plaintiff's shoulder and pelvic girdle problems as well as her history of an elevated sedimentation rate would make one suspect PMR [polymyalgia rheumatica] or RA [rheumatoid arthritis], "but I think most of this, in fact, as suggested by others, is classical fibromyalgia." (AR 00452). Dr. Schur also stated that he "wonders what a rheumatoid factor, CRP, and x-rays of the hands might show." (Id.). He also questioned Plaintiff's treatment of her cardiac condition and noted that he "wonder[ed] whether she need[ed] so much" medication and that "beta blockers have been associated with fatigue." (Id.). Dr. Schur concluded "[t]herefore, at least for the time being, [Plaintiff] is clearly disabled not only from work, but from being able to take care of her household. What I have suggested above is some modifications of her regime that hopefully will improve matters, so that she can

get her stamina back and be able to go back to work. However, for now, until that is accomplished, which may take months, she is clearly disabled." (AR 00452-53).

21.  Genrad subsequently determined that it would pay short-term disability benefits to Plaintiff through April 3, 2002. (AR 00443).

### Plaintiff's Claim for Long-Term Disability Benefits

22.  On or about June 5, 2002, Plaintiff applied for long-term disability benefits under the Policy based on her alleged disability due to fibromyalgia. (See AR 00446-53). In her application for benefits, she described her illness as follows:

> Worsening Fibromyalgia Syndrome over the years to the point where I am now in so much pain, I have insomnia and am constantly fatigued.

(See AR 00435). Along with her application for benefits, Plaintiff, through her attorney, submitted the December 11, 2001 report from Dr. Goodman and the April 12, 2002 report from Dr. Schur. (AR 00449-453).

23.  By letter dated July 11, 2002, Liberty Life acknowledged receipt of Plaintiff's claim for long-term disability benefits. (AR 00432). Liberty Life asked Plaintiff to complete claims paperwork and provide other medical documentation related to her claim.

24.  As part of its review of Plaintiff's claim for long-term disability benefits, Liberty Life requested an occupational analysis. (AR 00431). As a result, a vocational case manager provided an occupational description for Plaintiff's position from OASYS Transferable Skills Analysis program. This occupational description was from the Department of Labor and was the description for Plaintiff's position in the national economy. (AR 00424-431).

25.  On or about July 23, 2002, Plaintiff, through her attorney, provided completed claims paperwork to Liberty Life, the report of Dr. Schur, office notes from Dr. Goodman, and

Dr. Malanoski's response to Dr. Miller's report. (AR 00410-23). In the Activities Questionnaire, Plaintiff indicated that her daughter and husband shopped for groceries and carried groceries into the house. She also indicated in the Activities Questionnaire that she could drive a car for only five minutes, sit in a car for only 20 minutes, walk for only 10 to 15 minutes, and that she does not shop at malls. (AR 00416).

26. As part of its review, Liberty Life also asked Nurse Kaye to review Plaintiff's file, including Dr. Schur's report, and to determine if the restrictions/limitations supported a finding of disability. In her review on August 8, 2002, Nurse Kaye concluded that the new medical information from Dr. Schur did not alter Liberty Life's previous findings that a significant change in Plaintiff's condition was not noted at the time of disability. (AR00045-48).

27. In reviewing the claims file, Nurse Kaye noted that the occupational and job descriptions did not indicate that constant standing was a requirement of Plaintiff's job. (AR 00046).

28. In regard to Dr. Schur's report, Nurse Kaye wrote, "Since an IME provides an examination on a specific date in time, its scope is limited in that inferences to the status of conditions 6 months previous cannot be accurately assessed. [Plaintiff] is noted to be severely deconditioned as of 4/02, most likely as a result of interrupted functional activities, [and] this could certainly have affected Dr. Schur's assessment. His conclusion that [Plaintiff] is on excessive cardiac medications, with unclear indications, may be an additional contributing factor to [Plaintiff's] reports of fatigue." (AR 00046). Nurse Kaye noted that there is not a standard duration for fibromyalgia and that Plaintiff "may be self-limiting her work or social activities, with no objective medical basis to support [restrictions and limitations] from 10/3/01-4/12/02." (Id.). Nurse Kaye also suggested "consideration to non-medical intervention to determine if

[Plaintiff's] daily activities are consistent with the low level of functioning that she has reported. [Plaintiff's] physicians' assertion that [Plaintiff] is unable to stand for long duration at work is not supported by the physical job demands of her job." (Id.).

29.  On August 20, 2002, based its review of the claims file, Liberty Life informed Plaintiff's counsel that it had completed its review of Plaintiff's claim for long-term disability benefits and concluded that such benefits were not payable.  In a letter to Plaintiff's counsel, Liberty Life explained the review history of Plaintiff's claim for short-term disability benefits and that Dr. Schur's report was reviewed by Liberty Life's nurse case manager.  Liberty Life stated that the information provided by Dr. Schur did not alter Liberty Life's previous findings that there was no significant change in Plaintiff's condition on October 3, 2001 which would preclude her from performing the duties of her occupation.  As a result, Liberty Life determined that Plaintiff did not meet the definition of "disabled" for long-term disability benefits and therefore did not satisfy the 180-day elimination period under the policy. (AR 00404-407).

30.  By letter dated September 24, 2002, Plaintiff's counsel appealed Liberty Life's decision as to her claim for long-term disability benefits. (AR 00399). In response, Liberty Life sent a letter to Plaintiff's counsel on October 14, 2002 in which it requested medical records from December 2001 through the present. (AR 00396-97).  Plaintiff's counsel subsequently sent a letter to Liberty Life on October 21, 2002 enclosing medical records which were previously sent and a report by Milton Taylor, Ph.D. of the Massachusetts Rehabilitation Commission Disability Determination Services relating to Plaintiff's psychiatric condition. (AR 00381-93). In that report, Dr. Taylor concluded that Plaintiff's depression was not "of sufficient severity to prevent her from gainful employment." (AR 00387).

31. As part of its review of Plaintiff's appeal of the denial of her claim for long-term disability benefits, Liberty Life requested a labor market survey and vocational review to determine the actual physical requirements of Plaintiff's occupation as it is performed in the national economy. MPO Consulting provided a vocational report, dated November 16, 2002, which included a labor market survey. (AR 00375-76). In the report, the vocational consultant concluded that the physical demands for Plaintiff's position "would be considered sedentary to light work with occasional standing, walking and bending." (AR 00376). The vocational consultant also concluded that Plaintiff would not be in one position all day, but would have the "opportunity to intermittently change positions from sitting to standing and walking is typically provided during the course of the workday." (Id.). Concentra provided a labor market survey dated November 12, 2002. (AR 00374, 00377-80). This survey included descriptions of Plaintiff's job as it is performed at other companies and/or in the national economy. (Id.).

32. In addition, as part of its review, Liberty Life requested that an independent investigator conduct surveillance of Plaintiff's activities to determine her level of activity. (AR 00395). As a result, Miles Investigations, Inc. conducted a surveillance of Plaintiff on October 24, 2002, November 2, 2002, November 4, 2002, and November 5, 2002. (AR 00365-72). During the surveillance, Plaintiff was observed driving and performing errands. (Id.). She was observed "walking and moving in a fluid non-obstructed manner, bending and lifting items such as a case of soda and a gallon of milk without difficulties." (AR 00371). She was also observed walking in a normal fashion, as well as transferring grocery bags from a shopping cart into her car and then carrying grocery bags from her car to her house. (AR 00369, 00371). She was observed driving her car for up to 20 minutes at a time and running errands for approximately 3

hours. (AR 00371-72). The surveillance report did not note any restrictions or limitations. (AR 00365-372).

33.     After receiving Plaintiff's updated medical records, the vocational consultant's report, the labor market survey, and the surveillance report, Liberty Life referred Plaintiff's claim to Network Medical Review for an independent medical review. Dr. John Bomalaski, a board certified Rheumatologist, conducted a review of Plaintiff's file and prepared a report, dated December 4, 2002. (AR 00331-35). In his report, Dr. Bomalaski concluded that the physical examination and testing did not support the diagnosis of fibromyalgia. Dr. Bomalaski noted the current signs of fibromyalgia contained in Plaintiff's medical records were merely Plaintiff's "areas of subjective discomfort on examination." (AR 00333). Dr. Bomalaski noted the lack of abnormal laboratory tests contained in the medical records. (AR 00332). He also noted that the surveillance photos revealed that Plaintiff is able to "go shopping, use[] a grocery cart and is able to lift with one hand a gallon of water from a grocery cart and put that into her car." (Id.).

34.     With regard to Dr. Schur's report, Dr. Bomalaski pointed out that Dr. Schur appeared to have doubt as to whether Plaintiff suffered from fibromyalgia. (Id.). Dr. Bomalaski stated that Dr. Schur noted concerns that Plaintiff's shoulder and pelvic girdle problems and her history of elevated sedimentation rate would cause one to suspect polymyalgia rheumatica and raised the possibility that Plaintiff suffered from rheumatoid arthritis. (Id.). Dr. Bomalaski also noted that "there is no documentation of laboratory testing ruling out coexisting causes of myalgia such as hypothyroidism or disorders of calcium metabolism." (Id.). Dr. Bomalaski further noted that Plaintiff had an elevated sedimentation rate in the past and opined that "further testing related to that is not available nor is a rheumatoid factor, as suggested by Dr. Schur." (Id.).

35.   In responding to Liberty Life's specific questions related to Plaintiff's condition, Dr. Bomalaski concluded as follows:

> The clinical medical evidence does not clearly support severe impairment because as noted the diagnosis of fibromyalgia remains in question not only by this reviewer but also by Dr. Schur, the consultant rheumatologist who had examined [Plaintiff] at the request of her treating rheumatologist, Dr. Goodman. . . . [Plaintiff's] condition does not prevent a return to full time work. . . . [B]ased on the available medical information, from a rheumatology perspective, [Plaintiff] is capable of working full time in a primarily sedentary position within the limitations and restrictions noted on the Functional Capacities Form.  (AR 00333).

36.   Based on Dr. Bomalaski's review and the information in the claims file, Liberty Life determined that it was unable to reverse its original determination to deny long-term disability benefits.  (AR 00344-48).  In a letter to Plaintiff, Liberty Life summarized the key documents in the claims file including Dr. Miller's report, Dr. Malanoski's response to this report, Dr. Schur's report, the psychiatric findings of Dr. Taylor, the surveillance of Plaintiff, the vocational consultant's report, and the report of Dr. Bomalaski.  (Id.).  Based upon this evidence, Liberty Life determined that the medical evidence lacked support of a severity of impairment that would preclude Plaintiff from performing the job duties of her own occupation as customarily performed.  (Id.).  Accordingly, Liberty Life determined that Plaintiff did not meet the definition of disabled under the policy and, thus, it upheld its denial of her claim for long-term disability benefits.  (Id.).

                    Respectfully submitted,

                    LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON, THE GENRAD, INC. LONG TERM
DISABILITY PLAN, THROUGH TERADYNE, INC.,
AS SUCCESSOR FIDUCIARY

By their attorneys,

/s/Richard W. Paterniti
Andrew C. Pickett, BBO# 549872
Richard W. Paterniti, BBO #645170
JACKSON LEWIS LLP
75 Park Plaza
Boston, MA 02116
(617) 367-0025

May 31, 2005