UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIANE DENMARK,<br><br>  Plaintiff<br><br>v.<br><br>LIBERTY MUTUAL ASSURANCE COMPANY OF BOSTON, THE GENRAD, INC. LONG TERM DISABILITY PLAN, THROUGH TERADYNE, INC., AS SUCCESSOR FIDUCIARY<br><br>  Defendants | Civil Action No. 04-12261-DPW |

**DEFENDANT'S SUPPLEMENTAL SUBMISSION REGARDING "PLAUSIBILITY" STANDARD UNDER ARBITRARY AND CAPRICIOUS REVIEW**

In response to the Court's request at oral argument on the parties' cross-motions for summary judgment on Wednesday, November 2, 2005, Defendant hereby submits this supplemental memorandum concerning the standard of review in ERISA denial of benefits. In particular, at oral argument, the Court requested citations to specific cases in the First Circuit in which the Court had applied the standard of "plausibility" to determine if the decision of the Plan Administrator is reasonable under the arbitrary and capricious standard of review.

In response to the Court's request, Defendant respectfully refers the Court to the cases of Leahy v. Raytheon Company, et al, 315 F. 3d, 11, 17 (1st Cir. 2002) (Selya, J.) and Richard Martin v. Poloroid Corporation Long Term Disability Plan, 2005 U.S. Dist. Lexis 22884 (Oct. 7, 2005) (Stearns, J.)(copy attached). In Leahy, the First Circuit Court of Appeals upheld the grant of summary judgment in defendant's favor applying the arbitrary and capricious standard of review. In defining the standard of review, the Court stated as follows: "The arbitrary and

capricious standard asks only whether a fact finder's decision is *plausible* in light of the record as a whole, see, e.g., Pari-Fasano v. ITT Hartford Life and Accident Insurance Company, 230 F. 3d, 415, 419 (1st Cir. 2000), or put another way, whether the decision is supported by substantial evidence in the record, Doyle, 144 F 3d at 184." 315 F.3d at 17 (emphasis supplied). In its analysis upholding the District Court's grant of summary judgment, the Court noted that sharply conflicted evidence may require even greater deference to the Plan Administrator's decision. In particular, the Court stated:

> "Disability, like beauty, is sometimes in the eye of the beholder. This is such a case: we have scrutinized the record with care and conclude without serious question, that it is capable of supporting competing inferences as to the extent of plaintiff's ability to work. That clash does not suffice to satisfy plaintiff's burden. We have held before, and today reaffirm, that the mere existence of contradictory evidence does not render a plan fiduciary's determination arbitrary and capricious. Indeed, when the medical evidence is sharply conflicted, the deference due to the plan administrator's determination may be especially great."

315 F. 3d at 18-19.

Most recently, Judge Stearns applied the "plausibility" standard articulated in Lahey to uphold the decision of a plan administrator denying plaintiff's claim for long-term disability benefits in a case involving a claim of disability due to fibromyalgia and other related ailments. See Martin v. Poloroid Corporation Long Term Disability Plan, slip opinion at 19 ("Under the arbitrary and capricious standard, the decision of the plan administrator will be upheld even where contrary evidence might suggest a different result, so long as the decision 'is *plausible* in light of the record as a whole ... or, put another way, where the decision is supported by substantial evidence in the record.'" (citing Lahey, 315 F 3d at 17)(emphasis supplied).

Defendant respectfully submits that Judge Stearns' decision in Martin is remarkably apposite to the facts of the case at bar, and supports the conclusion that Liberty Life's decision to

deny plaintiff's claims for long-term disability benefits due to fibromyalgia is plausible based on the record as a whole. As in this case, there were substantial conflicts in the evidence in the Martin case regarding whether the Plaintiff was disabled from his own occupation due to fibromyalgia. For example, Plaintiff was referred for an IME to a physician retained by the insurer. This physician concluded – similar to the conclusion reached by Dr. Schur in the case at bar -- that the plaintiff was unable "at this time to carry out his usual work activity, because of his inability to travel, to carry out physical appraisals such as climbing and walking." Slip Opinion at 5-6. In addition, one of Met Life's reviewing doctors – like Dr. Clay Miller in this case -- "noted the lack of objective evidence in the medical record supporting the diagnosis of fibromyalgia." Slip Opinion at 10.

Notwithstanding the fact that an IME physician retained by the plan administrator found the plaintiff to be disabled from his own occupation, and the fact that reviewing doctors noted the lack of objective evidence supporting functional impairment, the Court nonetheless carefully examined the administrative record and reached the conclusion that "while it was open to Met Life to reach a different result, the opinions of Dr. Hopkins and Dr. Schroeder provide a reasonable basis of support for Met Life's decision to deny Martin's claim." Slip Opinion at 24. In so holding, the Court expressly noted that there was no obligation to defer to claimant's treating physicians where medical opinions differ, and that "a decision denying benefits may be based on the reasoned opinion of a non-examining, reviewing physician." Slip Opinion at 23 (citing Matias-Correa v. Pfiizer, Inc., 345 F 3d 7, 12 (1st Cir. 2003); Gannon v. Metropolitan Life Insurance Company, 360 F 3d 211, 216 (1st Cir. 2004). Cf. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003)("If a consultant engaged by a plan may have an incentive 'to

make a finding of not disabled,' so a treating physician, in a close case, may favor a finding of disabled.").

In the case at bar, Liberty Life respectfully submits that its decision to deny Plaintiff's application for LTD benefits was equally as "plausible in light of the record as a whole" as the decision to deny benefits in Martin. As in Martin, Liberty Life retained reviewing doctors "with medical concentrations appropriate to" Ms. Denmark's case. Martin, Slip. Opinion at 21, n.8. As in Martin, one of Liberty Life's medical reviewers, Dr. Clay Miller, noted a lack of objective evidence of functional impairments that would explain Plaintiff's sudden decline into total disability as of October 3, 2001. As in Martin, the IME physician opined only as to disability from the claimant's own occupation "at this time" or "at least for the time being". Slip Opinion at 5; AR 00420. Unlike the examining physician in Martin, Ms. Denmark's examining physician, Dr. Schur, suggested exploration of potential alternate causes, studies and diagnoses of Plaintiff's complaints of fatigue and exhaustion (AR 420), although there is no evidence in the record, either initially or during her administrative appeal, that Plaintiff made any serious efforts to follow up on Dr. Schur's suggestions. Finally – and unlike in Martin – there is compelling surveillance evidence indicating that seven months after Dr. Schur's IME, Plaintiff was able to engage in significant activities outside the home for several hours, such as driving, shopping, walking with a normal gait and loading groceries into her car. (AR 00071-77 and 00369-372). These observed activities were in substantial contrast to Dr. Schur's conclusion seven months earlier that Ms. Denmark "is disabled not only from work, but from being able to take care of her household." (AR 00420). These observed activities were also in stark contrast to Plaintiff's statements in her Physical Activities Form, in which she stated that she could drive for no more than five minutes and that she was basically a "shut in" who could perform no normal household

tasks, including taking groceries out of the car. (AR 00414-415). Accordingly, Defendant respectfully submits that Defendant's decision to deny benefits was "plausible" based on the administrative record as a whole.

        Respectfully submitted,

        LIBERTY LIFE ASSURANCE COMPANY OF
        BOSTON
        By its attorneys,


        /s/ Richard W. Paterniti
        Andrew C. Pickett, BBO# 549872
        Richard W. Paterniti, BBO#645170
        Jackson Lewis LLP
        75 Park Plaza
        Boston, MA 02116
November 4, 2005        (617) 367-0025

LEXSEE

**RICHARD MARTIN v. POLAROID CORPORATION LONG TERM DISABILITY PLAN**

**CIVIL ACTION NO. 03-11507-RGS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2005 U.S. Dist. LEXIS 22884*

**October 7, 2005, Decided**

**PRIOR HISTORY:** *Martin v. Polaroid Corp., 2004 U.S. Dist. LEXIS 9510 (D. Mass., May 27, 2004)*

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Richard Martin, Plaintiff: Stephen L. Raymond, Law Office of Stephen L. Raymond, Esq., Haverhill, MA.

For Polaroid Corporation, Defendant: James F. Kavanaugh, Jr., Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, Boston, MA.

**JUDGES:** Richard G. Stearns, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Richard G. Stearns

**OPINION:**

MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

STEARNS, D.J.

On August 12, 2003, plaintiff Richard Martin filed this declaratory judgment action against the Polaroid Corporation Long Term Disability Plan (LTD Plan) under the Employment Retirement Income Security Act (ERISA), *29 U.S.C. § 1132(a)*. Martin seeks a declaration that he was wrongly denied long term disability benefits by the Plan administrator, Metropolitan Life Insurance Company (MetLife). In March of 2004, the parties exchanged motions for summary judgment. Polaroid maintains that the denial of benefits is supported by evidence in the administrative record and is therefore immune from attack under the arbitrary and capricious standard of review. Martin contends that MetLife's rejection of his claim constituted an abuse of discretion.

At the initial hearing on the parties' [*2] motions, it became apparent to the court that MetLife's independent medical examiners had not been provided with Martin's complete medical record. Consequently, the court remanded the matter "solely for the purpose of determining, whether on examination of the full record, the opinions [the examiners] expressed in their reports of August 27, 2002, remain the same or are changed in any material respect." On January 13, 2005, MetLife notified the court that the examiners, after reviewing the supplemented record, remained of the same opinion and that "MetLife therefore does not rescind [its] decision [denying benefits]." The court heard further argument from the parties on May 10, 2005.

BACKGROUND

Martin was employed by Polaroid as a Customer Fulfillment Manager. Polaroid's formal description of Martin's position is that of a "computer data processor, connected with a service for information instrumentation computer system network." The U.S. Department of Labor's dictionary of occupational titles classifies the job as sedentary. n1

After being diagnosed with degenerative joint disease, fibromyalgia, migraine headaches, and depression, Martin quit his job at Polaroid on August 24, 2001. On [*3] February 27, 2002, he filed a claim under Polaroid's LTD Plan. According to the Plan, a participant is disabled if

> after the first 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into considera-

Case 1:04-cv-12261-DPW    Document 59    Filed 11/04/2005    Page 7 of 12

Page 2
2005 U.S. Dist. LEXIS 22884, *

tion your training, education, experience and Predisability Earnings.

To qualify for long term benefits, the Plan requires that the participant provide evidence of continuing disability; proof that he or she is receiving care from a medical doctor; and information about any coordinate benefits. The Plan also requires a claimant to authorize the release of private medical and financial information to the Plan administrator.

> n1 Laurie Enos, a Senior Distribution Manager at Polaroid, described Martin's job as requiring the ability to sit for 5-6 hours, stand for 1-2 hours, and walk for 1-2 hours. Martin was also required to perform simple/light grasping for 3-4 hours, fine finger dexterity for 3-4 hours in the dominant hand and to use his head and neck in a static position for 3-4 hours. See MetLife Record, at 111 (hereinafter MET #). According to Enos, Martin's job did not require any lifting, carrying, bending, twisting, or other physically demanding activities. The "frequency of interpersonal relationships necessary to perform [his] job" was "continually" or 67-100% of the time, and the "frequency of stressful situations necessary to perform [his] job" was "frequently" or 34-67% of the time. Id.

[*4]

In addition to submitting the required documents, Martin provided MetLife with a narrative report from his treating neurologist (Dr. Butler), which included MRIs of the lumbar and cervical spines, an MRI of the brain, a sensory and nerve conduction (EMG) report, a CT and Myelogram of the cervical spine, the results of blood tests, a list of prescribed medications, a brief description of Martin's symptoms, and a list of his treating and consulting physicians.

The medical notes most relevant to Martin's claim include the following. On January 7, 2002, Dr. Earl Hoerner, an orthopedic surgeon, conducted a physical examination of Martin at MetLife's request. Martin reported the following symptoms to Dr. Hoerner: an inability to drive distances, to sit for more than twenty minutes, or to stand more than 25-30 minutes; as well as persistent difficulty in moving his arms, back, and legs. During the examination, Martin appeared to be in "mild distress," and had difficulty stepping onto the examination table. MET 81. Dr. Hoerner noted that Martin does "have the diagnoses for which he has been receiving treatment: migraine headaches, fibromyalgia syndrome, and degenerative joint disease (cervical [*5] and lumbar area)." MET 82. He observed that Martin had tender trigger points often associated with fibromyalgia, but that other common symptoms were absent. He also noted that Martin was being treated by a psychiatrist for depression and was taking anti-psychotic medication. While Dr. Hoerner was of the opinion that Martin was able to perform some sedentary work, he concluded that Martin was unable "at this time to carry out his usual work activity, because of inability to travel, to carry out physical appraisals such as climbing and walking." MET 115.

In an Attending Physician's Statement dated February 27, 2002, Dr. Carol Savage, Martin's primary care physician, listed Martin's primary diagnosis as fibromyalgia n2 with secondary depression, insomnia, and migraine headaches. MET 26. Among objective findings, she referenced the results of blood tests, a CT scan, an EMG, and an MRI. Dr. Savage recommended physical therapy and a prescription regime of Topamax (a drug primarily prescribed for epilepsy, but also to prevent migraines) and other medications. Id. In Dr. Savage's opinion, Martin's psychological functioning measured relative to "Class 4," indicating that he is "unable [*6] to engage in stress situations or engage in interpersonal relations (marked limitations)." Id. She also noted "physical pain secondary to fibromyalgia, extreme lethargy & difficulty concentrating" as complicating stress factors that had affected Martin's ability to work normally. Id. Dr. Savage opined that Martin could sit for up to one hour and could walk for up to one hour, but could not stand for more than thirty minutes a day. MET 27. She believed it "impossible to anticipate" when Martin would improve. Id. After the initial denial of Martin's claim, Dr. Savage completed a questionnaire for the Social Security Administration noting her diagnoses of fibromyalgia, chronic fatigue syndrome, and depression. Symptoms listed by Dr. Savage included myalgia, fatigue, forgetfulness, distractedness, "aches all over," and recurring migraine headaches. MET 93-94.

> n2 Fibromyalgia has gained clinical acceptance as an authentic medical syndrome only in the last decade. While there is no consensus as to the cause of its many symptoms, current medical thinking postulates (in addition to psychological or psychiatric factors), a chemical imbalance causing nerve cells in the spinal cord and brain to become oversensitized, an imbalance of brain chemicals altering mood and lowering a patient's threshold for pain, or hormonal deficiencies resulting in similar mood effects.

[*7]

On February 27, 2002, Martin was examined by Dr. Mark Cutler, a Massachusetts Rehabilitation Commission psychiatrist. As part of his examination, Dr. Cutler administered a standard psychological test. The results indicated that Martin's "mood and affect were depressed," but that the symptoms did not impede Martin's mental functioning. MET 102. Dr. Cutler noted that Martin had difficulty ambulating and expressed suicidal ideation. Dr. Cutler reported that on Axis I of the DSM-IV's multiaxial assessment, Martin exhibited "pain disorder associated with both psychological factors and a general medical condition, dysthymia." Id. On Axis III, he noted fibromyalgia, and marked Martin's global assessment as "40." n3 Id. Given Martin's condition, Dr. Cutler recommended a "more intensive outpatient psychiatric treatment regimen," but noted that Martin "could manage whatever finances were available to him." Id.

n3 According to Martin's counsel, under the "Global Assessment of Functioning," an evaluation of "40" represents "serious symptoms . . . or any serious impairment in social, occupation, or school functioning." See MET 89.

[*8]

On March 8, 2002, Dr. Susan Witkie, a Social Security Administration physician, found Martin medically unable to perform his past relevant work or any comparable occupation in the national economy. See MET 95. Dr. Witkie found evidence of both depression and a somatoform disorder. In Dr. Witkie's opinion, Martin suffered moderate limitations in his daily activities, moderate difficulties in maintaining social functioning, marked difficulties in concentration, persistence and pace, and had suffered four or more episodes of decompensation, each of extended duration. See MET 98. These findings "satisfy the functional criterion" supporting a finding of disability for Social Security purposes. Dr. Witkie concluded that Martin suffered "total body pain," and was "unable to concentrate or persist at all [secondary] to pain [or somatic delirium] depression." MET 99. Dr. Witkie noted that Martin's condition was likely to last at least twelve months (a Social Security disability requirement). n4 Id.

n4 Martin is currently a recipient of Social Security benefits. A Social Security determination of disability, however, has little if any bearing on the impeccancy of a plan administrator's benefits determination. *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000).

[*9]

Dr. Savage had earlier referred Martin to Dr. Butler and Dr. Weiss. Dr. Butler, a neurologist, concluded that the "clinical exam shows a man who is very depressed in his demeanor and very depressed in his thought content." MET 29. Dr. Butler noted minimal tenderness of the temporomandibular joints, tenderness of the clavicular and trapezius insertion, tenderness of the elbows, and lower back pain. He recommended that Martin participate in a physical management program and undergo psychiatric treatment for depression. Id. In his Treating Physician Report, Dr. Butler noted that Martin had difficulty with "the traditional fibromyalgia trigger points, including the neck and low back." MET 103-104.

In an Attending Physician's Statement, dated June 25, 2002, Martin's treating psychiatrist, Dr. Weiss, rendered a diagnosis of depression with psychotic features and associated fibromyalgia. See MET 117. He noted that Martin suffered from anhedonia, agitation, unacceptable obsessive thoughts, decreased energy and lack of motivation, hopelessness, and occasional suicidal ideation. Id. Dr. Weiss evaluated Martin's psychological functioning as "Class 4," or "unable to engage in stress [*10] situations or engage in interpersonal relations (marked limitations)" noting that depression, obsessions, anger, and physical pain were the "stress factors or problems with interpersonal skills" which affected Martin's ability to work. Id.

On April 11, 2002, MetLife denied Martin's claim stating that "the medical records provided did not support your inability to perform the physical requirements of your own occupation." MET 70. As part of Martin's administrative appeal, MetLife reviewed additional medical information submitted by Martin. n5 MetLife also referred the medical records to two consulting physicians, Dr. Amy Hopkins and Dr. Mark Schroeder, for an independent review. n6 In her report of August 27, 2002, Dr. Hopkins noted the lack of objective evidence in the medical record supporting the diagnosis of fibromyalgia. Dr. Hopkins also found the following aspects of the medical record troublesome: "no mention of control point testing in the notes," trigger points are "nonspecific and found in many disorders, including sleep disturbance and psychiatric disorders," no sleep evaluation was documented, his symptoms "can all be explained on a psychiatric basis," there was no [*11] evidence in the record of any "objective reason" for Martin to suffer chronic pain syndrome, and no "significant objective findings were documented on the physical exams." MET 136. In Dr. Hopkins' opinion, Martin's case "appeared to be primarily a psychiatric [one]." Id.

n5 The additional records that were provided included the Social Security Questionnaire completed by Dr. Savage; relevant portions of the Psychiatric Review Technique completed by Dr. Witkie; the transcription of a consultative examination performed by Dr. Cutler, and the Treating Physician Report prepared by Dr. Butler.

n6 Dr. Amy Hopkins is board certified in internal and occupational medicine. Dr. Mark Schroeder is board certified in psychiatry and neurology.

Dr. Schroeder also submitted a report dated August 27, 2002. Dr. Schroeder concluded that the medical records addressing Martin's psychiatric issues were cursory and vague, and that there were no detailed mental health treatment notes. While the Attending Physician's Statement [*12] completed by Dr. Weiss reported considerable emotional distress, "there are no associated treatment records or further justification for his findings." MET 142. Dr. Schroeder faulted Dr. Cutler's report of February 27, 2002 for "the lack of any comment on the patient's ability to work." Id. Dr. Schroeder concluded that

> overall, the record does not provide specific details, mental health treatment notes or documents that support the employee's inability to maintain an appropriate interpersonal relationship, and inability to handle stressful situations on a frequent basis, or, in general, an inability to perform the essential functions of his own occupation.

Id.

After a review of the records and the reports of the reviewing physicians, MetLife made the following findings:

> The determination of disability is not determined by diagnosis, but is based on functional ability supported by clinical evidence that would substantiate symptoms consistent with those reported by the patient and medical providers.
>
> The medical evidence provided revealed that with regards to the physical complaints, the conditions that are reported to have impacted Mr. Martin's ability [*13] to work are headaches, degenerative disc disease and fibromyalgia. The migraine headaches are reported to occur 4-5 times a week. These are assumed to respond to medication and cause no more than some temporary discomfort since there are no reported emergency room treatments or other aggressive therapies that would note intractable headaches.
>
> Dr. Hoerner found no cranial nerve damage or sensory loss. Based on the limited findings on exam, it would appear that Dr. Hoerner's opinion regarding your clients limited mobility, traveling and climbing was based on your client's self reported limitation.
>
> [Dr. Savage also] reported functional limitations based on Mr. Martin's self-report, as there is no correlation by testing of the functional limitations for the physical or cognitive aspects reported. There were also no office notes provided in support of the conclusions rendered by Dr. Savage.
>
> The consultant with specialty in Occupational Medicine opined that trigger points and somatic symptoms appeared to be the basis for the diagnosis of fibromyalgia although these symptoms can be present in many other conditions. In as much as there was no control point testing noted in [*14] the records, the validity of these observations is questionable. Furthermore the diagnosis of fibromyalgia does not in and of itself denote a disability. The literature suggests that inactivity or rest has not proven to be a useful treatment modality for fibromyalgia. It also suggest [sic] that persons who carry this diagnosis and continue to work and remain active overall do much better.
>
> According to the physician statement dated June 25, 2002, Dr. Tom Weiss has been treating your client for depression. He reported several symptoms for which Mr. Martin has received individual therapy and pharmacotherapy. There was no indication fo the frequency of therapy, mention of antipsychotic medication or accompanying office notes. The Consultative Examination Report dated February

27, 2002 . . . noted your client to be oriented, having adequate judgment, no loose associations, no thought disorder and his short and long term memory were intact. These findings would not support a global assessment of functioning indicative of a severe psychiatric disorder, unless the global assessment of functioning is based solely on the examinee's self reported limitations.

The psychiatric physician [*15] consultant indicated that the record lacked detailed mental health treatment notes and self reported emotional distress appeared to be the basis for Dr. Weiss' reported findings. Furthermore, the psychiatric review technique form noted limitations in concentration, persistence and pace and episodes of decompensation that are not documented or supported by the medical records available in this long term disability file. It would appear there is no basis to find that Mr. Martin would be unable to engage in interpersonal relations or stressful situations as required by the duties of his job. Both physician consultants agreed that the medical records available failed to denote any complaints or side effects from medication.

In conclusion, the medical records lack physical or psychological findings to support that Mr. Martin would be unable to perform his job. Therefore, the original claim determination was appropriate.

MET 124-125. Based on these findings, MetLife determined that Martin was capable of returning to work and that he had therefore failed to establish that he was "disabled" within the meaning of the LTD Plan.

At the initial hearing on the cross-motions for summary [*16] judgment, the court realized that MetLife had not received all of Martin's psychiatric records. The court remanded the matter to MetLife to permit Martin to supplement the record and to give MetLife a renewed opportunity to give "full and fair consideration [to Martin's] claims on the merits." On November 29, 2004, Dr. Hopkins responded to the court's May 27, 2004 Order. Dr. Hopkins found that the additional medical information

documented that [Martin] reported significant pain, but that examinations were unrevealing for an etiology with a known psychological basis. . . . [Martin's] pain appears to be markedly out of proportion to the minimal findings on examinations and diagnostic tests. . . . FMS is not necessarily, in and of itself, an impairing disorder, and many people who carry this dx are able to work. Tender points do not, in and of themselves, provide objective support for significant physical impairment. As noted previously, Dr. Hoerner felt that [Martin] had a sedentary work capacity, which would be consistent with deconditioning noted by Dr. Butler, who recommended that [Martin] exercise to build up his endurance.

MET 524. In sum, Dr. Hopkins concluded [*17] that "no physical impairment was documented in this record which would have precluded [Martin] from return to work, full-time, own occupation, no restrictions or limitations, as of 8/27/02." MET 525.

Dr. Schroeder also submitted a supplemental opinion dated December 1, 2004. Based on his review of the additional records, Dr. Schroeder opined that

while some of these [records] do note the employee's report of history of depression or that the employee appeared depressed, these records did not contain detailed mental health information that would be supportive of the presence of a severe psychiatric illness or impairment. . . . Although it was stated at one point the employee had suicidal thoughts, these were without intent or plan. Suicidal thoughts without intent or plan may indicate emotional distress and be relevant to treatment, but do not necessarily establish global and sustained psychiatric impairment. The records of Dr. Weiss do not document more severe objective signs of psychiatric illness, such as marked deficits in organization of thought reality testing, cognitive or motor function, communication or hygiene. . . . The record does not provide a detailed description [*18] of the employee's daily activities, or any specific difficulties that he would have performing work or non-work related activities. The treatment described in the

claims file is outpatient psychiatric visits ranging from every several weeks to every several months. In summary, the available information indicates that the employee has reported subjective symptoms of discouragement, emotional distress, depression and anxiety that have been related to the employee's complaints of pain. The available information does not substantiate a severity of psychiatric illness or impairment that we be expected to be associated with psychiatric restrictions or limitations.

MET 520-521.

Based on Dr. Hopkins and Dr. Schroeder's supplemental evaluations, MetLife "decided that its decision to deny long-term disability benefits to Richard Martin was warranted." Defendant's Response, at 1.

DISCUSSION

A motion for summary judgment is the procedural vehicle by which the denial of a benefits claim is tested under ERISA. Summary judgment is a misnomer in an ERISA context as a "trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as [*19] a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002). De novo review is the default standard for considering challenges to the denial of ERISA benefits "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989). When plan administrators are granted such authority, an "arbitrary and capricious" standard of review applies instead. See *Recupero v. New England Tel. & Tel. Co.*, 118 F.3d 820, 827 (1st Cir. 1997). Under the arbitrary and capricious standard, the decision of the plan administrator will be upheld even where contrary evidence might suggest a different result, so long as the decision "is plausible in light of the record as a whole, . . . or, put another way, whether the decision is supported by substantial evidence in the record." *Leahy*, 315 F.3d at 17. "Substantial [*20] evidence . . . means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence. . . . [The] question [is] not which side [the court] believes is right, but whether [the administrator] had substantial evidentiary grounds for a reasonable decision in its favor." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998). See also *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir. 2001) ("The existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary."). The parties agree that the LTD Plan unambiguously grants MetLife the unfettered discretion to interpret the Plan and make benefits determinations. Consequently, the arbitrary and capricious standard applies to Martin's case. n7

- - - - - - - - - - - - - - - - - -

n7 Martin makes an unpersuasive argument that a *de novo* standard of review should apply because MetLife exhibited "an actual conflict of interest," evidenced by the bad faith with which it allegedly handled his claim. Martin points to the failure of MetLife to obtain an independent medical review prior to his administrative appeal and its failure to contact his medical providers to obtain his full treatment record. MetLife counters that bad faith requires a showing of actual or constructive fraud, deliberate deception "or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by any honest mistake as to one's rights or duties, but by some interested or sinister motive." *Local No. 48, United Brotherhood of Carpenters & Joiners v. United Brotherhood of Carpenters & Joiners*, 920 F.2d 1047, 1054 (1st Cir. 1990), quoting Black's Law Dictionary 127 (5th ed. 1979). There is no evidence of any nefarious motive on MetLife's part in rejecting Martin's claim.

- - - - - - - - - - - - - - - - - -

[*21]

In denying Martin's disability claim, MetLife relied initially on Dr. Hoerner's opinion that Martin was capable of performing sedentary work and on Dr. Cutler's conclusion that Martin's mental functions were normal. While MetLife acknowledged the opinions of Dr. Savage and Dr. Weiss that Martin was unable to return to work, MetLife based its ultimate determination that Martin was not disabled on the opinions of Dr. Hopkins and Dr. Schroeder n8 that the medical record did not corroborate Martin's subjective complaints. n9

- - - - - - - - - - - - - - - - - -

n8 In contrast to the practice of some insurers, MetLife recruited reviewers with medical concentrations appropriate to Martin's case, internal and occupational medicine (Dr. Hopkins), and psychiatry and neurology (Dr. Schroeder).

n9 Polaroid argues that the denial of benefits was reinforced by the contradictions in the medical evidence offered by Martin. For example, Dr.

Savage concluded that Martin could climb, MET 27, while Dr. Hoerner reached the opposite conclusion. MET 82. Similarly, while Dr. Butler noted that Martin's "tandem gait, toe-walk, heel-walk, are normal," MET 29, Dr. Hoerner observed the opposite: "He has difficulty on tandem walking. When asked to stand on his toes he has a sway mechanism and has a tendency to fall to the left." MET 81.

[*22]

Martin makes the argument that MetLife's benefits determination does not survive the arbitrary and capricious test because the medical record (as he interprets it) liberally documents his complaints, and that simply because his symptoms can be explained on a "psychiatric basis" does not mean that they have no physical manifestations. Martin points to the First Circuit's suggestion that an insurer may act unreasonably in demanding that a claimant suffering from chronic fatigue syndrome or fibromyalgia produce "objective evidence" when the symptomatology of these and similar diseases has yet to be fully established. See *Cook v. Liberty Life Assur. Co. of Boston, 320 F.3d 11, 21-22 (1st Cir. 2003)*. Martin argues that as in *Doe v. Travelers Ins. Co., 167 F.3d 53, 57 (1st Cir. 1999)*, the court should afford "special weight" to his treating physicians' diagnoses and their conclusion that he is unable to engage in stress situations or interpersonal relations, both of which are requirements of his job.

While this is not by any stretch an open and shut case, "it is the responsibility of the administrator [and not the court] to weigh conflicting evidence. [*23] " *Vlass, 244 F.3d at 32*. Where medical opinions differ, the administrator is not required to defer to those of a claimant's treating physicians. See *Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 155 L. Ed. 2d 1034, 123 S. Ct. 1965 (2003)* ("Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). A decision denying benefits may be based on the reasoned opinion of a non-examining, reviewing physician. *Matias-Correa v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003)*; *Gannon v. Metropolitan Life Ins. Co., 360 F.3d 211, 216 (1st Cir. 2004)*. Cf. *Nord, 538 U.S. at 832* ("If a consultant engaged by a plan may have an incentive' to make a finding of not disabled,' so a treating physician, in a close case, may favor a finding of disabled. [*24] '"). See also *Boardman v. The Prudential Ins. Co. of America, 337 F.3d 9, 16-17 n.5 (1st Cir. 2003)* (distinguishing between requiring objective evidence to support a diagnosis, which may not be reasonable given that some conditions cannot be proven with objective evidence, and requiring objective evidence of functional impairments, which can be quantitatively measured). Here, while it was open to MetLife to reach a different result, the opinions of Dr. Hopkins and Dr. Schroeder provide a reasonable basis of support for MetLife's decision to deny Martin's claim.

ORDER

Martin's motion for a declaratory judgment is DENIED. Polaroid's cross-motion for summary judgment is ALLOWED.

SO ORDERED.

Richard G. Stearns

UNITED STATES DISTRICT JUDGE