UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIANE DENMARK,                    )
      Plaintiff,                  )
                                  )        CIVIL ACTION NO.
          v.                      )        04-12261-DPW
                                  )
Liberty LIFE ASSURANCE           )
COMPANY OF BOSTON, THE            )
GENRAD, INC. LONG TERM            )
DISABILITY PLAN, THROUGH          )
TERADYNE, INC. AS SUCCESSOR       )
FIDUCIARY,                        )
      Defendants.                 )


<u>MEMORANDUM AND ORDER</u>
November 10, 2005

The Plaintiff Diane Denmark brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 seeking review of the decision by the Defendant Liberty Life Assurance Company of Boston ("Liberty") to deny her, a participant in the Defendant Genrad, Inc. Group Disability Income Policy ("Disability Policy"), long term disability ("LTD") benefits. Specifically, the Plaintiff seeks to recover LTD benefits allegedly due to her pursuant to 29 U.S.C. §§ 1132(a)(1)(B), (2) and (3).  The Plaintiff and the Defendants have both moved for summary judgment pursuant to Fed. R. Civ. P. 56. In addition, the Plaintiff seeks to supplement the administrative record with documents discovered pursuant to my order of April 4, 2005.

## I. BACKGROUND

### a. Facts

The Plaintiff began working at GenRad, Inc. ("GenRad") on
April 2, 1973 at age twenty-three.  She had only completed formal
schooling through the eighth grade.  GenRad employed her as a
Group Leader in Manufacturing Inspection.  In this position, the
Plaintiff was primarily responsible for overseeing "the
inspection of GenRad components, modules and finished systems to
specifications and quality standard"; making "routine work
assignments, monitor[ing] job performance and ensur[ing] an
efficient work flow"; and providing "guidance, assistance and
training to less senior inspection personnel."  An internal
GenRad document lists the physical demands of this position as
follows: "Bending, squatting and body movement involved
inspecting external and internal components of various products.
Ability to utilize material handling equipment to move test
equipment and position product.  Occasional lifting of 25
pounds."  The Plaintiff continued in this position through
October 2, 2001.  At that time, the Plaintiff's bi-weekly
earnings were $1,844, excluding commissions and bonuses, and her
monthly income, including commissions and bonuses, was $3,995.33.

The Plaintiff stopped attending work on October 3, 2001 (her

date of disability) allegedly for health reasons.  She had been
suffering from fatigue and muscle pain, symptoms consistent with
fibromyalgia syndrome, for a number of years.  The Plaintiff's
primary care physician, Dr. Gregory Malanoski, first diagnosed
her with fibromyalgia in 1996.  Fibromyalgia is a chronic
disorder that can be alleviated, but not cured.  There is no
single treatment that is effective for everyone, but certain drug
regimes are often used to alleviate the chronic pain and sleep
disturbance.[1]  The Plaintiff's symptoms had occurred
periodically, but she claims that they worsened to the point
where she could no longer work in October 2001.

---

[1] The Seventh Circuit recently described fibromyalgia as "a
common, but elusive and mysterious, disease, much like chronic
fatigue syndrome, with which it shares a number of features. Its
cause or causes are unknown, there is no cure, and, of greatest
importance to disability law, its symptoms are entirely
subjective. There are no laboratory tests for the presence or
severity of fibromyalgia. The principal symptoms are 'pain all
over,' fatigue, disturbed sleep, stiffness, and--the only symptom
that discriminates between it and other diseases of a rheumatic
character--multiple tender spots, more precisely 18 fixed
locations on the body (and the rule of thumb is that the patient
must have at least 11 of them to be diagnosed as having
fibromyalgia) that when pressed firmly cause the patient to
flinch.... Some people may have such a severe case of
fibromyalgia as to be totally disabled from working, but most do
not and the question is whether [the claimant] is one of the
minority." Hawkins v. First Union Corp. Long-Term Disability
Plan, 326 F.3d 914, 916 (7th Cir. 2003) citing Sarchet v. Chater,
78 F.3d 305, 306-07 (7th Cir. 1996).  See also Cook v. Liberty
Life Assurance Co. of Boston, 320 F.3d 11, 15, n. 4 (1st Cir.
2003) citing National Institutes of Health, *Questions and Answers
About Fibromyalgia*, at http://www.niams.nih.gov/hi/topics/
fibromyalgia/fibrofs.htm (December 1999).

On the date of disability, the Plaintiff was covered under GenRad's Short Term Disability Benefits Plan and its Long Term Disability Benefits Plan.  Liberty served as the disability claims administrator for the STD plan, providing an initial claims review and decision for STD claims by GenRad employees. Liberty also served as the insurer for the Long Term Disability Benefits Plan, which was administered through the Group Disability Income Policy, policy no. GF3-810-254021-01 (the "Disability Policy").  At some point in late 2001, Teradyne, Inc. ("Teradyne") acquired GenRad, but the Plaintiff's rights to disability benefits under the two plans remained the same.

1. <u>Short-Term Disability Benefits</u> - The Plaintiff filed for short term disability ("STD") benefits shortly after October 3, 2001. Under the STD plan, "disability" or "disabled" meant that the claimant is "unable to perform all of the material and substantial duties of your occupation on an Active Employment basis because of an Injury or Sickness."

To evaluate the Plaintiff's claim, Nurse Debra Kaye, a Liberty Disability Case Manager, reviewed the medical records provided by Dr. Malanoski[2] and Dr. Thomas Goodman[3], a

_____

[2] On October 4, 2001, Dr. Malanoski diagnosed the Plaintiff with fibromyalgia and GERD (Gastroesophageal Reflux Disease). According to the Attending Physician Statement dated November 6, 2001, his diagnosis of fibromyalgia was based on the following "objective medical findings", as best as I can decipher them: diffuse muscle tenderness, weakness and fatigue.  He opined that the Plaintiff's physical impairment was Class 5, meaning "severe limitation of functional capacity; incapable of minimum

rheumatologist to whom Dr. Malanoski referred the Plaintiff on October 4, 2001.  From these records, Nurse Kaye noted that the information "does support [a diagnosis] of fibromyalgia," but that "there is no evidence that [the claimant] needed to cease occupational functioning" and that in the past she "was able to function in an occupational setting full time, working long hours" because her "occasional flares ... have responded to physical therapy."  Earlier one of the Liberty employees noted,

---

activity", and that the Plaintiff's treatment plan was a "rheumatology consult and physical therapy."  In his medical notes on October 4, 2001, Dr. Malanoski indicated that the Plaintiff was "Doing poorly: much worse myalgia generally. ... No work until further [follow-up]." He also listed the nine prescribed drugs she was taking for her multiple ailments.

[3] Dr. Goodman indicated that the Plaintiff had multiple trigger point sensitivities consistent with fibromyalgia and that "recently her symptoms of fatigue, exhaustion, myalgia and insomnia had worsened.  These symptoms appear to have been quite marked over the last year or so, such that she is unable to perform her usual work as a quality control group leader" as "[t]his work requires her to be on her feet all day."  Dr. Goodman opined that her medications "afford her some relief of her symptoms but she remains totally disabled in terms of her line of work.  She is unable to perform this work as she is unable to be on her feet for the amount of time it takes to perform her job adequately.  She is also disabled by exhaustion and myalgia which makes it difficult for her to stay at work for any appreciable amount of time.  The prognosis for this condition ... is poor to fair.  My hope is that we can improve Diane's exhaustion and her pain with medication she is currently receiving."  Dr. Goodman indicated that the Plaintiff's past medical history and present abnormal conditions also included anemia, atrial fibrillation, high cholesterol, angina, and Raynaud's Phenomenon.  He also noted in October 2001 that the Plaintiff exercises on a "regular schedule."  Nurse Kaye interpreted his note on November 6, 2001 as meaning that the Plaintiff's menopausal symptoms have exacerbated her fibromyalgia symptoms.

however, that the Plaintiff has been "using vacation time when unable to [work] -- (some half days also) as condition is worsening over last few years."  Nonetheless, Nurse Kaye repeatedly commented that it was unclear what had changed in her condition to support the restrictions/limitations justifying disability benefits.  Based on this analysis, Nurse Kaye requested an independent medical review of the Plaintiff's medical records.  In the medical file sent to the peer reviewer, Nurse Kaye also included medical records provided by Dr. Terrence Hack, a cardiologist whose report she thought showed that there were no serious cardiac arrhythmias or other cardiac symptoms that would support any new restrictions/limitations.

Dr. Clay Miller, a physician specializing in Physical Medicine and Rehabilitation, reviewed the medical records in the Plaintiff's file and issued a Peer Review Analysis on December 5, 2001.  In his report, Dr. Miller concluded that Dr. Goodman's October 2001 rheumatology exam documented a normal neurological and musculoskeletal physical exam, other than the 18 positive fibromyalgia tender points, and that "[t]here are no documented objective physical exam findings that support a decrease or significant change in this patient's physical condition" around the date of disability.  Furthermore, Dr. Miller found that the "treatment to date has been appropriate", although he "would recommend multidisciplinary chronic pain management with behavioral interventions."

Based on Dr. Miller's report and the medical records submitted by Dr. Malanoski, Dr. Goodman and Dr. Hack, Liberty concluded that the Plaintiff's claim for STD benefits should be denied.  Liberty then sent a denial letter signed by Mary Ellen Smith, a Liberty Disability Case Manager, to the Plaintiff dated December 26, 2001 explaining that their review of the medical records available failed to demonstrate any restrictions or limitations that would preclude the plaintiff from performing the duties of her job at GenRad.  Liberty also sent letters signed by Mary Ellen Smith to Dr. Goodman and Dr. Malanoski asking them to review Dr. Miller's peer review and reply with comments if they disagreed.  Dr. Malanoski replied that he "strongly disagree[d] with the peer review decision not to provide disability benefits" because fibromyalgia is a "condition lacking abnormalities in blood testing or specific abnormalities in physical exam." (emphasis in original).  Dr. Malanoski also indicated that Dr. Goodman "agrees with her degree of disability."

The Plaintiff exercised her right to appeal the denial in a request for review dated January 3, 2002.  On January 17, 2002, Liberty informed the Plaintiff that her employer reviewed all appeals itself and that her file and appeal documents had been forwarded on to her employer, now called Teradyne.  Thereafter, Teradyne decided that the Plaintiff should undergo an "Independent Medical Examination" and Dr. Goodman referred her to Dr. Peter Schur.

In Dr. Schur's letter summarizing his findings, he stated that most of the Plaintiff's symptoms suggest classical fibromyalgia, although he wondered whether other tests might show she actually has polymyalgia rheumatica or rheumatoid arthritis.[4] He also questioned prior findings related to cardiac disease and whether she needs to take so many medications, some of which have been associated with fatigue.  He found that the Plaintiff "clearly has a sleep disorder" and that she is "severely deconditioned and clearly needs to get some exercise but probably won't until she sleeps."  He concluded that "at least for the time being, she is clearly disabled not only from work, but being able to take care of her household... [F]or now, until [modifications of her regime improve her situation and stamina][5], which may take months, she is clearly disabled."  Teradyne subsequently determined that it would pay STD benefits to the Plaintiff through April 3, 2002 based on this Independent Medical

---

[4] Dr. Schur found that the Plaintiff's "shoulder and pelvic girdle problems plus her history of an elevated sedimentation rate would make one suspect PMR [polymyalgia rheumatica], but I think most of this, in fact, as suggested by others, is classical fibromyalgia.  I find a CRP [C-reactive protein measurement] much better for evaluating inflammation than a sedimentation rate, but given her morning stiffness, makes one suspect either PMR or, in fact, RA [rheumatoid arthritis], and wonder what a rheumatoid factor, CRP, and x-rays of the hands might show."

[5] Specifically, Dr. Schur indicated that he suggested "some modifications of her regime that hopefully will improve matters, so that she can get her stamina back and be able to go back to work.  However, for now, until <u>that</u> is accomplished, which may take months, she is clearly disabled." (emphasis supplied)

Exam.

2. <u>Long-Term Disability Benefits</u> - The Plaintiff filed for LTD

benefits on or about June 5, 2002.  Section 2 of the Policy

defines "Disability" or "Disabled" as follows:

    1.    For persons other than pilots, co-pilots, and
        crewmembers of an aircraft:
        i.    if the Covered Person is eligible for the 24 Month
            Own Occupation benefit, "Disability" or "Disabled"
            means that during the Elimination Period and the
            next 24 months of Disability the Covered Person,
            as a result of Injury or Sickness, is unable to
            perform the Material and Substantial Duties of his
            Own Occupation; and
        ii.   thereafter, the Covered Person is unable to
            perform, with reasonable continuity, the Material
            and Substantial Duties of Any Occupation.

Section 2 also defines "Any Occupation" as "any occupation that

the Covered Person is or becomes reasonably fitted by training,

education, experience, age, physical and mental capacity" and

"Own Occupation" as "the Covered Person's occupation that he was

performing when his Disability or Partial Disability began.  For

the purposes of determining Disability under this policy Liberty

will consider the Covered Person's occupation as it is normally

performed in the national economy."  "Sickness" is defined as

"illness, disease, pregnancy or complications of pregnancy."

Along with her application for benefits, the Plaintiff,

through her attorney, submitted Dr. Goodman's December 11, 2001

report and Dr. Schur's April 12, 2002 letter.  The Plaintiff also

completed claims paperwork, including an Activities Questionnaire

and a Training-Education-Experience Form, and provided the

medical records evaluated for her STD claim as requested by
Liberty.   Liberty also requested and received a basic
occupational description of the Plaintiff's position as described
by the Department of Labor Dictionary of Occupational Titles
(DOT).   That document, which the sender noted lacked input from a
vocational professional, set out the physical requirements for a
Group Leader, Printed Circuit Board Quality Control (Code
726.361-018) as follows: "Strength: Light - Lifting, Carrying,
Pushing, Pulling 20 Lbs. occasionally, frequently up to 10 Lbs.,
or negligible amount constantly. Can include walking and or
standing frequently even though weight is negligible.  Can
include pushing and or pulling of arm and or leg controls."

To evaluate the Plaintiff's LTD benefits claim, Nurse Kaye
again reviewed the Plaintiff's medical file focusing on the
information added since her initial review.  After reviewing Dr.
Goodman's December 11, 2001 report, Dr. Malanoski's January 14,
2001 letter and Dr. Schur's April 12, 2002 letter, Nurse Kaye
concluded that her additional "review does not [yield] new
medical information to alter previous findings that [there was
no] significant change in [claimant]'s condition" around the date
of disability "to substantiate [restrictions/limitations] during
the elimination period."  After reviewing GenRad's job
description of a "Group Leader - Manufacturing Inspection" and
the DOT description for Group Leader, Printed Circuit Board
Quality Control, Nurse Kaye found that Dr. Goodman's assertion

that the Plaintiff is "unable to stand for long duration at work is not supported by the physical job demands of her job."  Nurse Kaye opined that the Plaintiff "may be self-limiting her work or social activities".  She also questioned the usefulness of Dr. Schur's opinion in assessing the Plaintiff's condition for the past six months because his report only provides information for the particular date of the independent medical exam.  Based on this review, Liberty sent the Plaintiff a LTD benefits denial letter on August 20, 2002 signed by Elizabeth Kiernan, a Senior Disability Case Manager.

The Plaintiff appealed the LTD benefits denial in a letter dated September 24, 2002 and subsequently forwarded a report by Dr. Milton Taylor dated July 24, 2002.  In that report, Dr. Taylor concluded "[i]t is likely that [the Plaintiff] does, in fact, have some difficulty with concentration when she becomes overly fatigued" and that the Plaintiff "presents in an honest and straightforward manner and I suspect that she has some significant physical limitations, as noted by Dr. Schur, M.D.  I do not believe that her depression, in and of itself, is of sufficient severity to prevent her from gainful employment. Therefore, the all important factor in her disability claim would have to be medical in nature."

As part of Liberty's review of the Plaintiff's appeal, Liberty requested a labor market survey and vocational review to determine the actual physical requirements of the Plaintiff's

occupation as it is performed in the local and national economy. The vocational consultant was given GenRad's job description for Group Leader - Manufacturing Inspection, the DOT description for Group Leader, Printed Circuit Board Quality Control, and the Plaintiff's Training-Education-Experience Form.  The consultant concluded that "the physical demands would be considered sedentary to light work with occasional standing, walking and bending.  The opportunity to intermittently change positions from sitting to standing and walking is typically provided during the course of the workday."

Liberty also arranged for a surveillance investigation to determine the Plaintiff's activity level.  Miles Investigations, Inc. conducted a surveillance on October 24 and November 2, 4, and 5, 2002.  On October 24th, the Plaintiff was observed doing errands for just over three hours.  The investigator reported that she was "walking and moving in a fluid non-obstructed manner, bending and lifting items such as a case of soda and a gallon of milk without difficulties."  On the other days, the investigator did not observe any activity out of her house except one quick trip to a drug store, although the Plaintiff did not appear to be home on the morning of the 2nd.

Lastly, Liberty sent the vocational consultant's report, the labor market survey, the surveillance report, and all of the available medical records to the Network Medical Review - Elite Physicians ("NMR") for a final medical review.  Dr. John

Bomalaski did the review and wrote a report on December 4, 2002. He found that the "clinical medical evidence does not clearly support severe impairment because ... the diagnosis of fibromyalgia remains in question."  He also concluded that the Plaintiff "is capable of working full time in a primarily sedentary position within the limitations and restrictions noted on the Functional Capacities Form."  The physical limitations to which he referred were that, in his opinion, the Plaintiff would occasionally (up to one third of an eight hour day) have difficulty sitting, standing, walking, driving, pushing, pulling, reaching, grasping, doing repetitive wrist, elbow, shoulder or ankle motions, and lifting up to 20 lbs.[6]  He also found that she would seldom have difficulty squatting, bending, keeling and climbing stairs.  Dr. Bomalaski recommended that additional laboratory studies be performed to rule out other diagnoses; that other treatments and medication be tried to see if any are more effective; and that the Plaintiff's depression should be treated because it might improve her overall discomfort.

Based on this information, Liberty declined to alter its original determination and sent a letter dated December 10, 2002 and signed by Michelle Scott, a Liberty Appeal Review Consultant, which concluded that the "medical evidence lacks support of a

---

[6] Dr. Bomalaski did not fill out the form indicating one way or the other whether the Plaintiff would be restricted if she had to lift more than 20 lbs.

severity of impairment that would preclude [the Plaintiff] from performing her own occupational job duties as customarily performed[.]"

3. <u>Social Security Decision</u> - On January 31, 2004, Administrative Law Judge Carter (the "ALJ") issued a decision that the Plaintiff is entitled to $1,496 of disability benefits per month retroactive to October 2, 2001. The ALJ considered the Plaintiff's own testimony, the evidence of Dr. Goodman and Dr. Hack, and the evidence of state agency physicians, who were of the opinion that the Plaintiff was not disabled. The ALJ concluded that the Plaintiff has been "disabled" within the meaning of the Social Security Act since October 2, 2001 because the "claimant's severe pain, limitations and restrictions ... prevent[] her from performing her past relevant work" and because she has suffered a "substantial loss of ability necessary to perform a significant number of jobs identified in unskilled sedentary occupational base[.]"

Based on this favorable decision, the Plaintiff again requested that Liberty review the denial of LTD benefits and submitted a new letter from Dr. Goodman. Liberty replied on June 3, 2004 that the Social Security Disability benefits decision did not affect their prior denial determination. On August 23, 2004, Liberty reaffirmed in a letter again signed by Michelle Scott that the December 10, 2002 denial was its final determination and that it was not contingent on the Social Security Disability

benefits award.

### b. Procedural History

On September 17, 2004 the Plaintiff filed an action against the Defendants in Suffolk Superior Court of the Commonwealth of Massachusetts seeking benefits allegedly due under ERISA, 29 U.S.C. §§ 1132(a)(1)(B), (2) and (3) and for breach of contract. On October 27, 2004, the Defendants served notice of removal of the original action to this Court.  The Plaintiff has not pursued her breach of contract claim in this Court; in any event, I find that it is pre-empted by ERISA.  See generally Hampers v. W.R. Grace & Co., 202 F.3d 44, 51-53 (1st Cir. 2000) and 29 U.S.C. § 1144(a).  With respect to the Plaintiff's allegation in paragraph 27 of her Complaint that she "is entitled to relief against the Plan and Liberty to recover benefits due to her under the terms of the Plan, to enforce her rights to benefits under the Plan and to clarify her rights to future benefits under the Plan", I find, as a preliminary matter, that the appropriate civil enforcement provision for this "traditional benefits claim" is 29 U.S.C. § 1132(a)(1)(B), not 29 U.S.C. §§ 1132(a)(2)[7] and (3)[8] as alleged

---

[7] 29 U.S.C. § 1132(a)(2) allows a participant, beneficiary or fiduciary to bring a civil action for appropriate relief under 29 U.S.C. § 1109, which makes a fiduciary personally liable to make good to a plan any losses to the plan resulting from a breach of his or her fiduciary duty, and to restore to such plan any profits of such fiduciary.  Furthermore, § 1109 subjects the fiduciary to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.  In

in her Complaint.  <u>Fenton v. John Hancock Life Ins. Co.</u>, 400 F.3d 83, 86 (1st Cir. 2005).

The Plaintiff filed a Motion for Focused Pre-Trial Discovery Relating to the Scope of the Administrative Record with Rule 7.1 Certification.  I granted this motion to the extent of requiring the Plaintiff to file a separate motion to supplement the record with the product of this discovery, which she has done in her Motion to Complete the Record on Review with Rule 7.1 Certification.  In response, the Defendants have now filed a Motion to Strike references to the discovered documents in the Plaintiff's Facts.

The Plaintiff and the Defendants also filed motions for orders contending respectively that the review would be de novo review and arbitrary and capricious review.  I denied both standard of review motions without prejudice to being developed in their motions for summary judgment.  Neither the Plaintiff nor the Defendants has bothered to develop their standard of review arguments further in the motions for summary judgment currently

---

this case, the Plaintiff is not asking for this relief.

[8] 29 U.S.C. § 1132(a)(3) has been called ERISA's "catch all" provision.  <u>Watson v. Deaconess Waltham Hosp.</u>, 298 F.3d 102, 108 (1st Cir. 2002).  The Supreme Court has interpreted the provision as "a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy."  <u>Id.</u> at 110, <u>citing</u> <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 512 (1996).  In this traditional benefits denial case, 29 U.S.C. § 1132(a)(1)(B) provides an adequate remedy.

before me.  Both have chosen simply to refer to their initial
memoranda.

## II. DISCUSSION

### a. Standard of Review

1. <u>Summary Judgment in ERISA Actions</u> - Summary judgment is
appropriate when "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(c).  Cross-motions for
summary judgment do not alter the basic summary judgment
standard, but rather require courts to determine whether either
of the parties deserves judgment as a matter of law on facts that
are not disputed.  <u>Adria Int'l Group, Inc. v. Ferre Dev., Inc.</u>,
241 F.3d 103, 107 (1st Cir. 2001).  In deciding a typical cross-
motion for summary judgment, courts must consider each motion
separately, drawing inferences against each movant in turn.
<u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 6 (1st Cir. 1997).

The standard of review in an ERISA case differs from the
review in an ordinary civil case, where summary judgment serves
as a procedural device designed to screen out cases that present
no trialworthy issues.  <u>Leahy v. Raytheon Co.</u>, 315 F.3d 11, 17
(1st Cir. 2002).  In a typical "ERISA benefit denial case, trial
is usually not an option: in a very real sense, the district
court sits more as an appellate tribunal than as a trial court.

It does not [usually] take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Id. at 17-18.  Thus, in a typical ERISA case, "where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue" regardless of the degree of deference owed to the plan fiduciary, as discussed in the following sub-section.  Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).  "This means the non-moving party is not entitled to the usual inferences in its favor."  Orndorf, 404 F.3d at 517.[9]

---

[9] I note, however, that the First Circuit has not consistently articulated this last point.  In another 2005 ERISA case, the First Circuit held that the operative inquiry under the deferential standard of review is "whether the aggregate evidence, **viewed in the light most favorable to the non-moving party**, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits."  Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005)(emphasis supplied) citing Twomey v. Delta Airlines Pension Plan, 328 F.3d 27, 31 (1st Cir. 2003), which in turn cites Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2000).

While Orndorf involved de novo review of the insurer's denial, the First Circuit clearly stated that "the use of summary judgment in this way [including no usual inferences for the non-moving party] is proper regardless of whether our review of the ERISA decision maker's decision is de novo or deferential."  Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).  Furthermore, in Orndorf, the First Circuit cites to Liston v. Unum Corp. Officer Severance Plan, 300 F.3d 19, 24 (1st Cir. 2003), a deferential review case, where the Court held that "assuming that the decision is to be made by the judge based solely on the record made at the administrative level, summary

2. <u>De Novo or Deferential Review</u> - Whether a de novo or
deferential standard of review applies to an ERISA action depends
on the degree of deference owed the original decision-maker.
This standard remains the same through all stages of federal
adjudication.  <u>Leahy</u>, 315 F.3d at 17.  The Supreme Court
determined in <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S.
101, 115 (1989) that "a denial of benefits challenged under §
1132(a)(1)(B) is to be reviewed under a de novo standard unless
the benefit plan gives the administrator or fiduciary
discretionary authority to determine eligibility for benefits or
to construe the terms of the plan."  If, however, "the ERISA plan
grants the plan administrator discretionary authority in the
determination of eligibility for benefits, the administrator's
decision must be upheld unless it is arbitrary, capricious, or an
abuse of discretion."  <u>Wright v. R.R. Donnelley & Sons Co. Group
Benefits Plan</u>, 402 F.3d 67, 74 (1st Cir. 2005)(internal citation
and quotation omitted).

In this case, the Defendants argue that Section 7 of the
Disability Policy "provides a clear grant of discretionary
authority to Liberty by allocating to it the right to make

---

judgment is merely a mechanism for tendering the issue and no
special inferences are to be drawn in favor of a plaintiff
resisting in summary judgment; **on the contrary, the rationality
standard tends to resolve doubts in favor of the administrator.**"
(emphasis supplied).

factual findings, to determine eligibility for benefits, and/or
to interpret the terms of the Plan."  Section 7 provides:

**Interpretation of the Policy**

> Liberty shall possess the authority, in its sole
> discretion, to construe the terms of this policy and to
> determine benefit eligibility hereunder.  Liberty's
> decisions regarding construction of the terms of this
> policy and benefit eligibility shall be conclusive and
> binding. [A.R. I, p. 35.]

According to the Disability Policy, Liberty also "reserves the
right to determine if the Covered Person's Proof of loss is
satisfactory."

To apply the <u>Firestone</u> test in <u>Leahy</u>, the First Circuit
considered the wording of the Plan documents, which gave MetLife,
the claims administrator, "the exclusive right, in [its] sole
discretion, to interpret the Plan and decide all matters arising
thereunder" and further provided that any decision by MetLife in
the exercise of that authority "shall be conclusive and binding
on all persons unless it can be shown that the ... determination
was arbitrary and capricious."  The First Circuit found that
"[t]his discretionary grant hardly could be clearer" and applied
the arbitrary and capricious standard.  The same can be said
here. <u>See also Brigham v. Sun Life of Canada</u>, 317 F.3d 72, 81-82
(1st Cir. 2003)(reaffirming that "there are no 'magic words'
determining the scope of judicial review of decisions to deny
benefits").

The Plaintiff does not contest that the wording in Section 7

is a sufficiently clear grant of discretionary authority, rather she argues that Liberty's denial of her LTD benefits claim should be subject to de novo review because, as I understand the argument, no grant of discretionary authority was given to GenRad, the default plan administrator, or delegated by GenRad to Liberty.  According to the Plaintiff, Section 7 of the Disability Policy is not a valid delegation of discretionary authority because it is not an ERISA plan instrument and Liberty cannot grant discretion to itself.

The Plaintiff points to 29 U.S.C. § 1002(16)(A)(ii) for the proposition that since the Disability Policy does not specify who the Plan Administrator is, it must be GenRad, the Plan Sponsor. And since GenRad has not delegated its administrative authority to Liberty in a written instrument as required by 29 U.S.C. § 1105(c) and Firestone, the review must be de novo.  For support, the Plaintiff cites to cases including Davidson v. Liberty Mutual Ins. Co, 998 F.Supp. 1 (D.Me. 1998).  In Davidson, the claimant had been employed by Liberty Mutual.  The LTD plan vested discretionary authority in Liberty Mutual, the employer and Plan Administrator.  Liberty Mutual designated Liberty Life, a subsidiary of Liberty Mutual, to administer the LTD plan, but the District Court found that it failed properly to delegate its fiduciary duties and discretionary authority as plan administrator as required by Rodriguez-Abreu v. Chase Manhattan

Bank, N.A., 986 F.2d 580, 584 (1st Cir. 1993).

The Plaintiff's reference to cases such as Davidson and her consequent line of reasoning miss the point.  The Plaintiff has sued Liberty, not GenRad, as the defacto administrator and fiduciary of GenRad's LTD Benefits Plan.  Although the Disability Policy does not specifically name Liberty as the "Plan Administrator" as anticipated by 29 U.S.C. § 1002(16)(A)(i), all of the documents in the administrative record support the Plaintiff's own assertion in her Complaint that Liberty has acted as the defacto administrator in accordance with its administrative role outlined in the Disability Policy.  See also Cook v. Liberty Assurance Co. of Boston, 320 F.3d 11, 13 (1st Cir. 2003)(where the Court treated Liberty as the administrator where the employer offered LTD benefits under insurance policies provided and administered by Liberty.)  Furthermore, the record unequivocally shows that Liberty is a fiduciary within the meaning of ERISA because it acted in the capacity of manager and administrator of GenRad's LTD Benefits Plan.  See Pegram v. Hendrich, 530 U.S. 211, 222 (2000) and 29 U.S.C. § 1002(21)(A)(i) and (iii).  In this case, unlike Davidson and Rodriguez-Abreu, the written policy gives the challenged decision-maker, here Liberty, the discretionary authority to determine eligibility for benefits and to construe the terms of the plan.  Thus, there are no issues of improper delegation.

Where, as here, the underlying plan reserves discretion to

the insurer who is also acting as the plan administrator, the insurer's denial of benefits is reviewed under the arbitrary and capricious standard. See e.g. Cook, 320 F.3d at 18; Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co., 230 F.3d 415, 418 (1st Cir. 2000); Doe v. Travelers Ins. Co., 167 F.3d 53, 56-57 (1st Cir. 1999); and Giannone v. Metropolitan Life Ins. Co., 311 F.Supp.2d 168, 174-75 (D.Mass. 2004).  This standard means that a "decision to deny benefits to a beneficiary will be upheld if the administrator's decision was reasoned and supported by substantial evidence.  Evidence is substantial when it is reasonably sufficient to support a conclusion. Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision."  Wright, 402 F.3d at 74 (internal citations and quotations omitted).[10]

---

[10] The Defendants argue that Liberty's decision should be upheld because it was "plausible" based on the administrative record as a whole.  As support for this standard, the Defendants referred in post hearing briefing to Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002), where the First Circuit held that "[t]he arbitrary and capricious standard asks only whether a factfinder's decision is **plausible** in light of the record as a whole, see, e.g., Pari-Fasano v. ITT Hartford Life & Accid. Ins. Co., 230 F.3d 415, 419 (1st Cir. 2000) or, put another way, whether the decision is supported by substantial evidence in the record, Doyle, 144 F.3d at 184." (emphasis supplied).  Neither Pari-Fasano, nor Doyle, nor the cases cited by those decisions, use the term "plausible".  To the extent the Defendants suggest that Judge Selya's choice of alternative words directs a more deferential standard of review, I reject the suggestion and find the formulation in Wright to be the full and complete standard for which the word "plausible" used in Leahy was meant in context

### b. Conflict of Interest & Heightened Standard of Review

In applying the arbitrary and capricious standard, I must consider the administrator's conflict of interest as a factor if such a conflict is established. Wright, 402 F.3d at 74. "In this Circuit, if a court concludes there is an improper motivation amounting to a conflict of interest, the court may cede a diminished degree of deference -- or no deference at all -- to the administrator's determinations." Id. (internal citations and quotations omitted); see also Fenton, 400 F.3d at 90 (1st Cir. 2005)("[T]he financial self-interest of a plan administrator may warrant arbitrary and capricious review with 'more bite.'")

The burden is on the claimant to demonstrate a conflict of interest. Wright, 402 F.3d at 74, n. 4. The conflict must be real; "a chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due." Id. at 74, citing Leahy, 315 F.3d at 16. While Liberty is both the payor of benefits and the administrator with respect to the LTD benefits, the case law clearly precludes me from finding that the potential for Liberty to deny claims to maximize its profit is sufficient, in and of itself, to establish a conflict of interest.[11]

_____

to provide a shorthand statement without diluting the standard.

[11] See e.g. Pari-Fasano, 230 F.3d at 418, where the Court acknowledged that an insurer "does have a conflict of sorts when

-24-

Given this limitation, the Plaintiff argues that a heightened standard of review is nevertheless appropriate here because (1) the "lucrative financial relationship" between Liberty and NMR suggests bias, and (2) "Liberty engaged in a whole host of conduct, that demonstrates it acted as an adversary, rather than a fair adjudicator of a claim for benefits."  I will address the two grounds in turn.

1. <u>The Liberty and NMR Financial Relationship</u> - Before considering the merits of this argument, I must first determine whether or not the Plaintiff may supplement the administrative record with documents related to the financial relationship between Liberty and NMR, which she received pursuant to my order for discovery.  As pointed out by the Defendants, "the decision as to whether to allow discovery is distinct from the decision as to whether to allow consideration of additional evidence." <u>Allison v. UNUM Life Ins. Co.</u>, 2005 U.S. Dist. LEXIS 3465, * 34 (E.D.N.Y. Feb. 11, 2005).  Where, as here, the review is under

---

a finding of eligibility means that the insurer will have to pay benefits out of its own pocket," but determined that the market presents competing incentives that substantially minimize the apparent conflict of interest.  In <u>Wright</u>, the First Circuit considered itself bound by well-established precedent to maintain the degree of deference for insurer/administrator decisions even though the rationale relied upon in decisions like <u>Pari-Fasano</u> might overstate the ability of market forces to minimize the apparent conflict and "other circuits have rejected the market forces rationale and specifically recognized a conflict of interest when the insurer of an ERISA plan also serves as plan administrator[.]"  <u>Wright</u>, 402 F.3d at 75, n. 5.

the arbitrariness standard, the ordinary question is whether the administrator's action on the record before him was unreasonable. Cook, 320 F.3d at 19 (emphasis supplied). However, the First Circuit has not adopted an "ironclad" rule against new evidence. Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, (1st Cir. 2003). Supplementation may be needed where the decisional process was too informal to provide a record or when certain kinds of claims are raised that by "their nature or timing take a reviewing court to materials outside the administrative record." Id. "Still, at least some very good reason is needed to overcome the strong presumption that the record on review is limited to the record before the administrator." Id. Here, the Plaintiff

 argues that the documents are relevant to the issue of whether Liberty has been improperly motivated amounting to a conflict of interest. This is a sufficient reason. A claimant cannot meet the burden of demonstrating a conflict of interest if she cannot supplement the record with relevant evidence.

As support for her argument that the financial relationship between Liberty and NMR proves that Liberty was improperly motivated, the Plaintiff cites to Darland v. Fortis Benefits Ins. Co., 317 F.3d 516 (6th Cir. 2003), where the Sixth Circuit held that "the district court should have considered whether [the administrator] was operating under an apparent conflict of

interest when it denied [the claimant]'s claim for continued LTD benefits." _Id._ at 527.  In that case, the Court noted that the Sixth Circuit recognizes that "there is an actual, readily apparent conflict here, not a mere potential for one[,] when the insurance company/plan administrator is the insurer that ultimately pays the benefits." _Id._  The Court then further justified the departure from the arbitrary and capricious standard because the administrator/insurer's "ultimate disability determination was based upon the 'peer review' panels selected by Network Medical Review Company, which [the administrator/insurer] had contracted to assess [the claimant]'s claim. As the plan administrator, [the administrator/insurer] had a 'clear incentive' to contract with a company whose medical experts were inclined to find in its favor that [the claimant] was not entitled to continued LTD benefits." _Id._ at 527-28.

The persuasiveness of the _Darland_ decision is limited because the First Circuit does not recognize that the dual role of insurer and administrator alone establishes a real conflict of interest.  _See_ Note 9 _supra_ and accompanying text.  Furthermore, as the Defendants point out, the second part of the _Darland_ Court's justification is questionable given the Supreme Court's subsequent decision in _Black & Decker Disability Plan v. Nord_, 538 U.S. 822 (2003), which rejected the rule advocated in _Darland_ that ERISA requires plan administrators to accord special deference to opinions of treating physicians.  As part of its

-27-

reasoning, the Supreme Court explained:

> [W]e [do not] question the Court of Appeals'
> concern that physicians repeatedly retained
> by benefits plans may have an incentive to
> make a finding of 'not disabled' in order to
> save their employers money and to preserve
> their own consulting arrangements.... [I]f a
> consultant engaged by a plan may have an
> "incentive" to make a finding of 'not
> disabled,' so a treating physician, in a
> close case, may favor a finding of
> 'disabled.'

Black & Decker, 538 U.S. at 832 (internal citations and
quotations omitted).

This explanation stands as a cautionary reminder that both the

Plaintiff's treating physicians and the administrator/insurer's

reviewing physicians are potentially affected by inherent

incentives and biases.  Nonetheless, I take the First Circuit's

reluctant concurrence with past precedent in Wright as a

suggestion that additional evidence of the ERISA plan

administrator's efforts to maximize profits could be enough to

turn apparent conflict into real conflict.

The supplemental evidence shows that Liberty paid over two

million dollars ($2,004,656.00 to be exact) to Network Medical

Review - Elite Physicians from 2001 through 2003.  While this

amount shows that NMR certainly has a financial interest in

maintaining its medical consulting business with Liberty, any

reviewing physician or network of physicians hired by an

administrator/insurer has the potential to be affected by the

inherent pressure of giving conservative opinions in order to

receive more consulting contracts.  To demand greater scrutiny on review, there must therefore be something more.

In this case, I ordered Liberty to produce certain documents requested by the Plaintiff, which related to Liberty's relationship with NMR, and to answer the Plaintiff's interrogatory about the number of files that Liberty and its affiliated companies had referred to NMR and NMR's affiliated companies or entities.  I also ordered Liberty to stipulate the number of cases where "they [NMR] have accepted a claim", which Liberty understood to mean stipulating "the number of claims accepted or granted and rejected or denied after a review by a physician retained through NMR and/or Elite Physicians, Ltd." Without moving to modify my order, Liberty refused to make such a stipulation claiming that it was "unable to provide this information ... due to the very substantial burden and expense that would be involved in retrieving and manually reviewing the over 1,200 claims files that were referred to NMR physicians from 2001 to 2003."  Under the circumstances, where a party is under court order to provide information pursuant to stipulation and the party fails to comply without seeking relief from the court, I will, as a sanction, draw the inference suggested by the Plaintiff, namely that NMR has not found in favor of a single claimant in connection with the 1,204 Liberty files referred to NMR during the years 2001 - 2003.  This gives Liberty a "clear

incentive" to contract with NMR to obtain peer reviews that support denial of disability benefits, justifying a review with "more bite".  However, in calibrating the sanction, I will only apply the heightened standard of review to Liberty's reliance on Dr. Bomalaski's opinion, the only product of the colorably conflicted relationship with NMR.

2. <u>Liberty's Conduct as an "Adversary"</u> - In a further effort to meet her burden of demonstrating that Liberty operated under a conflict of interest throughout her claims process, the Plaintiff argues that "Liberty engaged in a whole host of conduct, that demonstrates that it acted as an adversary, rather than a fair adjudicator of a claim for benefits."  In attempting to show that Liberty was improperly motivated when it evaluated her claim for this reason, the Plaintiff lists the following conduct: (a) Liberty provided inconsistent reasons for denying the Plaintiff's claim; (b) Liberty relied on an opinion of the wrong type of medical specialist; (c) Liberty rejected the finding of disability by the United States Social Security Administration; (d) Liberty pretended it did not participate in the STD analysis; (e) Liberty added a requirement of objective evidence not contained in the policy; (f) Liberty failed to follow the Department of Labor claims regulations and ERISA; and (g) Liberty did not properly analyze the Independent Medical Exam physician opinion or that of the treating doctor.

The Defendants wrongly criticize this part of the Plaintiff's argument for heightened review as "merely an attempt to circumvent the controlling authority."  The Supreme Court has made it clear that where the plan fiduciary exercising the discretion operates under a "conflict of interest", this is a "factor" in determining whether discretion has been abused. Firestone, 489 U.S. at 115.  "What constitutes a conflict and how the factor is to be weighed were not explained, and naturally the cases in the lower courts [and other Circuits] are now somewhat divided."  Doe v. Travelers Ins., 167 F.3d at 57.  Clearly the administrator/insurer's own financial interest in the decision is insufficient in and of itself to constitute a conflict in this Circuit, but the First Circuit has yet to decide how else a claimant might establish the existence of a conflict of interest. Thus, the Plaintiff properly looks to decisions in other Circuits relating to other ways of establishing conflicts of interest.  I note that similar factual-based arguments were raised in Wright, 402 F.3d at 76.  Although both the District Court and the First Circuit found each factual claim unpersuasive in Wright, the First Circuit has been open to the idea that the claimant may meet his or her burden by coming forward with something amounting to "material, probative evidence, beyond the mere fact of the apparent [administrator/insurer] conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary" or

-31-

participant.  Lang v. Long-Term Disability Plan of Sponsor
Applied Remote Tech. Inc., 125 F.3d 794, 798 (9th Cir. 1997).[12]
Consequently, I examine each factual argument in turn,
recognizing that my discussion will have applicability as well to
merits review against the arbitrary and capricious standard.

a. Inconsistent Reasons for Denial - The Plaintiff argues
that "Liberty first contended that Denmark's fibromyalgia was not
disabling.  Then, after an examination by an Independent Medical
Examiner, who determined that Denmark was suffering from
fibromyalgia and was completely disabled, Liberty changed its
position and contended that she might not even be afflicted by
fibromyalgia."  Even if inconsistent reasons might be an
indication that the insurer's decision has been tainted by self-
interest, see Lang, 125 F.3d at 799 and Brown v. Blue Cross and
Blue Shield of Alabama, Inc., 898 F.2d 1556, 1569 (11th Cir.
1999), I find that Liberty's reasons for denying her claim were
sufficiently consistent to avoid taint on that basis.

After reviewing the opinions of Dr. Goodman and Dr. Miller,
Nurse Kaye initially questioned whether her fibromyalgia was

---

[12] Although the First Circuit seems to have rejected a
precursor to Lang v. Long-Term Disability Plan of Sponsor Applied
Remote Tech. Inc., 125 F.3d 794, 798 (9th Cir. 1997), the
decision in Atwood v. Newmont Gold Co., 45 F.3d 1317 (9th Cir.
1995), which outlined a method for "presuming conflict and
shifting burden of proof to insurer," id. at 1322-23, I find that
the First Circuit has not rejected conflict of interest analysis
that is unrelated to the administrator/insurer's financial
interest. See Doe v. Travelers Ins. Co., 167 F.3d 53, 57, n. 2
(1st Cir. 1999) and Wright, 402 F.3d at 75, n. 5.

disabling and pointed to the fact that there was no evidence to support a change in her condition in October 2001.  This is reflected in the STD benefits denial in the December 26, 2001 letter.

After reviewing the opinions of Dr. Miller, Dr. Schur and Dr. Bomalaski, Liberty continued to find that there was no significant change in her condition in October 2001 that would preclude her from performing the duties of her occupation.  While it is true that Liberty mentioned in the December 10, 2002 LTD benefits denial that Doctors Schur and Bomalaski questioned the diagnosis, this is explained by Liberty's incorporation by reference of the later medical opinions.  There is no showing of material inconsistencies in the actual reasons for denial of benefits.

b. <u>Reliance on the wrong type of medical specialist</u> - Next the Plaintiff argues that instead of having a rheumatologist examine her or review her file, Liberty relied on file review by a physical medicine and rehabilitation doctor (Dr. Miller). According to the Plaintiff, "[t]his was wrong, and indicative of a conscious effort to deny benefits."  Even if deliberate reliance on the wrong type of medical evidence could show that Liberty breached its fiduciary duty,[13] the Plaintiff misconstrues

---

[13]  The cases to which the Plaintiff cites are cases where the type of specialist relied on was a factor in deciding whether the denial of benefits was an abuse of discretion or arbitrary

the record and assumes that since fibromyalgia is a rheumatic
disease, the only relevant specialist is a rheumatologist.  See
Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

First, specialists in the field of physical medicine and
rehabilitation, like Dr. Miller, are called physiatrists.
According to the American Academy of Physical Medicine and
Rehabilitation, "[p]hysiatrists focus on restoring function.
They care for patients with acute and chronic pain, and
musculoskeletal problems like back and neck pain, tendonitis,
pinched nerves and **fibromyalgia**." (emphasis supplied) [See
http://www.aapmr.org/.]  Since the Plaintiff has not provided any
evidence that administrators should only consult rheumatologists
when deciding claims involving fibromyalgia, consulting a
physical medicine and rehabilitation specialist does not show
that Liberty was improperly motivated or acted unreasonably as
discussed below.

Second, Liberty did not "rely" on Dr. Miller's opinion

_____

and capricious, not whether or not there was a conflict of
interest.  See Monroe v. Pacific Telesis Group Comprehensive
Disability Benefits Plan, 971 F.Supp. 1310, 1314-15 (C.D. Cal.
1997) and Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118,
1123 (9th Cir. 1998) citing Kunin v. Benefit Trust Life Ins., 910
F.2d 534, 538 (9th Cir. 1990) for the proposition that inadequate
investigation and reliance on non-experts in field failed to
provide reasonable basis for ERISA administrator's determination.
However, I note that Wright could be read as suggesting that the
denial of benefits without a review by any physician (and by
analogy perhaps without review by the proper specialist), could
show bad faith or improper motivation, unless the treating
physician's report supported a finding of no disability.  Wright,
402 F.3d at 77.

alone; it also considered the opinion of two rheumatologists, Dr.
Schur and Dr. Bomalaski, in addition to Dr. Goodman.  In its
initial denial of the Plaintiff's claim for LTD benefits dated
August 20, 2002, Liberty based the denial in part on Dr. Miller's
opinion that there were no findings indicating a significant
change in October 2001, but also on the opinion of Dr. Schur, who
the Plaintiff acknowledges as a board certified rheumatologist.
When Liberty denied the Plaintiff's appeal, it also referred to
the opinion of another rheumatologist, Dr. Bomalaski.

The Plaintiff attempts to discredit Dr. Bomalaski's report
by suggesting that Liberty did not provide him with a complete
set of medical records based on his statement that "[t]he
physical examination and testing do not support the diagnosis of
Ms. Denmark's treating physicians, **at least with the records
provided**." (emphasis supplied).  Dr. Bomalaski's comment must be
read in the context of his footnote referencing Wolfe, F. et al.
*The American College of Rheumatology 1990 criteria for the
classification of fibromyalgia: report of the multicenter
criteria committee,* 33(2) Arthritis & Rheumatology 160-72 (1990).
This article sets out the two criteria -- widespread pain that
has been present for at least 3 months and pain in 11 of 18
tender point sites on digital palpation -- for satisfying the
classification for fibromyalgia according to the authors.  Nurse
Kaye referred to the same criteria when she noted that "it is

unclear from [Dr. Malanoski's] office notes if [the claimant's symptoms] meet the criteria for the establishment of the [diagnosis] of fibromyalgia as defined by the American College of Rheumatology which includes widespread pain for at least 3 months, & pain in 11/18 specified tender points upon exam."  The fact that Dr. Malanoski never made reference to the two criteria in his notes in the record sufficiently explains Dr. Bomalaski and Nurse Kaye's comments.

    c. <u>The Social Security Decision</u> - Within the 'reliance on the wrong type of medical specialist' section of her argument, the Plaintiff also suggests that Liberty's refusal to consider the decision of the Social Security Administration ("SSA") shows that Liberty was improperly motivated.  The Plaintiff specifically raises this argument as an attempt to prove that Liberty abused its discretion.  The argument is unconvincing in both contexts even though it is true that "[a]lthough the SSA's determination of a claimant's entitlement to social security disability benefits is not binding on disability insurers, it can be relevant to an insurer's determination whether that claimant is eligible for disability benefits."  <u>Gannon v. Metropolitan Life Ins. Co.</u>, 360 F.3d 211, 215 (1st Cir. 2004).

    Liberty rendered its first decision with respect to the Plaintiff's claim for LTD benefits on August 20, 2002.  Liberty informed the Plaintiff of her right to appeal Liberty's determination and her right to bring an action under section 502

of ERISA.  Liberty informed the Plaintiff that should she request administrative review, Liberty would notify her of its "final decision" within the statutory time requirements. The Plaintiff appealed the decision on September 24, 2002 and subsequently forwarded a new report by psychologist Dr. Taylor.  Liberty considered the new report and sought additional evidence in the form of a labor market survey and vocational review, a surveillance investigation and a medical review by another rheumatologist.  After receiving Dr. Bomalaski's review, Liberty declined to alter its original determination in a letter dated December 10, 2002.  In that letter, Liberty wrote that the Plaintiff's "administrative right of review has been exhausted and no further review will be conducted by Liberty," but that she had a right to bring an action for judicial review under section 502 of ERISA.  Liberty also wrote that "decisions rendered by the Social Security Administration or Workers' Compensation are not determinative of entitlement to benefits under the terms and conditions of the GenRad Inc.'s Group Disability Income Policy." On January 13, 2004, more than 13 months later, the SSA issued a favorable decision for the Plaintiff.

I set out all of these dates to emphasize the timing. Liberty cannot have failed to consider the SSA's decision in bad faith when it issued its decisions in August and December 2002 since the SSA did not issue its decision until more than 13 months after its final decision.  Cf. Calvert v. Firstar

Finance, Inc., 409 F.3d 286 (6th Cir. 2005), where the SSA's decision was issued more than two years before Liberty denied the claimant's appeal.  In this connection, it bears emphasizing that the First Circuit has observed that "in order to find that an insurer had abused its discretion under the contract, we would have to conclude that the insurer's eligibility determination was unreasonable in light of the information available to it" **when it made its decision**.  Pari-Fasano, 230 F.3d at 419.  See also Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 186 (1st Cir. 1998) (considering a later report only to "lend color to the earlier appraisals relied upon by" the administrator).

Plaintiff refines its argument by contending that Liberty's failure to reconsider its decision in light of the SSA decision shows that it is improperly motivated.  I disagree.  The regulations adopted pursuant to the "full and fair review" ERISA provision, 29 U.S.C. § 1133(2), do not require administrators of disability policies to afford additional review.  Rather, 29 C.F.R. § 2560.503-1(g)(1)(1977)[14], like the current version, only requires that "[e]very plan shall establish and maintain a procedure by which a claimant ... has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary of the plan, ... and under which a full and fair review of the claim and

---

[14] The regulations were amended in 2000, but the amended version only applies to claims filed on or after January 1, 2002. 29 C.F.R. § 2560.503-1(o)(1).

its denial may be obtained."  The Plaintiff does not suggest that
either the Disability Policy or Liberty's letter notifying the
Plaintiff of its adverse benefit determination on review offered
or required yet another level of appeal in addition to the
mandatory "full and fair review".[15]  More fundamentally, "[t]he
decision to which judicial review is addressed is the final ERISA
administrative decision.  It would offend interests in finality
and exhaustion of administrative procedures required by ERISA to
shift the focus from that decision to a moving target by
presenting extra-administrative record evidence [in this case the
SSA decision] going to the substance of the decision."  Orndorf,
404 F.3d at 519.  Thus, I find that Liberty neither abused its
discretion, nor acted as an adversary when it declined to
reconsider its denial in light of the SSA decision in the two
letters dated June 3, 2004 and August 23, 2004.

       d. Liberty's participation in the STD analysis - The
Plaintiff's argument that Liberty pretended it did not
participate in the STD analysis is wholly without merit.  The
evidence clearly shows that Liberty served as the disability
claims administrator for the STD plan, providing an initial

_____

       [15] The current version of the regulations permits two levels
of mandatory appeal of an adverse benefit determination, 29
C.F.R. § 2560.503-1(c)(3)(2005), and contemplates additional
"voluntary" levels of appeal, see 29 C.F.R. §§ 2560.503-1(c)(3)
and (j)(4)(2005).  However, neither the 1977 version nor the
current version of the regulations require more than one level of
internal review.

claims review and decision for STD claims by GenRad employees,
but that the employer, Teradyne by the time of the appeal, made
the appeals decision.  Liberty has never pretended otherwise.

e. Objective Evidence Requirement - I am also unconvinced by the
Plaintiff's argument that Liberty acted as an adversary by adding
a requirement of "objective medical evidence" that is not
contained in the Disability Policy, but not for the dismissive
reasons suggested by the Defendants.

In the context of reviewing the Plaintiff's STD claim, Nurse
Kaye sought a peer review from Dr. Miller asking him if "the
accompanying documentation provide[s] objective findings that
would indicate a significant change in condition that was evident
on or about the date of the disability (10/03/2001)?"  Dr. Miller
answered "No" because "there are no objective physical functional
deficits documented and the patient had a normal cardiac exercise
test 11/09/2001."  He further explained that "[t]here are no
documented objective physical exam findings that support a
decrease or significant change in this patient's physical
condition.  In fact, the patient had a normal cardiac exercise
test 11/09/2001.  Therefore, the medical records provided do not
substantiate that the patient's condition significantly changed
about the time of 10/03/2001."

In justifying its initial LTD denial, Liberty quoted Dr.
Miller's conclusion that "[t]he documentation provided does not

indicate a significant change in the patient's condition about
the time of disability 10/03/2001 because there are no objective
physical functional deficits documented and the patient had a
normal cardiac exercise test 11/09/2001."  In its December 2002
denial, Liberty rephrased Dr. Miller's findings as "[t]here were
no documented changes in the physical finding of the exam that
supported a decrease or significant change in the claimant's
condition. ... Dr. Miller concluded that the medical records did
not substantiate that the patient's condition had changed
significantly as of October 3, 2001, to warrant a cessation from
work."

Citing Cook, the Plaintiff claims that Liberty acted
improperly because "[i]t is black letter law that a reviewing
insurance company cannot add the requirement of 'objective
medical evidence' to a Plan that does not expressly contain that
language."  I find the Plaintiff's reference to Cook fails to
appreciate the subtle, but important distinction brought to light
in Boardman v. Prudential Ins. Co. of America, 337 F.3d 9, 17, n.
5 (1st Cir. 2003).

In many instances, an administrator would be justified by
requiring objective evidence from tests that were independent of
the claimant's reporting of her symptoms.  Cook, 320 F.3d at 21.
While fiduciaries have a duty to see that those entitled to
benefits receive them, they also have a duty to protect the

plan's assets against spurious claims.  <u>Gaither v. Aetna Life</u>
<u>Ins. Co.</u>, 394 F.3d 792, 807-08 (10th Cir. 2004).  However, where
the nature of the disease or condition is such that there is no
'dipstick' laboratory test, it would not be "reasonable for [the
administrator] to expect [the claimant] to provide convincing
'clinical objective' evidence that she was suffering from" the
disease or condition.  <u>Cook</u>, 320 F.3d at 21 (where the claimant
suffered from chronic fatigue syndrome and fibromyalgia).  The
evidence in the administrative record suggests that fibromyalgia
is such a condition because as Dr. Malanoski explained, it is a
"condition lacking abnormalities in blood testing or specific
abnormalities in physical exam."  What the Plaintiff fails to
appreciate, however, is that "[w]hile the diagnoses of chronic
fatigue syndrome and fibromyalgia may not lend themselves to
objective clinical findings, the physical limitations imposed by
the symptoms of such illnesses do lend themselves to objective
analysis."  <u>Boardman</u>, 337 F.3d at 17, n. 5.

In <u>Boardman</u>, "Prudential did not require Boardman to present
objective medical evidence to establish her illnesses.  On the
contrary, Prudential was willing to accept that Boardman suffered
from the illnesses she reported to her doctors.  Rather,
Prudential wanted objective evidence that these illnesses
rendered her unable to work."  <u>Id.</u>  Requiring the latter is
permissible and does not make the administrator an adversary.
Nurse Kaye's question of whether there were any "objective

findings that would indicate a significant change in condition" around the date of disability appears to seek objective evidence of the permissible kind, namely objective evidence that supports a "severity of impairment that would preclude Ms. Denmark from performing her own occupational job duties as customarily performed."  Thus, this argument also fails to demonstrate that Liberty operated under a conflict of interest.  I will also address this issue on the merits in the reasonableness analysis.

Before turning to the Plaintiff's next conflict argument, I must point out, since the Plaintiff did not, that Dr. Bomalaski also used the controversial wording in his report.  He found that "Ms. Denmark has areas of discomfort on examination, but objective findings such as abnormal laboratory tests are not provided in the medical records for review."  His statement should, however, be read in the context of the preceding two paragraphs, where Dr. Bomalaski discussed the lack of objective laboratory tests ruling out other potential coexisting causes of her condition, and his subsequent discussion of the difficulty in assessing the limitations of her ability to function. Considering this context, I find that his reference to "objective findings" does not amount to the impermissible requirement of "objective findings" to establish the diagnosis of fibromyalgia. Although Dr. Bomalaski questioned the Plaintiff's diagnosis, as I discussed in Section II.b.2.b supra, Liberty does not cite his opinion as support for finding that the Plaintiff is not

suffering from fibromyalgia, but that she is not so severely
impaired that she is precluded from performing her own
occupation.

f. <u>Department of Labor claims regulations and ERISA</u> - The
Plaintiff claims that Liberty failed to produce all of the
documents requested as required by the governing regulations and
that this shows it was improperly motivated.

The 1977 version of the regulations required plan
administrators to provide every claimant who is denied a claim
for benefits written notice setting forth (1) the specific reason
or reasons for the denial; (2) specific reference to pertinent
plan provisions on which the denial is based; (3) a description
of any additional material or information necessary for the
claimant to perfect the claim and an explanation of why such
material or information is necessary; and (4) appropriate
information as to the steps to be taken if the participant or
beneficiary wishes to submit his or her claim for review.   29
C.F.R. § 2560.503-1(f)(1)-(4)(1977).   A decision on review must
"be in writing and [must] include specific reasons for the
decisions ... as well as specific references to the pertinent
plan provisions."   29 C.F.R. § 2560.503-1(h)(3)(1977).   The
August and December 2002 letters satisfy these requirements.

The Plaintiff's complaint revolves around the rule in 29
C.F.R. § 2560.503-1(g)(1)(ii)(1977) that a claimant may "review
pertinent documents".   The 2000 amendments, which apply to claims

-44-

filed on or after January 1, 2002, attempted to "clarify" this
requirement in the 1977 regulations, by replacing the term
"pertinent" with the term "relevant."  65 Fed. Reg. 70246, 70252,
2000 WL 1723740 (Nov. 21, 2000).   The amendment also states that
a document, record, or other information is considered "relevant"
if it was relied upon in making the determination, or was
submitted to the plan, considered by the plan, or generated in
the course of making the benefit determination, without regard to
whether such document, record, or other information was relied
upon in making the determination.  29 C.F.R. § 2560.503-
1(m)(8)(i),(ii).  The Department of Labor "believed that these
changes would make clear that claimants must be provided access
to all of the information present in the claims record, whether
or not that information was relied upon by the plan in denying
the claim and whether or not that information was favorable to
the claimant.  Such full disclosure, which is what the 1977
regulation contemplated, is necessary to enable claimants to
understand the record on which the decision was made and to
assess whether a further appeal would be justified."  65 Fed.
Reg. at 70252.

Based on this provision, the Plaintiff wrote to Liberty in
May 2004 requesting that Liberty produce "copies of the Summary
Plan Description and the plan documents and [the] policy of
insurance" and "all documents, including but not limited to
pertinent documents which the claims administrator considered or

relied upon when it decided to deny my benefits, both initially and after further review" as required by 29 C.F.R. § 2560.503-1(g).  From the Plaintiff's De Novo Memorandum, it appears Liberty complied with this request, except as to its internal claims guidelines, which I have since ordered produced, and a copy of the surveillance tape, which Liberty claims it was unable to locate until January 2005 at which time it was provided to the Plaintiff.

I decline to find that Liberty's failure voluntarily to turn over either of these documents promptly after the May 2004 request indicates bad faith on its part during the claims investigation and determination period.  See e.g. Wright, 402 F.3d at 78 (declining to interpret the omission of the Summary Detail Report as an indication of bad faith).[16]

g. Analysis of the IME and treating doctor's opinion -
Finally, I come to the Plaintiff's ultimate argument that Liberty

---

[16] I note that the current version of the regulations also requires administrators who relied on an internal rule, guideline, protocol, or other similar criterion in making the adverse determination, to disclose either the specific rule, guideline, protocol, or other similar criterion or a statement that such rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of the rule, guideline, protocol, or other similar criterion will be provided free of charge to the claimant upon request.  29 C.F.R. § 2560.503-1(g)(5)(A) and (j)(5)(i).  I find that this new requirement is not merely a clarification, but an amplification of the 1977 notice and disclosure requirements.  As a result, Liberty cannot be faulted for failing to disclose any internal guidelines even if it relied on them prior to the Plaintiff's request.

did not properly analyze the opinion of the IME physician (Dr. Schur) or that of the treating doctor, by which I assume she really meant "treating doctors" (Dr. Malanoski and Dr. Goodman). The crux of the Plaintiff's argument in her summary judgment motion is at bottom that the plan administrator arbitrarily refused to credit the claimant's reliable evidence, including the opinions of treating physicians. See Black & Decker, 538 U.S. at 834. I decline to consider the ultimate issue in the context of determining whether or not to apply an abuse of discretion standard of review with "more bite." This argument is more properly considered in the reasonableness analysis.

In sum, I reject the Plaintiff's contention that Liberty engaged in a whole host of conduct demonstrating that it operated under a conflict of interest deserving a heightened standard of review. As a result, I apply the traditional arbitrary and capricious or abuse of discretion review, other than with respect to Liberty's reliance on Dr. Bomalaski's opinion.

### c. Additional Supplementation

Aside from the conflict of interest/heightened standard of review issue, the Plaintiff also seeks to supplement the record with Liberty's claims guidelines in place during the relevant time. The Plaintiff argues that these additional documents show the arbitrariness of Liberty's decision because they lack sufficient meaningful guidance for the case reviewers. For

support, the Plaintiff cites <u>Glista v. Unum Life Insurance Co. of
America</u>, 378 F.3d 113 (1st Cir. 2004).  <u>Glista</u> stands for the
possibility that district courts may, and in certain
circumstances must, supplement the record with "the plan
administrator's own documents interpreting the language of the
Plan and providing the standard for evaluation of the facts
presented." <u>Glista</u>, 378 F.3d at 122.  <u>Cf.</u> <u>Liston</u>, 330 F.3d at
25-26, where the First Circuit was concerned with the different
problem of whether or not to supplement the record with facts
about other persons that were not before the administrator.
However, as the Defendants point out, the First Circuit did not
intend to create a "hard-and-fast rule[]" that manuals and
training materials will always be admissible for judicial review.
<u>Glista</u>, 378 F.3d at 115.  Rather, the Court recognized that
"[t]he weight and admissibility of internal documents, whether
those documents are offered in support of the <u>interpretation</u> of
the plan administrator or that of the claimant, will vary with
the facts of each case.  Such documents are most likely to be
relevant where they have been authenticated, have been generated
or adopted by the plan administrator, concern the policy in
question, are timely to the issue in the case, are consistently
used, and were known or should have been known by those who made
the decision to deny the claim.  Where a plan administrator has
chosen consistently to interpret plan terms in a given way, that

interpretation is relevant in assessing the reasonableness of the administrator's decision." Id. at 123 (internal citation omitted) (emphasis supplied).  On this point, "[C]ourts have long recognized that such consistency is required even under the most deferential judicial standard of review."  Id. at 123, n. 3 citing 65 Fed. Reg. at 70251.

Without repeating my earlier supplementation discussion, see Section II.b.1 supra, I agree with the Defendants that the internal guidelines are not relevant to a disputed "interpretation" of the Disability Policy.  The dispute in this case centers on the reasonableness of Liberty's evaluation of the evidence available at the time, not on the meaning of certain provision of the Disability Policy or the adequacy of the procedures.  Thus, I deny the Plaintiff's motion to supplement the record with Exhibit B.

### c. Review of the Denial

Having addressed all preliminary matters, I am now in a position to address the merits and determine whether Liberty's decision was arbitrary and capricious against the Wright standard.  See Note 10 supra and accompanying text.  The Plaintiff argues that even under the deferential arbitrary and capricious standard Liberty's denial of her LTD benefits claim was not supported by substantial evidence.  While the Plaintiff raises numerous arguments, the crux of her appeal is that

Liberty's denial unreasonably relied on the opinions of Dr. Bomalaski, Dr. Miller and Nurse Kaye that there is no evidence that her condition worsened in October 2001 to the point where she could no longer carry-out the duties of her occupation, while unreasonably rejecting the opinion of Dr. Schur, Dr. Taylor, and Dr. Malanoski that she was disabled.[17]  I do not focus on the opinions of Dr. Taylor or Dr. Hack because neither of their reviews are directly probative of her disability.

In reviewing Liberty's decision under the arbitrary and capricious standard, I consider the administrative record and the supplemental evidence to determine whether Liberty's decision was reasoned and supported by substantial evidence.  My review is deferential, but as pointed out by the Plaintiff, I am not simply a "rubber stamp".  Lopes v. Metropolitan Life Ins. Co., 332 F.3d 1, 5 (1st Cir. 2003).  This means I must answer the question, "not which side [I] believe is right, but whether [Liberty] had substantial evidentiary grounds for a reasonable decision in its favor."  Doyle, 144 F.3d at 184.

In ERISA benefits claims, the claimant has the burden of showing that he or she is disabled within the meaning of the policy.  Orndorf, 404 F.3d at 518; Boardman, 337 F.3d at 17; Brigham, 317 F.3d at 84-85 ("As claimant, Brigham needed to

_____

[17] As stated above in Section II.b.2.c supra, Liberty did not abuse its discretion when it declined to reconsider its final administrative decision in light of the SSA decision or the evidence considered therein.

demonstrate his entitlement to benefits, and he therefore had the burden of substantiating the doctors' new diagnosis that he was incapable of performing fully sedentary work.")  Liberty denied the Plaintiff's application for LTD because she did not meet the definition of disability, which requires claimants to prove (1) that he or she "is unable to perform the Material and Substantial Duties of his Own Occupation" and (2) that this limitation is the "result of Injury or Sickness".  Cf. Boardman, 337 F.3d at 16. As in Boardman, Liberty's LTD denial letters reveal that it denied the Plaintiff's claim because she failed to establish the first prong -- that her sickness severely impairs her ability to perform her own occupational job duties as customarily performed. Id.  Throughout Liberty's review, Nurse Kaye focused on whether the evidence demonstrated a change in the Plaintiff's condition such that she could no longer perform her occupation as she had despite suffering from self-reported fibromyalgia symptoms since at least 1996.  Although Dr. Schur and Dr. Bomalaski questioned the diagnosis of fibromyalgia by Dr. Malanoski and Dr. Goodman, suggesting other tests should be performed to rule out other causes, Liberty seems to have been "willing to accept, for the purpose of determining whether [the Plaintiff] met the definition of [] Disability, that she satisfied" the sick or injured requirement.  Id.  Furthermore, Dr. Schur opined that even if she did not have fibromyalgia, she likely suffered from another disabling rheumatoid condition, and Dr. Bomalaski seemed to agree

that she is suffering from at least some impairment.  Liberty
conceded in argument of these motions that the Plaintiff suffers
from fibromyalgia.  Thus, the issue in this action is not the
etiology of the Plaintiff's condition, but whether it affected
"her capacity for gainful employment" and more specifically,
whether or not her sickness precludes her from being able to
perform the material and substantial duties of her own
occupation.  Cf. Orndorf, 404 F.3d at 526 ("This case turns not
on the question whether plaintiff suffered back, ankle, or neck
pain.  The medical reports clearly show back problems and the
patient's reports of back pain over time.  This case turns on
whether he met his burden of showing that this backpain disabled
him from performing his job[.]")  As Judge Posner has observed,
"some people may have such a severe case of fibromyalgia as to be
totally disabled from working, but most do not and the question
is whether [the claimant] is one of the minority."  Sarchet, 78
F.3d at 307 (internal citation omitted).

    Before reviewing the evidence with this focus, I note that
Dr. Miller, Dr. Bomalaski and Dr. Schur all suggested
modifications of her treatment regime that might improve her
situation. Liberty did not require the Plaintiff to follow-up on
the alternative diagnoses and treatments, nor did the Plaintiff
do so on her own initiative, at least as reflected in the
administrative record.  Under the Disability Policy, Liberty can
require ongoing proof of a claimant's continued "disability,

regular attendance of a physician; and appropriate available treatment."  Presumably, the latter requirement means proof of continued use of appropriate available treatment.  However, since Liberty did not deny the LTD benefits because she was not using the appropriate available treatment, I must decide whether the evidence before Liberty was sufficient for it reasonably to decide that the Plaintiff's current condition, even without trying treatment regimes that might improve her situation, did not preclude her from being able to perform the material and substantial duties of her own occupation.

The evidence on the Plaintiff's physical abilities, restrictions and limitations can be summarized as follows.

   - Dr. Malanoski, the Plaintiff's initial treating
   physician, concluded, without any explanatory remarks,
   that her physical impairment due to fibromyalgia was
   Class 5, meaning "severe limitation of functional
   capacity; incapable of minimum activity";

   - Dr. Goodman, her treating rheumatologist, concluded
   that "recently her symptoms of fatigue, exhaustion,
   myalgia and insomnia had worsened.  These symptoms
   appear to have been quite marked over the last year or
   so, such that she is unable to perform her usual work
   as a quality control group leader" as "[t]his work
   requires her to be on her feet all day."  He also
   opined that her medications "afford her some relief of
   her symptoms but she remains totally disabled in terms
   of her line of work.  She is unable to perform this
   work as she is unable to be on her feet for the amount
   of time it takes to perform her job adequately.  She is
   also disabled by exhaustion and myalgia which makes it
   difficult for her to stay at work for any appreciable
   amount of time.";

   - Dr. Miller, the physiatrist who conducted the first
   peer review, concluded that "[t]here are no documented
   objective physical exam findings that support a

-53-

decrease or significant change in this patient's physical condition."  "The documentation provided does not indicate a significant change in the patient's condition about the time of disability 10/03/2001 because there are no objective physical function deficits documented and the patient had a normal cardiac exercise test.";

- Dr. Schur, a rheumatologist who performed an IME, concluded that "at least for the time being, she is clearly disabled not only from work, but being able to take care of her household... [F]or now, until [modifications of her regime improve her stamina], which may take months, she is clearly disabled.";

- Dr. Bomalaski concluded that the "clinical medical evidence does not clearly support severe impairment because ... the diagnosis of fibromyalgia remains in question."  He also concluded that the Plaintiff "is capable of working full time in a primarily sedentary position within the limitations and restrictions noted on the Functional Capacities Form."; and

- Nurse Kaye repeatedly stated that her "review does not [yield] new medical information to alter previous findings that [there was no] significant change in [claimant]'s condition" around the date of disability "to substantiate [restrictions/limitations] during the elimination period."  She pointed out that the Plaintiff's "occasional flares ... have responded to physical therapy" and questioned whether the Plaintiff "may be self-limiting her work or social activities".

- Surveillance evidence observing the Plaintiff doing errands for just over three hours in one day, which included "walking and moving in a fluid non-obstructed manner, bending and lifting items such as a case of soda and a gallon of milk without difficulties." On the other days, the investigator did not observe any activity out of her house except one errand, although the Plaintiff did not appear to be home on the morning of the 2nd.

- The Plaintiff's Activities Questionnaire from July 23, 2002.

Before considering this evidence, I must emphasize a few preliminary observations.  First, under the arbitrary and

-54-

capricious standard of review, "evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." Wright, 402 F.3d at 74 (internal citations and quotations omitted). Second, Liberty is not precluded from relying on the assessment of a non-examining physician, rather than the Plaintiff's treating physician. Black & Decker, 538 U.S. at 834; Gannon, 360 F.3d at 214. Third, I decline to discredit the opinions of any of the doctors or of Nurse Kaye because they would not qualify as "expert witnesses" at trial under the well-established Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) test. The Plaintiff fails to cite any relevant authority on this point.

The evidence Liberty considered that supported the Plaintiff's position was the Plaintiff's own self-reported Activities Questionnaire and the opinions of Dr. Malanoski, Dr. Goodman and Dr. Schur. This evidence has its limitations, as pointed out by Nurse Kaye in her review. The evidence Liberty considered that supported the denial were the opinions of Dr. Miller, Dr. Bomalaski and Nurse Kaye and the surveillance report. I review the surveillance evidence and these opinions to determine whether Liberty's decision was reasoned and supported by substantial evidence despite the contradictory opinions of Dr. Schur, Dr. Goodman and Dr. Malanoski.

1. Surveillance Evidence - In this action, the Defendants argue

that the surveillance evidence from October 2002 "fatally undermines" the Plaintiff's credibility by contradicting her self-reported limitations in the July 23, 2002 Activities Questionnaire and those reported to Dr. Schur in April 2002.  In the Activities Questionnaire completed less than three months before the surveillance, the Plaintiff indicated that she needed assistance to go grocery shopping and to carry groceries, that she can only sit in a car for 20 min, that she can only drive a car for 5 min, that she can only stand 10 min at a time and walk 10-15 min at a time, and that she only stands 30 min a day and walks 20 - 20 min a day.  It is true that the life described by these responses is inconsistent with running errands for just over three hours, including grocery shopping for more than an hour where the investigator observed her "walking and moving in a fluid non-obstructed manner, bending and lifting items such as a case of soda and a gallon of milk without difficulties."  On the other hand, the Plaintiff did indicate that she made trips to the local drug store if needed and that she usually left the house one day a week and once on the weekend.  Moreover, the Defendants' argument as to this issue overstates Liberty's apparent reliance on indications of contradictions during the

administrative process.  While Nurse Kaye noted that the surveillance found her to be "very active", neither she nor Liberty in its final December 2002 denial letter made reference

to these contradictions.  Rather, Liberty simply concluded that
"no restrictions and limitation[s] were noted throughout" the
surveillance.  In any event, I do not find evidence essentially
showing one three-hour excursion for errands on an isolated day,
to be particularly substantial with respect to her ability to
work an eight-hour day.

2. Dr. Miller's Report - As discussed in Section II.b.2.e supra,
in answering Nurse Kaye's referral question, Dr. Miller found the
notes of Dr. Goodman and Dr. Malanoski that he reviewed did not
reveal any "objective physical exam findings that support a
decrease or significant change in this patient's physical
condition."  The Plaintiff's strongest argument is that Nurse
Kaye's referral question, Dr. Malanoski's answer and Liberty's
fixation on the fact that she was diagnosed with fibromyalgia,
yet worked for many years before finally applying for disability
benefits, is unreasonable given the nature of her condition.  For
support the Plaintiff looks to Hawkins v. First Union Corp. Long-
Term Disability Plan, 326 F.3d 914 (7th Cir. 2003), where Judge
Posner found Prudential's fixation on objective proof of change
in condition led to an unreasonable denial.  With respect to the
idea of proof of change, Judge Posner explained:

> The plan's bad argument is that because [the claimant]
> worked between 1993 and 2000 despite his fibromyalgia and
> there is no indication that his condition worsened over
> this period, he cannot be disabled.  This would be
> correct were there a logical incompatibility between
> working full time and being disabled from working full
> time, but there is not.  A desperate person might force

himself to work despite an illness that everyone agreed was totally disabling.   Yet even a desperate person might not be able to maintain the necessary level of effort indefinitely. [The claimant] may have forced himself to continue in his job for years despite severe pain and fatigue and finally have found it too much and given it up even though his condition had not worsened. A disabled person should not be punished for heroic efforts to work by being held to have forfeited his entitlement to disability benefits should he stop working.

...

But what is most important and ties back to the plan's bad argument is that [the claimant's] unfortunate choice in life is between succumbing to his pain and fatigue and becoming inert, on the one hand, and on the other hand pushing himself to engage in a certain amount of painful and fatiguing activity. If he does the latter, it does not prove that he is not disabled.

Hawkins, 326 F.3d 914 at 918 (internal citations omitted).  With respect to the need for objective proof of disability, Judge Posner explained:

[T]he gravest problem with [the consulting doctor]'s report is the weight he places on the difference between subjective and objective evidence of pain.  Pain often and in the case of fibromyalgia cannot be detected by laboratory tests.   The disease itself can be diagnosed more or less objectively by the 18-point test (although a canny patient could pretend to be feeling pain when palpated at the 18 locations--but remember that the accuracy of the diagnosis of [the claimant]' fibromyalgia is not questioned), but the amount of pain and fatigue that a particular case of it produces cannot be.  It is "subjective"--and [the consulting doctor] seems to believe, erroneously because it would mean that fibromyalgia could never be shown to be totally disabling, which the plan does not argue, that because it is subjective [the claimant] is not disabled.

Id. at 918-19.

I find that while Judge Posner's second point is compelling,

-58-

I am bound by First Circuit precedent that approved denial of benefits where the administrator concluded that "[n]one of the specialists that have treated [the claimant] in the past two years have indicated any limitations or restrictions, based on objective findings that would preclude [the claimant] from performing any occupation for which she is suited.  Therefore, we have determined that [the claimant] does not meet the definition of disability as required by the policy." Boardman, 337 F.3d at 16-17.  Quite apart from the Plaintiff's burden of proving restrictions and limitations based on objective findings that would preclude her from performing her own occupation, the difficulty with Dr. Miller's opinion and Liberty's corresponding focus, as suggested by Judge Posner's first point, is that they draw the conclusion that she is not disabled because she has worked for many years without an objective change in her condition.[18]  The reason I will not discount Dr. Miller's opinion, as Judge Posner did in the opinion in Hawkins, is that the Plaintiff herself claims that her symptoms worsened to the

---

[18] In contrast to Hawkins, I note that in Orndorf, the First Circuit considered the fact that the claimant had "actually worked" in his occupation "without any physical limitations despite twenty years of back pain and treatment" as one of the pieces of evidence showing that the claimant did not meet the definition of disability.  In that case, the First Circuit also pointed out that "[e]ven as late as [14 months before he stopped working], [the claimant] complained to a doctor of 'long-standing' low back pain, yet he continued to perform his job for another 14 months without any physical limitations or claims of disability." Orndorf, 404 F.3d at 526.

point where she could no longer work in October 2001.  Thus,
under controlling First Circuit precedent, Liberty may reasonably
consider the lack of objective evidence to substantiate the
Plaintiff's self-reported worsening.  Boardman, 337 F.3d at 16-
17; Brigham, 317 F.3d at 84-85 ("As claimant, Brigham needed to
demonstrate his entitlement to benefits, and he therefore had the
burden of substantiating the doctors' new diagnosis that he was
[no longer capable] of performing fully sedentary work.")

3. Dr. Bomalaski's Report - I review Dr. Bomalaski's report more
carefully because of the conflict of interest inference I am
drawing against Liberty.  See Section II.b.1 supra.

     After reviewing the surveillance evidence and the
Plaintiff's medical records, Dr. Bomalaski concluded that the
"clinical medical evidence does not clearly support severe
impairment because as noted the diagnosis of fibromyalgia remains
in question not only by this reviewer but as also by Dr. Schur."
He also concluded that the Plaintiff "is capable of working full
time in a primarily sedentary position within the limitations and
restrictions noted on the Functional Capacities Form."  These
comments have limited probative value, but I will not go so far
as to describe Dr. Bomalaski's report as suffering from
"fundamental flaws".  Cf. Buffonge v. Prudential Ins. Co. of
America, 426 F.3d 20, 29 (1st Cir. 2005)(where the reviewing
doctor concluded that "a consensus exists" that the claimant

could perform a desk job, even though there were at least three recent reports concluding the opposite).

The first comment is ambiguous at best.  If Dr. Bomalaski intended his comment to mean that "the clinical medical evidence does not clearly support a [severely impairing medical illness or condition]", then the comment is consistent with the evidence given the doubts Dr. Schur raised about the fibromyalgia diagnosis.  See Section II.b.2.b supra.  If Dr. Bomalaski meant that "the clinical medical evidence does not clearly support a severe [physical] impairment" because the diagnosis is in doubt, then the comment ignores the possibility suggested by Dr. Schur that the Plaintiff might be suffering from some other rheumatoid condition, but is disabled nonetheless.  In any event, the first comment is neither a material mischaracterization as in Buffonge, nor a strong piece of evidence supporting Liberty's decision.

In contrast, the second comment has the potential to support Liberty's decision, but lacks sufficient evidentiary foundation. The first issue raised by the Plaintiff is the reasonableness of Liberty's use, and Dr. Bomalaski reliance upon, the labor market survey and vocational review completed in November 2002, instead of just GenRad's job description for Group Leader - Manufacturing and/or the DOT description for Inspection Group Leader, Printed Circuit Board Quality Control.  I decline to reproach Liberty for its use, and Dr. Bomalaski's reliance upon, the labor market

survey and vocational review because the Disability Policy
charged Liberty with determining whether the Plaintiff's
disability prevented her from performing "the material and
substantial duties of [her] own occupation" "as it is normally
performed in the national economy."  Furthermore, the vocational
case manager who provided the DOT description emphasized that it
is a "basic description without input from a vocational
professional.  If a claim determination is being considered on
the basis of this information, [the] Disability Case Manager
should consider a referral for a complete Vocational Case Manager
file review and to determine if further investigation, including,
but not limited to, a Labor Market Survey is needed."

In any event, the difference between the three occupational
documents is quite minimal.  Based on the labor market survey,
the vocational consultant found that the physical demands would
be considered sedentary to light with occasional lifting up to 20
lbs.  The other two documents list very similar physical
requirements with respect to lifting, except that GenRad's
description lists occasional lifting up to 25 lbs and the DOT
description lists "Strength: Light - Lifting, Carrying, Pushing,
Pulling 20 Lbs. occasionally, frequently up to 10 Lbs., or
negligible amount constantly."  I find the debate about what
weight the Plaintiff might need to lift occasionally to be for
the most part irrelevant and to miss the point.  The only doctor
that made any reference to whether the Plaintiff could do the

lifting required by her occupation was Dr. Bomalaski.  Neither
Dr. Goodman nor Dr. Schur mentioned her inability to lift certain
weights as part of the reason she is disabled from work.
Focusing on the weight element, ignores the true issue over which
Dr. Goodman, Dr. Schur and Dr. Bomalaski disagree, namely can the
Plaintiff work full-time in her occupation despite general
fatigue and muscle pain symptoms?

The amount of standing, sitting and walking is more relevant
to this question, although the real question at bottom is whether
or not she can do anything for eight hours.  GenRad's job
description said nothing about whether the Group Leader -
Manufacturing Inspection position requires employees to stand for
long periods of time or whether the position was primarily
sedentary.  The DOT description suggested that the
responsibilities for Group Leaders for Printed Circuit Board
Quality Control "[c]an include walking and or standing frequently
even though weight is negligible."  The vocational consultant's
report is even more specific: "the physical demands would be
considered sedentary to light work with occasional standing,
walking and bending.  The opportunity to intermittently change
positions from sitting to standing and walking is typically
provided during the course of the workday."  Thus, I find that it
was reasonable for Dr. Bomalaski to focus on whether the medical
reports and the other evidence before him indicated whether or
not the Plaintiff could function "primarily in a sedentary

environment."

The second issue is whether Dr. Bomalaski's answer to that inquiry is reasonable under a heightened standard of review. Dr. Bomalaski admitted in his report that "[l]imitations of ability to function are difficult to assess related to Ms. Denmark's impairment[.]" Yet, he found that she could function in a primarily sedentary environment for an eight hour work day, subject to the functional limitations and physical restrictions listed in the Functional Capacities Form. The only evidence he cites to support his evaluation is the surveillance evidence. The Plaintiff's three-hour errand run, which included grocery shopping -- and therefore walking, standing, lifting and pushing -- for more than an hour could reasonably support his conclusions regarding her ability to do occasionally many of the activities identified by the action verbs listed. What this evidence does not reveal is whether or not she can perform her duties for a full work day on an ongoing basis. The only evidence on this point in the file is the Plaintiff's own Activities Questionnaire, Dr. Goodman's uncorroborated conclusion that "[s]he is also disabled by exhaustion and myalgia which makes it difficult for her to stay at work for any appreciable amount of time", and one interpretation of Dr. Schur's opinion, namely that she is disabled from work and taking care of her household because of stamina and deconditioning issues. Even though neither Dr. Goodman nor Dr. Schur point to 'objective evidence'

supporting their opinions about the Plaintiff's ability to perform her duties for a full work day on an ongoing basis, this limitation undermines Dr. Bomalaski's conclusion.

4. <u>Nurse Kaye's Analysis</u> - To evaluate the Plaintiff's STD and LTD claims, Nurse Kaye, a Liberty Disability Case Manager, reviewed her medical records and sought additional opinions.  I evaluate the reasonableness of her analysis of the evidence favorable to the Plaintiff and her recommendations.

Nurse Kaye found Dr. Goodman's assertion that the Plaintiff is "unable to stand for long duration at work" to be "not supported by the physical job demands of her job."  She also found that his report did not support the Plaintiff's restrictions and limitations and requested a peer review "to fully define" the Plaintiff's condition and to "determine if [the restrictions/limitations] are supported."  These remarks are reasonable for the reasons discussed in the preceding sub-section.

With respect to Dr. Schur's opinion, Nurse Kaye found that it is limited in scope because his "inferences [in]to the status of [the Plaintiff's] conditions 6 months previous cannot be accurately assessed."  She explains that the Plaintiff "is noted to be severely deconditioned as of 4/02, most likely as a result of interrupted functional activities, & this could certainly have affected Dr. Schur's assessment.  His conclusion that [the Plaintiff] is on excessive cardiac medications, with unclear

indications, may be an additional contributing factor to [the Plaintiff]'s reports of fatigue. ... [The Plaintiff] may be self-limiting her work or social activities, with no objective medical basis to support [restrictions/limitations] from 10/3/01 - 4/12/02." Contrary to the Plaintiff's suggestions, I find that questioning the probative value of Dr. Schur's opinion because his "inferences [in]to the status of [the Plaintiff's] conditions 6 months previous cannot be accurately assessed" is a reasonable determination when read in the context of her explanation for the statement. Thus, Nurse Kaye's analysis disputes Dr. Schur's conclusion that the Plaintiff cannot perform the material and substantial duties of her own occupation.

5. <u>Conclusion</u> - The administrative record here contains conflicting medical opinions about the degree of the Plaintiff's restrictions and limitations. On the one hand, there is Dr. Goodman's conclusion that the Plaintiff "is also disabled by exhaustion and myalgia which makes it difficult for her to stay at work for any appreciable amount of time." This conclusion, although "unelaborated", <u>see</u> <u>Brigham</u>, 317 F.3d at 84, remains unchallenged in the administrative record. On the other hand, there are reasons in the record discussed above that support Liberty's doubts with respect to the Plaintiff's self-reported limitations, Dr. Schur's opinion that she is disabled from work, and Dr. Goodman's opinion that "[s]he is unable to perform this work as she is unable to be on her feet for the amount of time it

takes to perform her job adequately."  Furthermore, there is Dr.
Miller's uncontradicted opinion that "[t]here are no documented
objective physical exam findings that support a decrease or
significant change in this patient's physical condition" around
the date of disability and Dr. Bomalaski's not fully supported,
although still relevant, opinion that the Plaintiff "is capable
of working full time in a primarily sedentary position within the
limitations and restrictions noted on the Functional Capacities
Form."

     To draw a conclusion from this record, I turn to the words
in Boardman.  "Throughout the administrative process, [Liberty]
advised [the Plaintiff] of her failure to show how her illness
rendered her unable to work, and informed her of her right to
submit additional evidence and documentation that she wished to
have considered. [][The Plaintiff]'s submissions on appeal
consisted primarily of arguments based on existing documentation,
with scant attention to her burden of showing that, due to her
illness, she was unable to perform the duties of her own ...
occupation. Given (1) the absence of adequate evidence in [the
Plaintiff]'s medical records indicating that [the Plaintiff]'s
condition imposed limitations on her ability to perform the
material and substantial duties of her own occupation ...
occupation for which she is suited, and (2) the evidence to the
contrary provided in [the surveillance evidence, the reports of
Dr. Miller and Dr. Bomalaski, and Nurse Kaye's analysis],

[Liberty]'s determination that [the Plaintiff] failed to meet the definition of ... Disability was not arbitrary or capricious." <u>Boardman</u>, 337 F.3d at 17.

### III. CONCLUSION

For the reasons set forth more fully above, I GRANT the Plaintiff's Motion to Complete the Record on Review as to Exhibits A and C, I DENY the Defendants' Motion to Strike, I DENY the Plaintiff's Motion for Summary Judgment, and I GRANT the Defendants' Motion for Summary Judgment.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE